UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALICE G. SVEGE, ADMINISTRATRIX, ET AL. | : | CIVIL NO.  3:01 CV 01771 (MRK) |
| | : | |
| Plaintiffs, | : | |
| VS. | : | |
| | : | |
| MERCEDES-BENZ CREDIT CORPORATION, | : | |
| ET AL. | : | |
| | : | |
| Defendants. | : | APRIL 13, 2004 |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PRECLUDE TESTIMONY OF PLAINTIFFS' EXPERTS, GLENNON, SERO, AND CLEMENT, AND FOR SUMMARY JUDGMENT**

Defendants Freightliner Corporation, Mercedes-Benz Credit Corporation and Detroit Diesel Corporation (hereinafter "Defendants"), respectfully submit this Memorandum of Law in support of their Motion to preclude the testimony of Plaintiffs' experts, John C. Glennon, Jr., David Clement, and Samuel Sero, and for Summary Judgment.  Should this Court preclude the testimony of Plaintiffs' expert Glennon, Defendants respectfully request that the court enter summary judgment in their favor.  Defendants respectfully submit, however, that the testimony of all three experts should be excluded.

I.    **Facts**

This is a products liability action arising from a motor vehicle accident.  In the accident a passenger automobile was struck by a tractor-trailer truck on the Pennsylvania Turnpike in Chester County, Pennsylvania on September 16, 1999 during Hurricane Floyd.  At the time of the accident, Scottie Wightman was operating a 1998 Freightliner tractor with a trailer leased by 4H Trucking and Helmsley Industries.  On or about September 15, 1999, Mr. Wightman was assigned to pick up a load of pipe in Fairless Hills, Pennsylvania and haul it to Dalton, Ohio.

(Deposition of Scottie Wightman, November 19, 2001 ("Wightman Dep.") at 20.)[1]  When

Wightman arrived in Dalton, Ohio on September 15, 1999, the customer refused the delivery

because the pipes were the wrong size.  (Id. at 104.)  Mr. Wightman was required to return to

Fairless Hills, Pennsylvania.  (Id. at 107.)  He began his return to Pennsylvania somewhere

around 2:30 or 3:00 a.m. the morning of September 16, 1999.  (Id. at 115.)  The roadways were

wet and he was preceding in Hurricane Floyd eastbound on the Pennsylvania Turnpike.  (Id. at

124.)  He had been driving trucks with engine brakes for 16 years.  (Id. at 28.)  His "best

recollection" is that he turned off the engine brake, also known as a "Jake brake," before he

entered the Pennsylvania Turnpike.  (Id. at 59.)  It was his habit not to use the engine brake when

driving on wet roads.  (Id. at 47.)  Mr. Wightman lost control on a roadway bend and downgrade,

crossed the median divide and struck the Svege vehicle that was proceeding Westbound.

      Plaintiffs claim that the accident was caused by the alleged fact that the engine brake was

engaged at the time, and that it was engaged at the time because Defendants failed to warn Mr.

Wightman not to use the engine brake under the conditions prevailing at that time.  Thus, in

order to prove their claim, Plaintiffs must prove that the engine brake was engaged at the time of

the accident and that the accident occurred because the engine brake was engaged.

## II.    The Daubert Requirements:  Qualifications, Reliability, and Relevance

      Ensuring the reliability of expert testimony is an essential function of the trial court.  This

Court functions as a "gatekeeper" for determining credibility, relevance and reliability of expert

testimony.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).  This

gatekeeper function is designed to permit admission of testimony that has a legitimate foundation

---

[1] Copies of relevant pages of Scottie Wightman's deposition are attached hereto as
Exhibit 1.

in science, technology or another specialized field of knowledge and to prevent admission of testimony that is merely cloaked in scientific or technical garb, i.e., evidence dressed up to present to a jury that would never pass muster before the witness' professional peers.

Rule 702 specifically provides that the expert opinion must be in the form of "scientific, technical, or other specialized knowledge" to assist a jury. *See* Fed. R. Evid. 702. In *Daubert*, "the Court explained that 'the adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.'" *FDIC v. Suna Assocs.*, 80 F.3d 681, 687 (2d Cir. 1996) (quoting *Daubert*, 509 U.S. at 590). Indeed, objectivity is a touchstone of reliability and trustworthiness. *See Daubert*, 509 U.S. at 590 n.9 (equating "evidentiary reliability" with "trustworthiness"); *see also* Fed. R. Evid. 102 (the Federal Rules of Evidence must be construed so "that the truth may be ascertained").

"*Daubert* . . . requires that judges make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 2000) (citing *Daubert*, 509 U.S. at 592-93); *see also Washburn v. Merck & Co.*, No. 99-9121, 2000 U.S. App. LEXIS 8601 at *4 (2d Cir. May 1, 2000). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. AMTRAK*, 303 F.3d 256, 267 (2d Cir. 2002).

The party presenting an expert has the burden of showing "that the expert's findings are based on sound science, and this will require some objective, independent validation of the

expert's methodology." *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (*on remand*). Both reliability and relevance must be proven before a court can admit scientific or technical testimony. *See Daubert,* 509 U.S. at 579; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending the *Daubert* inquiry to "testimony based on 'technical' and 'other specialized' knowledge"). A putative expert's self-validating conclusions that cannot be tested, have no known or ascertainable rate of error, and are not subject to meaningful review within the relevant community of experts and, therefore, do not constitute "knowledge" under Rule 702.[2] Expert opinions which are speculative or mere conjecture must be excluded because they cannot assist the jury as required by Rule 702. *See Zaremba v. GMC*, No. 03-7565, 2004 U.S. App. LEXIS 2422 at *6 (2d Cir. Feb. 13, 2004) (affirming District Court's exclusion of expert testimony that was based on "unsupported conjecture").

## III.    Plaintiff's Expert John C. Glennon, Jr.

It is respectfully submitted that Glennon's testimony should be precluded because it is both unreliable and irrelevant. In response to Defendant's initial Motion to preclude the testimony of Plaintiffs' experts and for Summary Judgment, Plaintiffs have submitted an Affidavit and a Supplemental Expert Report by Glennon. In this way, Plaintiffs, as well as Glennon himself, effectively concede that the methodology initially described by him as underlying his opinions is inadequate and unreliable. As further set forth below, Glennon now claims that his opinion regarding the cause of this accident was formed as a result of reviewing various publications and performing calculations. Because this contradicts his prior deposition

---

[2] The United States Supreme Court cases following *Daubert* continue to emphasize the need for reliable objective grounds to support expert testimony. *See, e.g.*, *Kumho Tire*, 526 U.S. at 149; *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998); *United States v. Scheffer*, 523 U.S. 303, 309-10 (1998); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146-147 (1997).

testimony, it should be disregarded for the purposes of this motion.  *Hayes* v. *New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, *by omission or addition*, contradicts the affiant's previous deposition testimony.") (emphasis added; citation omitted.)

It is respectfully submitted that Glennon is merely attempting to buttress after the fact those opinions that he reached in the manner reflected by his initial deposition testimony.  Even if the Court concludes that the research and calculations described in his subsequent deposition were actually part of the methodology by which Glennon formed his opinions, however, they fall far short of constituting a reliable methodology.  Despite claiming experience in performing the very tests that could confirm or disconfirm his new calculations, and despite being aware that defense experts have performed tests that evidently disprove his newly expressed theory that the anti-lock brake system ("ABS") is incapable of disengaging the service brake without the driver depressing the service brake pedal, Glennon has still failed to perform any tests whatsoever.  This is particularly striking, because the relevance of the opinions offered by Plaintiffs' other experts depends entirely on Glennon's assertion that the engine brake was on at the time of the accident and caused the skid, and Plaintiffs have the burden of proof.  Finally, Glennon's testimony is also irrelevant because its relevance depends on an unwarranted factual assumption.

**A.    Neither the Methodology Glennon Actually Used in Forming His Opinions, Nor the Methodology by which He Has Since Attempted to Buttress Them, Are Scientifically Valid**

**1.    Glennon's Actual Methodology**

Glennon performed no tests with respect to his opinions in this case.  (Deposition of John C. Glennon, Jr., May 2, 2003 ("Glennon Initial Dep.") at 105.)[3]  As further discussed below, his opinions were not based on any research or calculations.  Although he took various measurements for the purpose of doing an accident reconstruction, he did not in fact reconstruct the accident:

> Q.    Why did you measure the grade of the road?
>
> A.    That probably would have been for reconstruction purposes.
>
> Q.    Did you use that grade information to reconstruct the accident?
>
> A.    No, I did not.
>
> Q.    Why not?
>
> A.    I don't know.
>
> . . . .
>
> Q.    Why did you measure the curve?
>
> A.    Probably for reconstruction purposes.
>
> Q.    Is that the same reason you measured the median width?
>
> A.    Sure.

(Id. at 91, 93).

He did no "analysis of this accident to demonstrate the forces and the dynamic motion on the truck during the loss of control event."  (Id. at 106.)  He did no forensic mapping.  (Id. at 141.)  Although the accident took place during Hurricane Floyd, he made no effort to determine

_____

[3] Copies of relevant pages of Glennon's initial deposition taken on May 2, 2003 are attached hereto as Ex. 2.

-6-

whether there was standing water on the road at the time of the accident.  (Id. at 105.)  He

admitted at his initial deposition that he had not ruled out other possible causes of this accident:

> Q.     How did you rule out hydroplaning?
>
> A.     I don't think I ruled out hydroplaning.
>
> Q.     How did you rule out that Mr. Wightman was driving too fast?
>
> A.     I don't think I ruled that out.

(Id. at 109.)  This is particularly significant, because Glennon's primary opinion is that the

engine brake was the cause of the accident, and at his initial deposition he effectively admitted

that "the most common cause of loss of traction is driving too fast for weather conditions."  (Id.

at 109-10.)

       After he drafted a Supplemental Report and submitted an affidavit in response to

Defendants' Motion to preclude his testimony, Glennon's deposition was continued on February

23, 2004 ("continued deposition").  At that time, he asserted that, since the drafting of his

original report and his initial deposition, his only work involving this case was to draft his

affidavit and supplemental report and to help Plaintiffs' attorney Gilberg in his preparations for

various other depositions.  (Glennon Cont'd Dep. at 235.)[4]  This implies that all of the research

and calculations upon which he claims to have relied when forming his opinions were in fact

done prior to his forming of those opinions.  His May, 2003 deposition ("initial deposition")

testimony, however, clearly shows otherwise.

       At his initial deposition, Glennon admitted that he relied on no documents that were not

in his file at that time:

---

[4] Copies of relevant pages of Glennon's continued deposition are attached hereto as
Exhibit 3.

> Q.      . . . . Is there anything that you're relying upon in formulating your opinions in this case that you have not included and produced with respect to this file?
>
> MR. GILBERG:  You mean in terms of documents?
>
> MR. WILLIAMS:  Yes.
>
> A.      As far as documents, I don't believe so.

(Glennon Initial Dep. at 57.)  More specifically, he admitted that the only publications he reviewed prior to forming his opinions were copies of the Commercial Drivers License manual produced by the Motor Vehicle Administrators Association.

> Q.      Any other texts or publications that you looked to in formulating your opinions in this case?
>
> A.      Not that I can think of.

(Id. at 58-59.)  The various documents upon which he claimed to have relied during his continued deposition, including the Northwestern University publication discussed below, were admittedly not in his file when he formed his opinions.  (See Glennon Cont'd Dep. at 197-98 (asserting that he relied on various publications); Id. at 226 (admitting that these were added to his file after his initial deposition and after issuing his initial report); Id. at 231-32 (same).)

In addition, Glennon admitted at his initial deposition that he had formed his opinions without having done any calculations:

> Q.      Are there any calculations that you did in this case that are not part of this file?
>
> A.      I didn't do any calculations, no.

(Glennon Initial Dep. at 59.)  He specifically admitted that he had done no analysis of vehicle speed (Id. at 141), and had not attempted to determine the coefficient of friction (Id. at 105; see also Id. at 140-41.)

Furthermore, Glennon has no prior experience in cases involving engine brakes (Id. at 52), and he does not rely upon any of his experience in specific driving tests in formulating his

opinions in this case.  (Id. at 133-34.)  He does not know what the torque of the drive shaft was at the time he claims the loss of traction occurred.  (Id. at 107.)  He does not know what the applied torque on the axle was at that time, and he does not know what the applied torque on the axle would be without the engine brake (Id. at  107-08.)  In short, Glennon has not acquired sufficient knowledge to enable him to form a scientifically valid opinion in this case.

Finally, because Glennon's opinions were not based on any testing, calculations, or research, they do not meet established standards for reliability.

> The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community . . . .

Amorgianos v. AMTRAK, 303 F.3d 256, 266 (2d Cir. 2002).  Glennon's opinions have not been tested, and they do not have a basis that is capable of being subjected to peer review, that can be assessed for rate of error, that has a known rate of error, or that is generally accepted in the relevant community.

## 2.    Glennon's Subsequent Attempts to Buttress His Opinions

Even if the Court chooses to credit the account of his methodology given by Glennon after his initial deposition, his opinions should nonetheless be found unreliable under *Daubert* standards.  Glennon still does not claim to have done any testing whatsoever, nor does he claim to have done other investigation, such as an accident reconstruction, that might enable him to reach a valid opinion.  He does now claim to have done calculations and research in support of his opinions, but, as set forth below, he has misread the text upon which he relies and has based his primary calculation – his calculation of the coefficient of friction – on three assumptions, each of which is either demonstrably false or otherwise clearly unwarranted under the

-9-

circumstances.  Equally importantly, he has not performed standard tests of the coefficient of friction to confirm or disconfirm his assumptions, does not rely on any tests involving the coefficient of frictions for trucks, and has not permitted peer review of his calculation method.

Glennon's method of determining the coefficient of friction began by taking the lowest published estimate, which referred to the coefficient of friction for passenger vehicles.  (See Glennon Cont'd Dep. at 295 ("Well, the .19 is adjusted for the downgrade and it came from the lowest friction, from one of these sources."))  He then reduced the lowest published estimate by 25%, stating that this was appropriate because the present case concerns a truck rather than a passenger vehicle.  (Id. at 297.)  Because the lowest published estimate was .30, this reduction yielded a result of .22.  (Id. at 296-98.)  By no particular formula, he then reduced the .22 figure to .19 to account for the putative fact that the road had a 2.5% grade.  (Id. at 306.)  On page 30 of his supplemental report, he offers the opinion that the coefficient of friction was probably less than .19, due to the "extreme conditions" present at the time of the accident.  (Glennon Supp. Report at 30.)[5]

Thus, Glennon has taken the lowest published estimate of coefficient of friction and reduced it for three reasons.  First, he believed that it should be reduced by 25% because the vehicle was a truck; second, he further reduced it to account for a road gradation of 2.5%; and third, he further reduced it to account for "extreme conditions."  None of these reductions is valid.

First, Glennon's belief that the coefficient of friction should be reduced by 25% to account for the fact that the vehicle involved is a truck is simply incorrect.  His only source for this belief is the Traffic Accident Reconstruction Manual published by Northwestern University.

-10-

(Glennon Supp. Report at 28; Glennon Cont'd Dep. at 304-05 (stating that he has no other basis).)  That manual states on page 78-22 that a truck has approximately 75% of the coefficient of friction of a passenger vehicle on dry roads, "approximately the same on a wet surface . . . ." (Id.; Baker Aff. ¶ 5[6]; Glennon Cont'd Dep. at 286.)  Glennon interpreted this to mean that a truck has approximately 75% of the coefficient of friction of a passenger vehicle on wet roads. (Glennon Cont'd Dep. at 286-87.)  However, the principal author of the publication cited has provided an affidavit indicating that his intent was to indicate that a truck has approximately the same coefficient of friction on a wet surface as a passenger vehicle does, and that he did not intend to suggest that on wet surfaces heavy trucks have 75% of the coefficient of friction of passenger vehicles, "because that is not true."  (Baker Aff. ¶¶ 5-7 (emphasis added); see also Fricke Aff. ¶ 3 (identifying Kenneth S. Baker as the principal author of this publication)[7].) Glennon did not check with the authors of the cited study to determine whether his interpretation was correct.  (Glennon Cont'd Dep. at 287.)   In addition, his method of calculating coefficients of friction has not been subject to peer review, because he has not shared his method with others, nor has he ever described it in any publication.  (Id. at 305-06.)

Glennon provides no basis for his opinion that a road gradation of 2.5% would result in another 13-14% reduction in the coefficient of friction, from .22 to .19.  This is immaterial, however, because his determination that the road gradation was 2.5% is without basis and is contrary to the most reliable sources.  This measurement is without basis because Glennon did not take rudimentary steps to provide a basis:

---

[5] Copies of relevant pages of Glennon's Supplemental Report are attached hereto as Exhibit 4.

[6] A copy of Kenneth S. Baker's Affidavit is attached hereto as Exhibit 5.

[7] A copy of Lynn Fricke's Affidavit is attached hereto as Exhibit 6.

Q.    Do you have any reference points on your measurements so that I can go back and verify your measurements of the grade?

A.    Not a reference point.

Q.    You have no reference points?

A.    No.

Q.    How do you know specifically where you took a measurement without reference points?

A.    I can't say, specifically.

Q.    As you sit here, you don't have a specific recollection of having done it back then?

A.    Not specifically where they were, no.

Q.    You would agree that your measurement of 2.5 percent is significantly higher than the turnpike maps; is that correct?

A.    Not significantly higher, slightly higher than that.

Q.    Well, the maps indicate 1.7 percent.

A.    Yes.  I have measurements that range from 1.5 up to about 3.3.

Q.    Okay.  But you can't give me the location so that I can go back and verify your calculations?

. . . .

A.    Not specifically I can't.

(Glennon Cont'd Dep. at 263-64.)  Even assuming that Glennon is qualified to determine road gradations, he has failed to follow a reasonable or reliable methodology in making such a determination in this case.

Moreover, as indicated above and in the following colloquy, he was aware that maps indicated that the pertinent stretch of road had a lower gradation.  Despite this, he did no calculation of the coefficient of friction that took into account these more reliable figures:

Q.    And is the 2.5 percent grade the grade of the road according to the road map?

A.    I believe the police, it was slightly lower than that, .17 -- I'm sorry, 1.7.

. . . .

-12-

Q.    And would the coefficient of friction be higher if it had been adjusted for 1.7?

A.    Slightly higher, yes.

Q.    Have you done that calculation?

A.    No, I have not.

(Id. at 306-07.)  This failure to account for the most reliable figures of which he was aware, or to use a method for taking his own measurements that could be replicated or verified, requires the conclusion that he has failed to use a reliable methodology in calculating the coefficient of friction.

Finally, Glennon asserts that the coefficient of friction should be determined by making one more reduction to account for "extreme conditions," specifically "extreme weather, large amounts of water on the road, things like that."  (Id. at 307.)  He acknowledges, however, that the figures from which he takes this reduction are based on wet conditions to begin with.  (Id. at 308.)  This further reduction is based on a police report of the accident that reported heavy rain. (Id. at 309.)  However, no flooding or standing water was reported.  (Id.)  Glennon says he "would suspect" that there would be standing water, but he has done no analysis of the drainage of this area.  (Id. at 308; see also id. at 167.)  Evidently, rather than attempting to determine the drainage pattern or the rate of rainfall, he has simply assumed that the drainage was poor enough to result in substantially more water on the road than would ordinarily occur in the rain.

Although he takes the position that the coefficient of friction for trucks is substantially different than that for other vehicles, none of the research actually relied upon by Glennon includes test data for trucks:

Q.    . . . . My question is, with respect to actual data on a truck test, do you have any such material that you have relied upon?

A.    Not specifically with regard to a truck test.

-13-

(<u>Id.</u> at 281-82.)  More importantly, although he says he tests coefficients of friction "[a]ll the time," and describes various means by which this can be done, and by which he has done it himself in other cases, he admits he did no such test in this case.  (<u>Id.</u> at 311-12.)  Finally, he has not permitted peer review of his method of determining the coefficient of friction, because, as stated above, he has not shared his method with others, nor has he ever described it in any publication.  (<u>Id.</u> at 305-06.)  Therefore, Glennon has still failed to meet the standards for reliability established  by the Second Circuit.  *See Amorgianos*, 303 F.3d at 266.

> **3.    Glennon Has Not Attempted To Validate His Opinion That The ABS Can Not Disengage the Engine Brake Without Application Of The Service Brake**

Listed among Glennon's opinions in his Supplemental Expert Report is the opinion that "[a]bsent an application of the service brakes, the ABS system would not have detected an impending wheel lockup or a full wheel lockup and the ABS event that disables the engine brake would not have occurred."  (Glennon Supp. Report at 38.)  Although he purports to have determined this "[w]ith a reasonable degree of certainty as an Automotive Technologist," Glennon failed to perform any tests that could have confirmed or disconfirmed this, although (a) he was aware that it could be tested, and (b) he was aware that Defendants' expert Bruce B. Koepke had performed tests that evidently demonstrated that Glennon's opinion is wrong:

> Q.    Sir, with respect to your opinions in this case, you've read the deposition testimony of Mr. Koepke and Mr. Howerton; is that correct?
>
> A.    Yes, I have.
>
> Q.    And you're aware that it is their opinion that the Jake brake would be disengaged without an application of the service brake?
>
> A.    I have read that opinion, yes.
>
> Q.    Have you tested that?
>
> A.    Have I tested it?  No.

. . . .

Q.     All right.  So if it is the opinion of Mr. Koepke and Mr. Howerton that the ABS
       sensor disengages the Jake brake without service brake application, you disagree
       with that?

A.     I disagree with it, yes.

Q.     But you would agree it is something you could test?

. . . .

A.     It's something that could be tested.

(Glennon Cont'd Dep at 188-90.)

Defendants' expert Bruce B. Koepke testified at his July 22, 2003 deposition that he had observed or performed two tests demonstrating that, even though Mr. Wightman apparently did not depress the service brake pedal, the Freightliner's ABS would have disengaged the engine brake when it sensed an impending lockup.  The first was a "bench test" observed by Mr. Koepke.  (See Koepke Dep. at  35-36.)[8]  As succinctly described by Defendant's expert William M. Howerton, "they set up a bench where they actually turn the wheel sensors, and that they will activate the ABS system.  And that's independent of the application of a service brake." (Howerton Dep. at 184.)[9]

Secondly, as he explained at his deposition, Koepke demonstrated that simply driving a truck over railroad tracks created an "ABS event" sufficient to "deactivate the Jake brake" without application of the service brake pedal.  (Koepke Dep. at 83.)  This demonstrates that Glennon's opinion quoted above – that the ABS cannot disengage the engine brake unless the driver depresses the service brake pedal – is wrong.  Although Glennon was aware that these tests had been performed, and agreed that his theory could be tested, he simply chose not "to do

---

[8] Copies of relevant pages of Koepke's deposition are attached hereto as Exhibit 7.

[9] Copies of relevant pages of Howerton's deposition are attached hereto as Exhibit 8.

any test to determine whether the ABS system would shut off the Jake brake without service

brake application." (Glennon Cont'd Dep. at 194.)

Not only does Glennon's unwillingness to put any of his theories "to the test" – even

when he is aware that other experts' tests indicate that his theories are incorrect – strongly

suggest his own lack of faith in his own theories, it also clearly and conclusively demonstrates

that he has not followed a reliable methodology.  The purpose of *Daubert's* gatekeeping

requirement is "to make certain that an expert . . . employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire

Co.*, 526 U.S. at 152.  Glennon has failed to meet this standard.

### 4.    Glennon's Opinion Regarding The Popping Noise Heard By Wightman

Glennon asserts, in his Supplemental Report, that "[h]ad Wightman testified that he did

turn off the engine brake,"  that testimony would be in conflict with his testimony "that he heard

a popping noise." (Glennon Supp. Report at 32.)  Evidently, Glennon now takes the position that

the popping noise heard by Wightman must have been made by the engine brake.  This is

contrary to the opinion he expressed at his first deposition:

Q.    Can there be a popping noise as a result of hydroplaning?

A.     I cannot imagine what would cause the noise.

Q.    Did you believe Mr. Wightman about the noise or not?

A.    I don't know.

(Glennon Initial Dep. at 144.)  Either Glennon formed his opinions without having adequate

familiarity with engine brakes, or there are in fact alternative explanations for the popping noise

reported by the driver.

**B.      Glennon's Opinions Are Based on an Unwarranted Factual Assumption**

Glennon's primary opinion is that the loss of vehicle control in this case was caused by use of the engine brake.  However, the primary assumption underlying this conclusion – that the engine brake was on in the first place – is contradicted by the testimony of the driver, who would be in the best position to know.  The driver, Mr. Scottie Wightman, testified that to "the best of [his] memory, [the engine brake was] off."  (Wightman Dep. at 47.)  He stated that "[i]n normal circumstances you would have the engine brake on, and on wet road conditions you'd have it off."  (*Id.* at 47.)  Plaintiff's counsel questioned again about this issue:

> Q.      Now, at any point did you turn off the engine brake?
>
> A.      I don't even recall if the engine brake was on.
>
> Q.      Okay.  You told us that.  But I'm saying that, do you recall at any time ever turning off the engine brake?
>
> A.      Before the accident?  During the accident?
>
> Q.      Right.
>
> A.      The best of my recollection, I turned it off when I entered the Pennsylvania Turnpike earlier that morning on the Ohio-Pennsylvania line.

(<u>Id.</u> at 58-59.)

Other evidence also suggests that the driver would surely be aware if the engine brake in the truck was on.  An engine brake makes a loud noise when it is on.  (<u>Id.</u> at 121.)  The noise is loud enough that some towns have erected signs ordering that truckers not use engine brakes when traveling through those towns.  (<u>Id.</u>)  Plaintiff's expert David Clement described this noise during his deposition.  "[M]y first experience was with one that was in a residential area making

a tremendous amount of noise that I knew shouldn't normally be happening, and I asked him what that was and he said that's his jake brake." (Clement Dep. at 51.)[10]

Glennon discredits this evidence and testimony. He opines that the engine brake was on at the time of the accident, basing his opinion on 1) his "analysis of the loss of control dynamics," and 2) his observation that one of the two engine brake switches was in the on position when he inspected the truck. (Id. at 80.) Glennon's "analysis of the loss of control dynamics" cannot be a sufficient ground for establishing that the engine brake was on, because, as set forth above, there are no indications of reliability for Glennon's method of reaching that conclusion. Regarding Glennon's observations of the control panel in the truck, Glennon's inspection took place on November 6th, approximately six weeks after the accident took place. (Id. at 80-81.) He noted that the second engine brake switch was broken off. (Id. at 82.) He could not say that the second switch on the engine brake was not broken in the accident. (Id. at 84.) He did not know if the driver wore a seat belt during the accident and did not know if the driver's body was moving around in the cab during the accident (Id. at 117), and could not say that the second switch on the engine brake was not broken in the accident. (Id. at 84.) Thus, Glennon was unable to rule out the switch being in the "on" position because of impacts during the collision. (Id.) It is respectfully submitted that there is inadequate basis for the assumption that the engine brake was on, and that Glennon's opinion is therefore irrelevant.

## IV.    **Plaintiff's Expert Samuel J. Sero**

Sero's opinions are relevant only if Plaintiffs can establish that the engine brake was on at the time of the accident and, more importantly, caused the accident. Sero has no independent

---

[10] Copies of relevant pages of Clement's deposition of May 28, 2003 are attached hereto as Exhibit 9.

-18-

basis for drawing these conclusions, because he did no analysis to determine whether the engine

brake caused the accident:

> Q    And you've done no analysis to determine what the – whether or not the engine
>      brake actually caused the skid in this case?
>
> A    No.

(Sero Dep. at 62.)[11]  As discussed below, Plaintiffs' third expert, David E. Clement, Ph.D., also

has no independent basis for concluding that the engine brake caused the accident, but instead

assumes that this is true based on Glennon's testimony. Thus, Sero's opinions are entirely

dependent on the assumption that Glennon's opinion is accurate and reliable.  Where the

opinions of one proffered expert are entirely dependent on the opinions of a second proffered

expert whose testimony is deemed inadmissible, the testimony of both must be precluded.  *See*

*Zaremba*, 2004 U.S. App. LEXIS 2422 at *10.  Because Glennon's opinion is inadmissible under

*Daubert* standards, Sero's opinion testimony is inadmissible as well.

     In addition, Sero should not be permitted to submit to the jury any of the opinions listed

in his report, because "[a]n expert must . . . stay within the reasonable confines of his subject

area, and cannot render expert opinion on an entirely different field or discipline."  *Lappe v. Am.*

*Honda Motor Co.*, 857 F. Supp. 222, 226-27 (N.D.N.Y. 1994), *aff'd mem.*, 101 F.3d 682 (2d Cir.

1996).  Rule 702 requires that the expert possess knowledge of his topic which will assist the

trier of fact.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 588.  It is respectfully submitted that

Sero should not be permitted to offer opinion testimony, because he is concededly unqualified to

give the opinions listed in his expert report, they lack a reliable methodology, and, for the

numerous reasons listed below, they are irrelevant.  In addition, any new opinion regarding the

---

[11] Copies of relevant pages of Sero's deposition of May 30, 2003 are attached hereto as
Exhibit 10.

electronic <u>feasibility</u> of additional warnings is irrelevant in light of the lack of admissible testimony, by either Clement or Sero, regarding the warnings themselves.  Furthermore, Sero's opinion that the engine brake can be disengaged only by the service brake is not the product of a reliable methodology, because, like Glennon, Sero has not tested it.

### A.    Sero Is Not Qualified

### 1.    Sero's Opinions Regarding Warnings

Sero is evidently confused about the nature of his own opinions and testimony.  In response to Defendants' assertion, in their initial Motion to preclude Plaintiffs' experts, that he is completely unqualified by any training or experience to provide expert testimony on the subject of warnings, Sero submitted an affidavit in which he bluntly admits that this is true.  In the affidavit, he states that "I claim only expertise in the field of electronic engineering" and "I do not claim to be a warning expert, and my function here is to show that this option existed, and I leave to David E. Clement, Ph.D., the human factors psychologist, to express any opinions in this matter."  (Sero Aff. at 3, 13.) [12]

Sero thus maintains that he has <u>not</u> given opinions on the subject of warnings, and states that, to the contrary, he has "been retained . . .with regard to [his] expertise as an electrical engineer to evaluate and analyze the electrical systems and the electronics of the Freightliner tractor that was involved in the accident . . . and to determine, within a reasonable degree of engineering certainty, whether any form of failure or lack in the electronic controls . . .caused or contributed to the accident."  (<u>Id.</u> at 2.)  Thus, he claims that Defendants' assertion that he is not qualified to give opinions regarding warnings "is an assertion that has no rhyme or reason."  (<u>Id.</u> at 3.)

---

[12] Sero's August 5, 2003 Affidavit is Exhibit 11.

All three of the opinions listed in his report, however, are to the effect that the

Freightliner was defectively designed because the warnings and other information provided

regarding the ABS and engine brake were inadequate:

> Freightliner and Detroit Diesel were had a defectively designed system for the following reasons:
>
> 1)    They did not incorporate a simple indicator lamp into the dash board location of the engine brake control to indicate the operating condition of the engine brake. A condition which the system was already designed to accommodate.
>
> 2)    The fact that the vehicle was equipped with ABS was not prominently displayed for notification to the operator.
>
> 3)    Warning regarding the need to disengage the engine brake and use only the ABS service brake in wet conditions was not prominently displayed.

(Sero Opinion at 3.)[13]  These are plainly all opinions regarding the adequacy of warnings,[14]

unrelated to electronics, as are all of the other remarks made by Sero under the heading

"**Opinions**."  (See id.)

Sero expressed additional opinions regarding warnings at his deposition that are also

unrelated to electronics, including the following:

> Q.    . . . did you do anything to determine whether the lamp would, in fact, result in better information to the truck operator?
>
> A.    Well, some data is better than no data at all, in this case it would have been data as opposed to nothing.
>
> . . . .
>
> Q.    . . . And would you agree if Mr. Wightman was aware that there was ABS in the tractor that your second opinion would not be relevant to this particular accident?

_____

[13] A copy of Sero's original Expert Report is attached hereto as Exhibit 12.

[14] Because the purpose of an indicator lamp would be to provide information to the driver in the interest of safety, discussion of Sero's opinions refers to both his opinions regarding the need for warnings, and his opinion regarding an indicator lamp, as opinions regarding "warnings."  It is respectfully submitted that these subjects fall within the same area of expertise, with regard to which Sero claims no expertise.

A.   No.

Q.   And why not?

A.   Because whether he was aware when he first got in and started driving it and then gets into a panic situation, there is a whole world of difference involved there as to what the operator's reaction is going to be.  Without having something in front of you that reminds you all the time, especially when you get into a panic situation, then, no, it really wouldn't have any bearing one way or another.

(Sero Dep. at 87, 89-90.)  In fact, in his Supplemental Expert Report of February 3, 2004, Sero has added new opinions regarding warnings.  These, too, are unrelated to electronics:

The transfer switch and indicator light, along with a decal describing the use of the switch could be placed at the engine brake switch location on the dash.  The decal would state: **Place switch in this position for inclement conditions, this position for normal conditions**, or words/symbols to that effect. . . .
It would seem only prudent that any tractor trailer which employs ABS should be prominently labeled that it does and that any engine braking system should be prominently signaled of its operating conditions at any time.

(Sero Supp. Opinion at 14 (underscore added; bold in original).)[15]

Thus, Sero is apparently unable to differentiate between testimony regarding the adequacy of warnings and testimony regarding the electronic feasibility of electronic warnings.  This is made particularly clear by the fact that he continues to formulate and issue new opinions regarding decals and labels.  If it could be said with confidence that he was aware of the difference, it would be reasonable to conclude that he had in fact withdrawn all of his opinions regarding warnings, including all of his numbered opinions cited above, by conceding his lack of qualification to testify on that subject.

It is respectfully submitted that Sero's opinions regarding the adequacy of warnings are plainly inadmissible under *Lappe* because they are outside his area of expertise.  *See Lappe*, 857

_____

[15] A copy of Sero's Supplemental Expert Report is attached hereto as Exhibit 13.

F. Supp. at 226-27. In addition, Sero's inability to understand the nature and basic limits of his claimed area of expertise – electronics – strongly suggests that, regardless of whether he has been permitted to testify regarding electronics in other cases, he is not qualified to give opinion testimony on that subject, either.

### 2.    Sero's Opinion Regarding the ABS and the Engine Brake Itself

Although it is not listed among his opinions in his Expert Report, Sero has expressed the view that the ABS system in the truck involved in the accident could not have disengaged the engine brake unless the driver depressed the service brake pedal, and that this made the truck unreasonably dangerous. He did not, however, consider this one of his "opinions":

> Q.    But just so I understand, your position is that the tractor that was involved in this subject accident, that ABS system did not have the - - could not disengage the engine brake without depressing the service brake?
>
> A.    To the best of my knowledge that's true.
>
> Q.    And if that is not true does it in any way affect your opinions in this case?
>
> A.    No.

(Sero Dep. at 103-04.) This may be due to his lack of expertise in this area.

Sero lacks the expertise required for forming reliable opinions regarding engine brakes. Indeed, he flatly admits this:

> Q.    . . . . But you don't hold yourself out as an expert on the use of engine brakes; is that correct?
>
> A.    No, I do not.

(Id. at 106.) In addition, Sero has no background in mechanical, as opposed to electrical, engineering. (Id. at 108.) He has never previously worked on a case involving engine brakes (id. at 41), or even a case involving the electrical system of a tractor-trailer, nor had he ever "inspected any specification drawings or description of engine brakes." (Id. at 59.) Sero does

-23-

not claim expertise in tractor driving (<u>Id.</u> at 107) and does not have a commercial driver's license. (<u>Id.</u> at 50.) He has never been trained or employed as an auto mechanic, nor has he ever designed components of an ABS or engine brake. (<u>Id.</u> at 49.) Although he has worked on other cases involving automotives, and, specifically, sudden acceleration, for those cases he brings a qualified colleague "to do the mechanical analysis." (<u>Id.</u> at 17, 98.)

In summary, of all the opinions Mr. Sero has expressed in the course of this litigation, he is qualified as an expert, at most, on the subject of whether additional <u>electronic</u> indicator – an indicator lamp – would be electronically feasible. He is not even qualified to express a view regarding whether such a lamp would be needed or even helpful.

**B.      Sero Has Not Followed A Reliable Methodology**

Sero's lack of clarity regarding the subject of his own testimony also reflects the lack of a reliable methodology with regard to all of his opinions, including those newly added opinions that do not concern the adequacy of warnings. Other facts also demonstrate his failure to use a reliable methodology.

**1.      Sero's Opinions Regarding the Adequacy of Warnings**

In a recent case, the Second Circuit held that the plaintiffs had satisfied none of the four factors identified in *Daubert* with respect to their expert's testimony about a safer alternative design, because

> (1) [the expert] has not tested his design; (2) he has not subjected it to peer review or publication; (3) his design does not have a "known rate of error," since it has not been tested; and (4) [the expert] has not shown general acceptance either of his design or of his methodology. Numerous courts have excluded expert testimony regarding a safer alternative design where the expert failed to create drawings or models or administer tests.

*Zaremba*, 2004 U.S. App. LEXIS 2422 at *10 (citations omitted). Sero has not met these standards.

Although he alleges that the truck at issue suffered from design defects, Sero has not created any alternative designs. Although he claims that the truck should have had an engine brake indicator lamp, he has not designed one, or even determined where it would be located, because he "didn't feel it was necessary." (Id. at 86.) Similarly, although he claims that the warnings provided were inadequate, he has not designed any alternative warning, and does not intend to do so. (Id. at 93.) Consequently, he has not tested any such design or submitted any design or tests for peer review. More specifically, he has admitted that he has done nothing "to determine whether [additional warnings] would have changed Mr. Wightman's actions at the time of the accident." (Id. at 117-18.) Indeed, he has performed no tests of any kind with regard to this case. (Id. at 44.) In summary, his methodology, insofar as he had one, lacks any indicia of reliability. *See Zaremba*, 2004 U.S. App. LEXIS 2422 at *6.

This is made still more clear upon considering each of his opinions individually. As noted above, Sero's first opinion was that the truck was defectively designed because it lacked an engine brake indicator lamp. He was unable to identify any methodology underlying that opinion:

Q.   . . . . did you do anything to determine whether the lamp would, in fact, result in better information to the truck operator?

A.   Well, some data is better than no data at all, in this case it would have been data as opposed to nothing.

Q.   Okay. My question was did you do anything to determine or try to assess whether the lamp would provide more information to the operator?

A.   Other than common sense, no.

Q.   Okay. Have we discussed your basis for your first opinion, is there anything else on which you rely?

A.   Not that I can think of.

(Id. at 87.)

Similarly, when asked the basis for his second opinion, that the truck was defectively designed because the fact that it was equipped with ABS was "not prominently displayed," he stated only that "a driver and operator should know when they get into a rig what safety features or lack thereof they're going to have to deal with." (Id. at 88.) Finally, regarding his third opinion, that the truck was defectively designed because "[w]arning regarding the need to disengage the engine brake and use only the ABS service brake in wet conditions was not prominently displayed," Sero admits that he has no opinion regarding where it should be displayed or what it should look like. (Id. at 94.) He does not know, and did not bother to find out, whether other trucks have such warnings in the cab. (Id. at 95.)

In short, none of Sero's opinions appear to have been the result of any sort of methodology whatsoever. He was evidently unaware of various considerations discussed by Clement, who does claim expertise in this area, that are necessary for evaluating the adequacy of warnings. For example, Sero apparently did not consider whether an indicator light might be "washed out" in daylight, as discussed by Clement, or whether the sound of the engine brake would in fact serve as a better indicator than a light that the engine brake was on. Nor does he appear to have considered whether Wightman's extensive experience as a driver would be relevant to the effectiveness of adding new warnings. Sero's lack of expertise in this area has prevented him from using reliable methods in drawing his conclusions.

### 2.     Sero's Opinions Regarding the ABS and the Engine Brake

Sero's opinions regarding the ABS and the engine brake are also not the product of a reliable methodology. Like Glennon, he did not test the theory that the ABS can only disengage the engine brake when the service brake pedal is depressed, despite the fact that this obviously

could be tested.  Indeed, as stated above, Sero performed no tests of any kind with regard to this case (id. at 44), and, specifically, performed no tests on any trucks.  (Id. at 63.)

Despite his admitted lack of expertise regarding engine brakes (see Id. at 106), he did not even do research regarding engine brakes before concluding that the ABS cannot independently disengage the engine brake:

> Q.    Are there any authoritative texts with respect to the engine brake?
>
> A.    Oh, I imagine there are.
>
> Q.    No, I mean with respect to these questions I'm talking about, what you view as authoritative.
>
> A.    Oh, I haven't really looked up any or read them.

(Id. at 107.)  Instead, he bases his conclusion only on "a very careful search of the documents in the Detroit Diesel Manuals."  (Sero Aff. at 9.)  In short, this opinion, too, lacks any indicia of reliability, due to Sero's failure to do adequate research in an area with which he did not have adequate familiarity and his failure to test a theory that the clearly subject to confirmation or disconfirmation by testing.

### C.    Sero's Opinions Are Not Relevant

As stated above, all of Sero's opinions are irrelevant because Plaintiffs have failed to offer admissible testimony demonstrating that the accident was caused by use of the engine brake.  (Sero Dep. at 97 (stating that his opinions are based on this assumption).)  In addition, Sero's opinions regarding the alleged inadequacy of warnings and the need for an indicator lamp are irrelevant for a variety of reasons for which, as discussed more extensively below, Clement's opinions to the same effect are also irrelevant.

Finally, as noted above, Sero himself asserts that, even if the ABS could independently disengage the engine brake, it would not affect his opinions in this case.  (Sero Dep. at 103-04.)

-27-

Apparently, Sero himself does not think his opinion on this subject is relevant.  In addition,

Sero's opinion regarding the ABS and the engine brake are irrelevant because neither he nor any

other expert has offered evidence regarding frequency with which accidents result from engine

brake use.  In other words, whether they are in fact "unsafe" to begin with has not been

established, although it is established that the use of the service brake is preferable in wet

conditions.

**V.     Plaintiffs' Expert David E. Clement, Ph.D.**

        Like Sero's opinions, Clement's opinions are relevant only if the engine brake was on at

the time of the accident and that the engine brake actually caused the accident.  Also like Sero,

Clement has no independent basis for drawing these conclusions.  Clement stated that "the

electrical engineer and the mechanical expert that were employed by [plaintiffs' counsel], to

evaluate this, both argue that" the engine brake was on at the time of the accident, and that he

"assume[d] these arguments to be correct . . . in formulating [his] opinion."  (Clement Dep. at

69.)  In addition, Clement testified that if Wightman's "best recollection" that the engine brake

was off at the time of the accident was correct, then "there is no basis for the lawsuit from

[Clement's] point of view" and that his opinions would be irrelevant.  (Clement Dep. at 16, 17,

62, 69, 147.)  As explained above, Glennon's opinion is inadmissible under *Daubert* standards.

Because Clement's opinions are all based on the assumption that Glennon's opinion is accurate

and reliable, all of Clement's testimony is inadmissible as well.  *See Zaremba*, 2004 U.S. App.

LEXIS 2422 at *10.

        Clement's testimony should also be precluded under *Daubert* as being both lacking in an

unreliable and irrelevant under the facts of this case.

A.    **Clement's Opinions Are Unreliable Because They Are Not Based On Any Reliable Methodology**

Each of Clement's opinions concerns the defendants' alleged failure to give to the driver adequate warning of the dangers of using the engine brake on wet pavement.  Specifically, Clement opines that the "[w]arnings regarding the use of engine braking in wet pavement conditions, as provided in owner's or operator's manuals were inadequate," and that the accident would most likely not have occurred if there was an additional and allegedly superior form of "active indication" regarding the engine brake in the cab.  (See Ex. 2 to Clement Dep. at 3.)[16] This Motion addresses separately Clement's opinions regarding warnings and those concerning "active indications" of engine brake status.

Like Sero, Clement has failed to meet the reliability standards for alternative designs  the Second Circuit set forth in *Zaremba*, as quoted above.  *See Zaremba*, 2004 U.S. App. LEXIS 2422 at *10.  As set forth below, Clement has not even created a design for an alternative warning or active indication of engine brake status, much less tested it or submitted it for peer review.  Furthermore,he is unfamiliar with the issues involved in the present case and has done no research or testing that might have enabled him to form educated opinions.  Instead, his opinions are based on assumptions that he chose not to test or research and that are either directly contrary to the record or are otherwise unwarranted.

1.    **Clement's Opinions Regarding Warnings**

Clement admits that he has no expertise with regard to engineering or accident reconstruction in general, or with regard to engine brakes or ABS systems in particular. (Clement Dep. at 15-16.)  Clement does claim to have expertise that is pertinent to warnings, and specifically in the area of "human factors psychology."  (Id. at 15.)  He has, however, done

no coursework in human factors and has never practiced as a clinical psychologist.  (Id. at 19.)

He disclaims any experience in designing warnings for consumer products and has never been

consulted by a trucking company.  (Id. at 22-23.)  He has not even prepared possible alternative

warnings for the present case, and was unable to identify any "specifications with respect to the

location, identity, size and color of the label" that he asserts should have been present on the

dashboard.  (Id. at 23, 32.)  He has never been part of any studies concerning the design of trucks

or truck cabs, nor has he ever published in the area of warnings on the dashboards of trucks or

other motor vehicles.  (Id. at 27.)   In fact, none of his publications relate to human factors in the

operation of machinery.  (Id. at 30-31.)  He has not reviewed his opinions in this case with other

experts.  (Id. at 27-28.)

　　　This is Clement's first case involving an engine brake.  (Id. at 29-30.)  He is not aware of

any other case in which an engine brake was allegedly responsible for an accident.  (Id. at

 30.)  He has never operated a truck with an engine brake, and to the best of his knowledge, has

never been a passenger in a truck that had such a brake.  (Id.)  He does not own a truck or have a

commercial driver's license.  (Id. at 47.)  His familiarity with the hazards associated with engine

brakes is limited to his review of documents provided as part of this case, including the

depositions and, he is "reasonably confident," the pleadings.  (Id. at 47.)

　　　Despite his lack of familiarity with the matters involved in this case, Clement has made

no effort to learn about them prior to formulating his opinions.  He did not compare the warnings

provided by Freightliner concerning engine brakes to those of any other truck manufacturer, and

does not know whether any other truck models have labels or warning concerning engine brakes

on their dashboards.  (Id. at 18-19.)  He has no "information as to how many hazards there are on

---

[16] Clement's opinion dated April 17, 2003, Exhibit 2 to his deposition is Exhibit 14.

this tractor that require warnings." (<u>Id.</u> at 106.)  Prior to forming his opinions in this case,

Clement did not even look at a photograph of the dashboard of the truck involved in this case.

(<u>Id.</u> at 18.)   Finally, although he has no personal experience or familiarity with engine brakes

and has done no research himself that is relevant to this case, he has not reviewed "any research

concerning human factors issues and the operation of motor vehicles" that is "specific to trucks."

(<u>Id.</u> at 47.)   Although he twice stated that whether there are any such studies is a "[w]onderful

question," he "*didn't do any research to determine if such studies exist.*"  (<u>Id.</u> (emphasis added).)

        Clement acknowledges that "the frequency of accidents, associated with a product or

component, factor[s] into whether [he] believe[s] the operator of that product is sufficiently

warned."  (<u>Id.</u> at 89.)  He is, however, unaware of any other accidents in which an engine brake

is alleged to have caused a jack-knife (<u>Id.</u> at 30, 89.), and his opinion that jackknifing is a

"predictable" result of engine brake use is not based on "any information concerning the

frequency with which jack-knifes occur as a result of the engine brake being on."  (<u>Id.</u> at 106.)

Despite not having any such information, he did not "do any research to determine if there were

any other accidents arising out of engine brakes as part of [his] work in this case."  (<u>Id.</u> at 27.)

Evidently, he simply assumed that the frequency was high enough to render existing warnings

inadequate.  This unwarranted assumption constitutes an unsupported conjecture upon which an

expert opinion cannot properly be based.  *See Zaremba v. GMC*, No. 03-7565, 2004 U.S. App.

LEXIS 2422 at *6; *FDIC v. Suna Assocs.*, 80 F.3d at 687.  Clement's failure to investigate the

frequency of such accidents before concluding that the warnings provided by defendants in this

case were inadequate shows that he did not engage in any methodology that meets *Daubert*

standards for reliability, because he did not employ "the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*, 526 U.S. at 152.

In addition, Clement has made no effort to examine a known body of research that would be relevant to this case. He understood that Wightman was a very experienced driver with over ten years experience driving tractors similar to the Freightliner at issue. (Id. at 66.) When asked if he was "aware of any research involving knowledgeable users and the effect of adding labels to products," Clement responded that "[t]here's a fair amount of research that's been done on a variety of circumstances involving things like that. The outcome is very specific as to what the product is, what the person's experience is, and exactly what kinds of information is being added via the labels." (Clement Dep. at 107-08.) When asked to identify any relevant studies concerning knowledgeable users, however, he could refer to no particular study on this subject (id. at 108); and, as noted above, he never bothered to check whether there was any relevant research specific to trucks.

Finally, Clement has acknowledged that whether someone reads and follows a warning depends on the individual's propensities as well as on how well designed the warning is, but admits that he has no information regarding Wightman's propensity to follow warnings or instructions, other than his deposition. (Id. at 109.) Clement's understanding was that Wightman did not read any operator's manual at any time. (Id. at 142-43.) Clement's failure or inability to determine whether an alternative warning would have affected Mr. Wightman's behavior renders his methodology unreliable. See Zaremba, 2004 U.S. App. LEXIS 2422 at *13 ("It is not enough for [an expert] to testify reliably that his hypothetical alternative design would, in some respects, have better performance than the [vehicle] involved in the accident; to provide relevant testimony, [the expert] must also establish that his hypothetical design would have resulted in greater safety in the . . . accident at issue.") Once again, Clement has evidently assumed, without any basis whatsoever, that Wightman is the sort of person who, despite extensive experience

-32-

with trucks similar to the Freightliner at issue, would have altered his behavior in response to a new warning concerning a danger of which he was already aware.

### 2.     Clement's Opinions Regarding "Active Indications"

Clement also offers opinions to the effect that "there was no active indication, much less warning, in the tractor cab regarding the active status of the engine brakes when they were in fact turned on (switch enabled)," and that, had there been such an active indication in the cab, this accident most likely would not have occurred.  (See Ex. 2 to Clement Dep. at 3.)  In support of this contention, he stated in his written report that "[t]here was no indicator light nor other mechanism to indicate that the engine brake was enabled other than the actual position of the switches."  (Id.)  When deposed, however, he admitted that the noise made by the engine brake also served as an "indication to the driver that the Jake brake is on," provided that it could be heard by the driver.  (Clement Dep. at 58.)  Furthermore, he was aware that the noise made by engine brakes is so loud that it has led some communities to prohibit their use in those areas.  (Id. at 61.)

Clement asserts that an adequate active indicator "could be . . . . anything that can change states and would specify the state when it was on."  (Id. at 82.)  This description would clearly include the noise made by the engine brake.  Indeed, Clement specifically testified that such a noise could well be the best possible indicator, but that he didn't have enough information to determine whether that was true in the present case:

> Q:     Is it your opinion that the Jake brake is not a noise sufficient to alert the operator even under any circumstances?
>
> A.     Under any conditions?  I have no information that would support that.
>
> Q.     What about rainy conditions?
>
> A.     Again, I don't have the information.  I understand it was windy and rainy and so forth.

-33-

Q.     So you don't have an opinion concerning that?

A.     Well, I have an inference, but I don't have an opinion about the loudness, the actual loudness level, no, sir.

Q.     And in human factors, is audible notice or an audible warning an acceptable method under some circumstances?

A.     Depending on what the warning is and the circumstances, it may be the best.

Q.     Certainly buzzers and bells are used; is that correct?

A.     Yes, sir.

Q.     Beepers are used on some machinery when they are put in reverse, for example?

A.     Right.  And actual language is used in terms of like cockpit warnings on aircraft.

Q.     And do you have an opinion as to whether or not the audible sound of a Jake brake is a warning or a notice to the operator that it's on?

A.     I believe statements have been made that you can tell the difference under the right circumstance.  I don't have an opinion that would expand that to say you can always tell the difference.

Q.     You just don't know?

A.     I don't know.

(Id. at 59-60 (emphasis added).)

Clement states that his lack of familiarity with the noise level was the reason for which he could not say whether the noise of the engine brake was an adequate indicator, stating that "[t]he problem with that is that in the middle of a storm, windshield wipers going, road noise from - - and air noise from the rain and things of that nature, I don't know whether that's a very audible difference."  (Id. at 58 (emphasis added).)  This is consistent with his testimony that, to his knowledge, he has never been a truck that had an engine brake.  (Id. at 30.)  Despite this, he made no effort whatsoever to determine if the noise would in fact be noticeable:

Q.     With respect to even just listening to a Jake brake in this model truck, you've not done that?

A.     That is correct.

-34-

> Q.    With respect to trying to test the audible notice that the Jake brake is on under rainy conditions, you've certainly not attempted to do that; correct?
>
> A.    That is correct.

(Id. at 58-59.)  Thus, despite being aware that the noise from engine brakes is loud enough that some communities have prohibited their use, and despite believing that the noise might well be the best possible indicator to the driver that the engine brake was on, he simply assumed that it was not loud enough to be heard by the driver without doing the most rudimentary check to confirm or disconfirm his assumption.  The fact that Clement would think that he could form an opinion strongly suggests that Clement did not want to but his opinions to the test, and precludes a finding that he employed an adequately reliable methodology.

Clement has not even taken steps that would enable him to determine whether the alternative indicators he proposes would be effective, despite acknowledging potential problems with them:

> Q.    You mentioned earlier how some lights on displays become washed out by daytime; correct?
>
> A.    Correct.
>
> Q.    Would that be a risk with respect to your display you are suggesting here?
>
> A.    That is a risk.  And depending on its location and what the overhang of the cab transom and things like that happen to be, it might be that a combination of little-- a tiny little strobe light that would flash in daylight, simply to attract attention to the visual display, and then maybe the visual display by itself when it gets darker outside would be sufficient.  If it were a strobe light, that's why I made that comment it could get irritating.  If you want something that catches attention and the person now sees that, you want to make sure they see it and process it, but you don't want them to be so angry at the thing that they break the light . . . .

Q.     But with respect to these various potential notices you've just described for us . . .
you've not done anything to determine if any of these would work appropriately;
correct?

A.     That is correct.  I've done no study on it.

(<u>Id.</u> at 83-84.)  When asked "[i]f you're going to do a study to determine how well [an indicator]
works, what would that involve?," he was able to describe in detail the various steps that should
be taken.  (<u>Id.</u> at 85-87.)  Nonetheless, he admitted that he had not "done any of these steps with
respect to [his] opinions in this case."  (<u>Id.</u> at 87.)  As noted above, *Daubert* requirements are
intended "to make certain that an expert . . . employs in the courtroom the same level of
intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire
Co.*, 526 U.S. at 152.  According to Clement's own testimony, he has failed to meet this
standard.

As with his opinions regarding warnings, it is apparent that Clement has based his
opinions regarding active indicators on unwarranted and untested assumptions.  Despite being
aware of potential drawbacks involved with the alternative indicators he was proposing, he took
no steps to design or test any such alternative to compare its effectiveness with that of the
existing indicators.  He simply assumed, without any basis or attempt at confirmation, that an
alternative design would be superior.  This constitutes pure conjecture or speculation, and,
accordingly, this opinion testimony should be precluded.

**B.     Clement's Opinions Are Irrelevant To This Case**

Clement's opinions are also irrelevant, for several reasons.  First, as explained above,
they are entirely dependent on Glennon's inadmissible opinion that the engine brake was the
cause of the accident.  Furthermore, as summarized by Clement himself, Wightman's testimony
described "the impossibility of throwing the switch, even if he had thought about it, at the time

of the accident.  And that's throwing the engine brake switch."  (<u>Id.</u> at 135.)  This testimony has

not been challenged.  Thus, in this particular case, having a warning regarding the hazards

associated with the engine brake or an additional active indicator on the dashboard could not

have prevented this accident, even if they served to remind the driver of those hazards at the time

of the accident.

      Clement's opinions regarding the alleged need for more warnings or an "active

indication" in the cab are also irrelevant for another reason.  According to Clement's own

testimony, the fact that Wightman was aware of the danger associated with use of the Jake brake

on wet roadways means that the danger was "open and obvious" to him, and that, therefore,

Wightman did not need to be warned not to do this:

| | |
|---|---|
| Q. | … [I]f a consumer or an operator is aware of the hazard - - |
| A. | At the time that they need to make some decision about whether to go near it, contact it, ignore it, whoever. |
| Q. | Then it is open and obvious? |
| A. | Yes, sir. |
| Q. | And it does not need to be warned about? |
| A. | For that person, it doesn't. |

(<u>Id.</u> at 107-08.)  Clement therefore effectively admits that his opinions regarding the adequacy of

warnings is irrelevant, because Wightman was aware that engine brakes should not be use on wet

roadways.

      In addition, there are yet more reasons for which Clement's opinions regarding warnings

or "active indications" are irrelevant.

## 1.    The Alleged Inadequacy of Existing Warnings

      Clement has offered the opinion that existing warnings are inadequate because they do

not "emphasize the predictable outcome, potential outcome" represented by jackknifing.

-37-

(Clement Dep. at 71.)  The following colloquy reveals that this opinion is similarly based on Glennon's opinion:

> Q.     When you say it's a predictable consequence, are you basing that on any information concerning the frequency with which jack-knifes occur as a result of the engine brake being on?
>
> A.     No, sir, and I'm accepting other peoples' statements about this being predictable.

Thus, under *Zaremba*, the fact that Clement's opinion regarding the adequacy of existing warnings is apparently based on Glennon's inadmissible opinion is an additional reason for precluding Clement's testimony on this subject.  *See Zaremba*, 2004 U.S. App. LEXIS 2422 at *10.

Furthermore, Clement's opinion regarding the adequacy of the warning in any operator's manual are irrelevant to this case because, as Clement himself has acknowledged, Wightman was aware that he should not use the engine brake on wet roadways (Id. at 76-77); he was in the habit of turning off the engine brake when he encountered a wet roadway (Id. at 67); and he did not read any operator's manual (Id. at 77, 142-43, 145, 147.)  Therefore, whether any warning or warnings provided in any operator's manual were adequate is irrelevant, first, because Wightman was already aware of the need to turn off the engine brake under wet conditions, and more importantly, because a different and allegedly better warning in an operator's manual would not have come to his attention in any event.

## 2.     The Alleged Need For "Active Indications" In The Cab

Finally, as noted above, although he is aware that the noise made by the engine brake and the position of the switch in the cab indicate to the driver whether the engine brake is on, Clement has failed even to attempt to establish that an additional indicator in the cab, such as a

light, would have provided a better indication to Wightman of whether the engine brake was on.

If the noise made by the engine brake and/or the switch position indicate to the driver whether

the engine brake is on as well as an indicator light would, then the lack of such an additional

signal that the engine brake was on is irrelevant.  Thus, although Plaintiffs have the burden of

proving that the expert testimony they proffer is meets the standards of *Daubert* and Rule 702;

*see Zaremba*, 2004 U.S. App. LEXIS 2422 at *5; Clement has failed to provide any basis for

concluding that his opinions regarding the absence of an additional indicator are relevant.

## VI.    <u>Plaintiffs' Misrepresentations</u>

Plaintiffs' opposition and supporting affidavits contain two key misrepresentations.  First,

plaintiffs state that defendants' expert Bruce Koepke stated that the engine brake was active at

the time of the accident on page 106 of his uncorrected deposition transcript.  Plaintiffs disregard

Koepke's testimony as a whole.

> Q.    And when you say that his rear axles didn't
>        slide, is that because of your earlier testimony that
>        the engine brake would have been disengaged?
> A.    Well, all of the things I said.  One:  That
>        my understanding of his testimony, which is somewhat
>        confusing, is that he had the Jake Brake off or he
>        drove with the Jake Brake off when it was wet.

(Koepke Dep. at 137-38.)  Plaintiffs ignore the fact that Koepke directly stated in his 26(f)

report, and in other parts of his testimony that the engine brake was off.  (<u>See also</u> <u>id.</u> at 48).

Additionally, plaintiffs offer the transcript before Koepke returned his errata sheet for the

deposition, clearing up any misstatements in a deposition that lasted over seven hours.  The correction to page 106 was made in accordance with Rule 30 (e) on August 1, 2003.[17]

Lastly, plaintiffs represent that there is no dispute that Wightman did not apply the service brake.  Defendants do not subscribe to that assertion.

## VII.    Summary Judgment Should Enter For Defendants

Here, where no expert can offer a reliable opinion to support the Plaintiffs' claims regarding the cause of the accident, it is appropriate for summary judgment to enter.  As the Second Circuit has recently reiterated in a case in which it affirmed the District Court's exclusion of expert testimony,

> In view of the District Court's decision to exclude the testimony of plaintiffs' experts, summary judgment for defendant was appropriate. *See*, *e.g.*, *Amorgianos*, 303 F.3d at 270-71 ("Having concluded that the district court did not abuse its discretion in granting defendant's *Daubert* motion, we also affirm the district court's grant of defendant's motion for summary judgment."); [*Brooks v., Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000)] ("Having determined that the district court acted within its discretion in excluding [plaintiff's expert] testimony, the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity. As a result, summary judgment was properly granted.").

*See Zaremba*, 2004 U.S. App. LEXIS 2422 at *16-17.

---

[17] A copy of Mr. Koepke's errata sheet is attached as Exhibit 15.

## VIII.   Conclusion

For all of the reasons stated above, Defendants respectfully request that this court

preclude the testimony of Glennon, Clement, and Sero, and enter summary judgment in favor of

Defendants.


DEFENDANTS,
FREIGHTLINER CORPORATION,
MERCEDES-BENZ CREDIT
CORPORATION, and
DETROIT DIESEL CORPORATION


By_____
        Paul D. Williams (ct05244)
        Daniel J. Foster (ct24975)
        Day, Berry & Howard LLP
        CityPlace I
        Hartford, Connecticut 06095-3499
        (860) 275-0100
        (860) 275-0343 (fax)
        Their Attorneys


## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed, on this date, postage
prepaid, to:

Leo Gilberg, Esq.                          Jeffrey C. Pingpank, Esq.
305 Broadway                               Cooney, Scully & Dowling
New York, NY 10007                         Hartford Square North, 10 Columbus Blvd.
                                           Hartford, CT 06106-5109



_____
Daniel J. Foster


-41-