1

1                    UNITED STATES DISTRICT COURT

                        DISTRICT OF CONNECTICUT

2

3    ALICE G. SVEGE, ADMINISTRATRIX,

     ET AL.,

4                           Plaintiffs,

5    vs.                                      Civil Action No.

                                              3:01cv01771 (JBA)

6

     MERCEDES-BENZ CREDIT CORPORATION,

7    ET AL.,

8                           Defendants.

9

10

11

12                    DEPOSITION OF JOHN C. GLENNON, JR., taken on

13   behalf of the Defendants Freightliner and Detroit Diesel,

14   before Tracy A. Patterson, RPR, CSR, pursuant to Notice on

15   the 2nd day of May, 2003, at the Marriott Hotel, 775

16   Brasilia Avenue, Kansas City, Missouri.

17

18

19

20

21

22

23

24

25

52

1    but let me be clear.  Do any of the cases that you list in

2    which you've testified involve your opinion that a Jake

3    brake caused a loss of traction on a tractor?

4         A.    Not that I can rule recall, no.

5         Q.    You mentioned earlier there's a distinction in

6    your mind between engine brake and Jake brake, so let me ask

7    the same question with respect to engine brake?

8              MR. GILBERG:  Note my objection to the form

9    of it.

10        A.    I don't think I --

11             MR. GILBERG:  You're summarizing his

12   testimony.  I don't know if that's what he said.

13        Q.    (By Mr. Williams) Do any of the cases in which you

14   testified involve your opinion that an engine brake caused a

15   loss of traction?

16        A.    Not that I can recall.

17        Q.    The case number on your report is 1509.  Could you

18   tell me what that refers to?

19        A.    That's just our case number.

20        Q.    Are they done sequentially?

21        A.    Yes, they are.

22        Q.    This is the 1,509th case?

23        A.    It might be.  I'm not sure.

24        Q.    Does that refer to John C. Glennon, Chartered or

25   just your cases?

57

1      Q.   Do you keep them somewhere else?

2      A.   I usually don't keep those, no.

3      Q.   If you don't keep transmittal letters, how do you

4   determine the dates by which you received information?

5      A.   I don't usually keep track of that.

6      Q.   Okay.  Is there anything that you're relying upon

7   in formulating your opinions in this case that you have not

8   included and produced with respect to this file?

9                    MR. GILBERG:  You mean in terms of documents?

10                   MR. WILLIAMS:  Yes.

11     A.   As far as documents, I don't believe so.

12     Q.   What about any books or treatises?

13     A.   There may be some that I used.

14     Q.   Do you know what you used in this case?

15     A.   I reviewed the CDL manual, maybe some other

16   documents like that.

17     Q.   Which manual did you review?

18     A.   Well, the CDL manual, the one that's produced by

19   the Motor Vehicle Administrators Association, I believe is

20   what it's called.

21     Q.   Okay.

22     A.   Which is adopted by the states and the same manual

23   is used in Missouri and Kansas and it just has a different

24   cover on it.

25     Q.   What publication year did you review of that?

1     A.   I probably reviewed the model.  I may have looked

2  at a state manual as well.

3     Q.   Do you know what year?  Would it have been '98 or

4  current model?

5     A.   I did review a current one, yes.

6     Q.   Did you at any time in the process go back to 1999

7  and look at the CDL manual?

8     A.   I reviewed the one that was probably that old as

9  well.

10     Q.   Was there any change between the two documents?

11     A.   Not in the parts that I reviewed, no.

12     Q.   What parts did you review?

13     A.   I reviewed the parts that pertained to the issues

14  in this case.

15     Q.   What would they be?

16     A.   One would be -- I think it's called skid control

17  and recovery, possibly, something to that effect.

18     Q.   Anything else?

19     A.   There may have been, but it would be related to

20  those issues.

21     Q.   You can't recall anything else specifically as you

22  sit here?

23     A.   That's the one that I recall reviewing, that

24  section.

25     Q.   Any other texts or publications that you looked to

59

1    in formulating your opinions in this case?

2        A.    Not that I can think of.

3        Q.    Are there any calculations that you did in this

4    case that are not part of this file?

5        A.    I didn't do any calculations, no.

6        Q.    Did you do any reconstruction?

7        A.    I didn't necessarily do a reconstruction

8    necessarily, no.

9        Q.    You as part of your CV have done -- have received

10   some training in accident reconstruction programs; is that

11   correct?

12       A.    Quite a bit, yes.

13       Q.    Have you employed any of those programs in your

14   work in this case?

15       A.    Yes and no.  I mean I didn't do a speed

16   reconstruction, if that's what you're asking, but there's

17   probably certainly things in there that I've applied to this

18   situation.

19       Q.    But you did not do any speed analysis in this

20   case?

21       A.    I did not do a speed analysis, no.

22       Q.    You did not do a path reconstruction of the

23   vehicle?

24       A.    I'm not totally sure what you're asking me.

25       Q.    Okay.  With respect to a reconstruction, would

80

1    Q.   When you arrived that day at this wrecker's

2    location, what was the -- withdrawn.

3         When you first got there in the morning, was there

4    any sort of tarp laying or covering the tractor or the

5    trailer?

6    A.   I don't recall there being any.

7    Q.   What did you do inside the cab?

8    A.   Inspected the inside of the cab.

9    Q.   What were your findings?

10   A.   Well, I found that the engine brake switches were

11   both in the on position.  I believe I attempted to determine

12   the -- what gear the truck might have been in.

13   Q.   What gear was it in?

14   A.   I wasn't able to tell because the cab had been

15   shifted.

16   Q.   Because of the amount of deformation within the

17   cab, you couldn't tell the gear?

18   A.   I don't know that I would call it deformation, but

19   I believe, if I remember correctly, the cab might have been

20   pushed backwards or sideways or something and was -- the

21   hole in the dog house may have been pressing against the

22   gear shift or something.

23   Q.   So you couldn't tell what gear it was in?

24   A.   No, I could not.

25   Q.   Now, this was November 6th?

81

1     A.    That's correct.

2     Q.    And the accident was on the 16th of September?

3     A.    That sounds right.

4     Q.    That's the first time you had seen the inside of

5     the cab; is that correct?

6     A.    That's correct.

7     Q.    Now, on the inside of the cab when you noted --

8     why did you note the engine brake locations?

9     A.    Because I noticed that they were on and was aware

10    of the weather conditions at the time of the accident.

11    Q.    How did you become aware of those conditions?

12    A.    I was probably told those conditions by

13    Mr. Gilberg.

14    Q.    Did you have any discussions with anyone other

15    than Mr. Gilberg concerning the case up to that point?

16    A.    I don't recall.  I may have, but I don't think I

17    did.

18    Q.    You didn't make notes of having such a discussion?

19    A.    No, I didn't.

20    Q.    Okay.  Why was it important to you to determine

21    the position of the engine brake switches because you knew

22    of the weather conditions?

23    A.    Well, I think I was worried there was a loss of

24    control, and some of the things I had done during my

25    inspection and testing of the vehicle were to determine what

82

1    may have caused the lost control.

2        Q.   So you mean determining the position of the engine

3    brake was just part of your inspection to determine loss of

4    control?

5        A.   Sure.

6        Q.   Did you conclude looking at the engine brake

7    switches that they had been in that position at the time of

8    the accident?

9        A.   I concluded that they were in that position when I

10   inspected them.

11       Q.   Did you conclude that they were in that position

12   at the time of the accident?

13       A.   Well --

14            MR. GILBERG:  At what time?

15            MR. WILLIAMS:  At the time of his inspection.

16            THE WITNESS:  At the time I inspected it, no.

17       Q.   (By Mr. Williams) In fact, is there a toggle

18   switch on those -- on that setting?

19       A.   I think you could tag it a toggle switch.

20       Q.   What would you call it?

21       A.   I think that's probably a fair name.

22       Q.   Is it true that one of them was broken off?

23       A.   I remember one of them being broken, yes.

24       Q.   Did it look like it was broken as a result of

25   damage?

84

1    There's another flipper valve for suspension.  I think it

2    says suspension error on it.  It's probably for inflating,

3    deflating the air bags on the suspension.

4         Q.   Do you know that?

5         A.   That's usually what that valve does.

6         Q.   It's your testimony that's what that valve is for?

7         A.   That's the way it appears to be, yes.

8         Q.   What position was that in?

9         A.   It's pushed to the right.  I can't read what the

10   switch says.

11        Q.   Did you make a note of it?

12        A.   No, I made no note of that.

13        Q.   Okay.  Did you make a note of the position as to

14   anything in the dash area other than the engine brake?

15        A.   No, I did not.

16        Q.   Now, could you say that the lever or the toggle on

17   that engine brake was not broken in this accident?

18        A.   I don't know that I could say that, no.

19        Q.   Do you know if there were any other toggles broken

20   on that dashboard?

21        A.   It doesn't look like there were.

22        Q.   Did you move anything while you were in the cab?

23        A.   No, I did not.

24        Q.   Did you sit in the driver's seat?

25        A.   I doubt it.

91

1   shoulder, are you talking about on the eastbound side of the

2   Pennsylvania turnpike?

3       A.   I believe that's correct, yes.

4       Q.   What were the weather conditions when you were

5   there?

6       A.   I don't know exactly, but it wasn't raining or

7   anything, if that's what you're asking.

8       Q.   Have you ever been back there?

9       A.   I think I was only there that one time.

10      Q.   Did you do any study of the drainage of the

11  highway?

12      A.   No, I did not.

13      Q.   Why did you measure the grade of the road?

14      A.   That probably would have been for reconstruction

15  purposes.

16      Q.   Did you use that grade information to reconstruct

17  this accident?

18      A.   No, I did not.

19      Q.   Why not?

20      A.   I don't know.

21      Q.   You were not asked to?

22      A.   I guess I wasn't.

23      Q.   Do know how long you were at the scene of the

24  accident?

25      A.   Approximately an hour.

93

1        A.   It was 1100 feet.

2        Q.   Why did you measure the curve?

3        A.   Probably for reconstruction purposes.

4        Q.   Is that the same reason you measured the median

5   width?

6        A.   Sure.

7        Q.   What was that measurement?

8        A.   Four-feet median, 12-foot lanes.

9        Q.   Anything else that you did at the scene?

10       A.   Of course I observed the evidence that was there.

11       Q.   What evidence did you observe at the scene of the

12   accident?

13       A.   Damage to the median barrier, and I believe there

14   were some skid marks as well.

15       Q.   Did you photograph the skid marks?

16       A.   I believe I did.

17       Q.   Could you take out Exhibit 4, the photographs that

18   you took of your inspection.

19                (Whereupon, a recess was taken.)

20       Q.   (By Mr. Williams) Am I correct, Mr. Glennon, with

21   respect to the photographs taken on the date of your

22   inspection of November 6, 1999 that there were only four

23   photographs taken at the scene?

24       A.   Are you ready for me?  I'm sorry.

25       Q.   You can answer if you can.

105

1    use of the engine brake?

2          A.    I was, yeah.

3          Q.    Have you written to any organizations or

4    governmental agencies about the danger of engine brakes?

5          A.    No, I have not.

6          Q.    Now, have you performed any tests with respect to

7    your opinions in this case?

8          A.    I haven't performed any tests, no.

9          Q.    Did you make any attempt to determine the

10   coefficient of friction on the road surface at the time of

11   the accident?

12         A.    I made observations of the road, but I didn't do

13   any testing as far as that's concerned.

14         Q.    You indicated earlier you had not done any

15   drainage pattern testing?

16         A.    No, I had not.

17         Q.    You understood it was Hurricane Floyd that was

18   blowing through?

19         A.    I understood that, yes.

20         Q.    Was there some evidence you were aware of

21   concerning some standing water?

22         A.    I'm not aware of standing water, no.

23         Q.    Did you make any determination as to how much

24   water was on the road surface at the time of the accident?

25         A.    No, I did not.

1        Q.   Did you make any determination as to whether or

2    not there was beading tar and oil on the roadway at the time

3    of the accident?

4        A.   Well, beading tar doesn't come and go.  Beading

5    tar is a roadway defect condition.  When present, it doesn't

6    disappear so it's evidenced by very dark spots on the

7    pavement.  It doesn't disappear.  I didn't see any evidence

8    of that out there.

9        Q.   It's not in the four photographs that you took?

10       A.   No, it's not.

11       Q.   Okay.  Did you do any analysis of this accident to

12   demonstrate the forces and the dynamic motion on the truck

13   during the loss of control event?

14       A.   No, I did not.

15       Q.   Did you determine what speed the truck was

16   traveling when the deceleration event began?

17       A.   No.

18       Q.   Did you determine what gear the vehicle was in

19   when the deceleration event began?

20       A.   That sounds like the same question to me.  I'm

21   sorry.

22       Q.   The speed and the gear is the same question?

23   Maybe I asked the wrong question.

24       A.   Yeah.  I didn't understand that.

25       Q.   What gear was the truck in when the deceleration

107

1    event began?

2        A.    According to the driver's testimony, I believe he

3    said it was in 12th gear.

4        Q.    Did you assume that to be true?

5        A.    I found no evidence to the contrary.

6        Q.    At the time of your inspection, you didn't know

7    what gear it was in; is that correct?

8        A.    I wasn't able to determine that.

9        Q.    Now, do you know what the RPM of the engine was at

10    the time the deceleration event began?

11        A.    No, I do not.

12        Q.    What is a normal -- well, in a Jake brake

13    application, what is the  torque at the drive shaft?

14        A.    I'm sorry?

15        Q.    An application of the Jake brake in this

16    accident --

17        A.    Okay.

18        Q.    Let me be clear.  Is it your opinion that the Jake

19    brake was engaged at the time of the loss of control in this

20    case?

21        A.    Yes.

22        Q.    At the time that occurred, what was the torque on

23    the drive shaft?

24        A.    I don't know that I could say.

25        Q.    What was the applied torque on the axle?

1        A.    I have no idea.

2        Q.    Do you know what the applied torque on the axle is

3    without the Jake brake application?

4        A.    All of these are dependent upon a lot of factors,

5    so, I mean, it's not just this is it.  I mean it depends on

6    the gear and RPM and a lot of things.

7        Q.    Have you made assumptions concerning any of these

8    issues?

9        A.    No, I have not.

10       Q.    All right.  So with respect to your opinion that

11   the engine brake was engaged at the time of the loss of

12   control, that's not based upon any analysis of the dynamic

13   forces involved; is that correct?

14       A.    It's based on my analysis of the loss of control

15   dynamics of the vehicle.

16       Q.    Okay.  What loss of control dynamics did you do of

17   the vehicle?

18       A.    Well, based on the driver's explanation of the

19   event and the evidence that was recorded by the police, as

20   well as the evidence that I observed.

21       Q.    What evidence was reported by the police that you

22   concluded or you took into account in your dynamic

23   evaluation?

24       A.    Well, they had some evidence of the vehicle's --

25   the tire marks left by the vehicle in their diagram.

109

1     Q.   What else?

2     A.   I believe that's it.

3     Q.   Can you have a loss of traction as a result of

4  hydroplane?

5     A.   You can, yes.

6     Q.   Can that occur as a result of driving too fast?

7     A.   Well, there's some research that indicates that

8  trucks don't have that problem, so I don't know.

9     Q.   Did you rely upon any of those studies in

10  formulating your opinions?

11     A.   Not specifically, no.

12     Q.   There's none that you want to cite us to as part

13  of supporting your conclusions in the case?

14     A.   I don't think I made a conclusion about

15  hydroplaning.

16     Q.   How did you rule out hydroplaning?

17     A.   I don't think I ruled out hydroplaning.

18     Q.   How did you rule out that Mr. Wightman was driving

19  too fast?

20     A.   I don't think I ruled that out.

21          MR. GILBERG:  I'm going to object to the form

22  of the question.  Too fast for what?

23          MR. WILLIAMS:  The conditions.  The witness

24  answered.

25     Q.   (By Mr. Williams) Would you agree that the most

1   common cause of loss of traction is driving too fast for

2   weather conditions?

3             MR. GILBERG:  Note my objection.

4     A.   I don't know how to answer that.

5     Q.   Do you know what the commercial driver's license

6   manual says about that?

7     A.   That's probably what it says.

8     Q.   Do you disagree with the commercial driver's

9   license manual?

10    A.   Not necessarily, no.

11    Q.   Now, with respect to your report, Exhibit 2, does

12   that contain the opinions you intend to offer in this case?

13    A.   Yes, it does.

14    Q.   Are there any other opinions that are not

15   contained in that report that you intend to offer?

16    A.   I don't believe so.

17    Q.   Your first opinion is that Wightman's description

18   of loss of control was consistent with the loss of control

19   consistent with engine braking; is that correct?

20    A.   That's correct.

21    Q.   Are there any -- is his description of loss of

22   control consistent with any other events?

23    A.   I mean you could have loss of control that would

24   occur that way if you had a brake imbalance problem, things

25   like that.  That's part of what my vehicle inspection

117

1     Q.   Was the CB handle hanging down from its perch?

2     A.   It may have been.

3     Q.   Okay.  Was Mr. Wightman belted?

4     A.   I don't remember.

5     Q.   Do you find any evidence to suggest that the belt

6  failed?

7     A.   I don't think I inspected the belt.  I don't know.

8     Q.   If -- do you know if he was moving within the cab

9  at the time of the accident?

10    A.   I don't know.

11    Q.   Do you know how that toggle switch got broken on

12  the engine brake face plate?

13    A.   No, I don't.

14    Q.   Can you rule out that the other toggle switch on

15  the engine brake was positioned in that way as a result of

16  impact from the collision?

17    A.   I don't know that I can.

18    Q.   Now, you said that -- in the second opinion you

19  said that absent an application of the service brakes, the

20  ABS system would not have detected the impending wheel

21  lockup or full wheel lockup and the ABS event that disables

22  the engine brake would not have occurred.  Is that correct?

23    A.   That's correct.

24    Q.   Without a service brake application, do the ABS

25  sensors disengage the engine brake?

133

1    A.   Yes, it is.

2    Q.   What's your basis for that opinion?

3    A.   I don't know what you're asking me.  I'm sorry.

4    Q.   Well, you've done no dynamic testing to

5    determine -- well, let me ask you.  Have you done any test

6    to determine the loads -- the forces in dynamic force of the

7    truck in the loss of control event?

8    A.   No, I haven't.

9    Q.   Have you done any testing to determine how

10   application of the ABS system would have performed in this

11   particular accident?

12   A.   I don't think that there would be a braking

13   induced loss of control with the ABS application.

14   Q.   That is based upon your experience?

15   A.   Yes, it is.

16   Q.   Is it based upon any testing that you've done in

17   this case?

18   A.   Not in this case, no.

19   Q.   What testing have you done -- did you rely upon

20   any testing that you've done for supporting your opinion?

21   A.   I've been involved in skid tests involving ABS

22   trucks.

23   Q.   How many skid tests have you been involved in?

24   A.   I don't know.  Quite a few.

25   Q.   Well, you talked about the two full-day seminars

134

1    or --

2         A.    That's a skid pad.

3         Q.    Okay.  Did those involve ABS testing?

4         A.    I wouldn't necessarily classify that as testing,

5    no.

6         Q.    Okay.  When did you do the ABS skid testing?

7         A.    I was involved in testing through both of the

8    classes that I attended on commercial vehicles and besides

9    that we've been -- set up our own testing on various

10   occasions.

11        Q.    Okay.  But you've chosen not to do that in this

12   case?

13        A.    I don't know that I chose not to.

14        Q.    Well, you haven't done it?

15        A.    I didn't do that.

16        Q.    Okay.  That testing material, are you relying upon

17   it in formulating your opinions in this case?

18        A.    I don't think I'm specifically relying on it.

19        Q.    Okay.

20        A.    It's definitely experience that I have and I'm

21   relying on that experience, yes.

22        Q.    Okay.  But in that experience -- did you videotape

23   those tests?

24        A.    No, I don't think I did.

25        Q.    Do you recall what the test specifications were?

140

1       Q.   Do you know what a total station is?

2       A.   Yeah, I do.

3       Q.   Have you done your own in some cases?

4       A.   I have a device that's called a -- it's

5   manufactured by Laser Technologies, LTI.  It works very

6   similar to a total station, but I don't know that I could

7   call it a total station, but it does basically the same

8   thing.

9       Q.   But in other cases where you're hired as an

10  accident reconstructionist, do you use that device in not

11  doing a survey, but a scene map?

12      A.   Yeah.  Usually refer to it as a forensic map.

13      Q.   And you investigate the -- inspect the vehicles,

14  correct?

15      A.   Yeah.

16      Q.   You determine if there's debris or other markings

17  at the scene of the accident?

18      A.   Sure.

19      Q.   And you do calculations to determine vehicle

20  speed; is that correct?

21      A.   I do, yes.

22      Q.   And the conservation of energy calculations as

23  well as the coefficient of friction issues; is that correct?

24      A.   Yeah.

25      Q.   You input the weight of the vehicles at issue?

141

1      A.   I mean they would be used in certain types of

2  calculations, yes.

3      Q.   These are all things you've done?

4      A.   Yes, they are.

5      Q.   These are things you've prepared reports on?

6      A.   Yes, I have.

7      Q.   You haven't done any of that in this case?

8      A.   I haven't done any speed analysis in this case,

9  no.

10      Q.   Well, you haven't done any of the things we've

11  just described; is that right?

12      A.   I don't know that I would say I haven't done any

13  of them, but I haven't done a speed reconstruction in this

14  case.

15      Q.   You haven't done a forensic map?

16      A.   I didn't do a forensic map, no.

17      Q.   You did no speed reconstruction?

18      A.   I probably would have got killed if I tried to do

19  that.

20      Q.   You did no speed reconstruction at all?

21      A.   I didn't do a speed reconstruction, no.

22      Q.   Did you speak to any witnesses to the accident?

23      A.   I don't think I did, no.

24      Q.   There was a Mr. Ficus, I think is his name?

25          MR. GILBERG:  Fiscus.

144

1    deposition.

2        Q.    You don't recall that?

3        A.    He may have.  I don't know.

4        Q.    Do you recall when that was relative to the loss

5    of traction that he experienced?

6        A.    I would have to look at his testimony.

7        Q.    Do you know -- did you come to an opinion as to

8    whether or not there was a noise?

9        A.    I don't know about the noise.  I inspected that

10    part of the truck and didn't find anything that was

11    consistent with that.

12        Q.    Did you find anything consistent with the left

13    front of the vehicle going down?

14        A.    No, I did not.

15        Q.    Can there be a popping noise as a result of

16    hydroplaning?

17        A.    I can't imagine what would cause that noise.

18        Q.    Did you believe Mr. Wightman about the noise or

19    not?

20        A.    I don't know.

21        Q.    Did you believe Mr. Wightman about the left front

22    of the tractor dipping down or not?

23        A.    No, I don't think I did.

24        Q.    Are there -- withdrawn.

25              In your review of the materials, do you hold