MOTOR CARRIER SAFETY & COMPLIANCE
ROADWAY DESIGN & SAFETY
RAIL CROSSING SAFETY

ACCIDENT INVESTIGATION
ACCIDENT RECONSTRUCTION
AUTOMOTIVE FAILURE ANALYSIS



# JOHN C. GLENNON, *Chartered*
## AUTOMOTIVE TECHNOLOGY & TRAFFIC ENGINEERING

## SUPPLEMENTAL EXPERT REPORT

Case #1509

Svege V. Mercedes-Benz et. al.

I am an Automotive Technologist and a graduate of Pittsburgh State Universtiy an internationally recognized school of Automotive Technology, located in Pittsburgh, Kansas where I earned a Certificate in Autobody Technology in 1993, an Associate of Applied Science Degree in Automotive Service Technology in 1995, and a Bachelor of Applied Science Degree in Automotive Technology in 1998.

At the time, I was recognized as the only student to have successfully completed all three of the Automotive Programs at Pittsburgh State.

I am a Certified Master Automotive Technician, a Certified Master Heavy-Duty Truck Technician, and a Certified Master Autobody Technician. My certifications, specifically for heavy trucks, include air and hydraulic brake systems, steering and suspension systems, drive train systems, engine repair, and electrical and electronic systems. As well, I am a licensed commercial vehicle driver.

My formal training and extensive experience with accident investigation, reconstruction, and analysis of accident causation for motor vehicle accidents including analysis and testing of vehicle componenets and systems, physics, truck-trailer

6917 WEST 76TH STREET, OVERLAND PARK, KANSAS 66204
PHONE: 913/383-3856    E-MAIL: experts@johncglennon.com    FAX: 913/383-2277
WEBSITE: www.johncglennon.com

compatibility and stability during skidding and braking, including engine brake and retarders and anti-lock brake systems (ABS), and hours of service compliance by truck drivers.

I have read the moving papers of the defendants, which contend that I do not possess adequate knowledge of engine brakes.

In fact, I have extensive education, training and experience related to engine brakes including over 150 college credit hours of automotive technical coursework. Included as part of this coursework was the study of heavy trucks and engine brakes. I have also studied the subject in many of the truck driver-training courses, truck safety courses, and truck accident reconstruction courses, all of which I have successfully completed.    Additionally, I have done endless amounts of research on this topic. However, there is likely no better way of learning how something works than to take it apart.  I have a deep understanding of the inner working of engine brakes because I have taken them apart and held all their pieces in my hands to be studied.  Furthermore, I have had many opportunities to drive trucks equipped with engine brakes and attended "skid pad" courses, which involved me personally skidding large tractor-trailers similar to the one involved in this accident on wet and icy surfaces.

Since 1998, I have been employed full-time by John C. Glennon Chartered in Overland Park, Kansas in the field of accident investigations which I have done for insurance companies and attorneys.

I am a member of the Society of Automotive Engineers, North American Transportation Management Institute, Automotive Service Association, and the Midwest Association of Technical Accident Investigators.

2

My qualifications to testify as an expert have never been challenged before, but I have been the subject of one Daubert motion where my testimony was narrowed and I was permitted to testify on certain issues but not on an issue, which was decided not to be pertinent to the case.

My report in this case along with my Curriculum Vitae is annexed as Exhibit A, with the list of cases in which I have been an expert in the last four (4) years.

In October of 1999, I was retained by plaintiffs' attorney Leo Gilberg to investigate an accident of September 16, 1999 when Scottie Wightman, who was driving a Freightliner tractor with a flat bed trailer loaded with pipes around a curve, travelling eastbound on the Pennsylvania Turnpike in very rainy conditions as the result of hurricane Floyd, lost control of the tractor-trailer, striking a concrete barrier to the right of the shoulder of the eastboud lanes, traveled along this barrier to the point where the concrete barrier ended and a metal guard rail began, struck the guard rail and then the tractor-trailer went to the left, across the two eastbound lanes of travel, striking and going over the center median concrete barrier separating east and westbound traffic, striking an SUV travelling westbound being operated by Thor Svege, Sr., in the right hand westbound lane, before finally coming to rest on the westbound side of the Turnpike facing east.

The collision killed three people in the SUV including Thor Svege, Sr. and severely injured three other occupants, including Mr. Svege's two minor children, Thor Svege Jr. and Briana.

My retention in this case was specifically and solely for the purpose of investigating and evaluating the factors involved in the initial loss of control of the tractor-trailer and to determine the cause of this loss of control.

Mr. Gilberg did not ask me to do an accident reconstruction of the entire accident sequence, since, in fact, Mr. Gilberg had ascertained that an accident reconstruction based upon the available physical evidence at the scene had already been done by Trooper Martin C. Long, certified as an accident reconstructionist by the Pennsylvania State Police, who was called to the accident scene.  Trooper Long, using measurements and angles obtained by a recognized method called Total Station, downloaded this information into a computer, and generated maps showing the path of the tractor-trailer beginning from the first available signs of physical evidence he found, namely gouge marks in the right concrete barrier which were photographed by the police among many photos taken at the scene by the police.

The General Investigation Report of Trooper Long including the Emergency Room Record of the driver, Scottie Wightman is annexed as Exhibit B.

I respectfully submit that it is on the basis of the Brandywine Hospital E.R record of Scottie Wightman at 11:54 a.m. that Trooper Long ruled out alcohol and/or drug use by the driver as a factor in this accident.

Trooper Long testified on Pg. 181, line 22 at his deposition,

"Q. Now, what was your purpose in wanting to obtain the hospital record of the driver of the tractor, Mr. Wightman?

A. I wanted to see if there was any alcohol or controlled substance in his system.

Q. And as a result of obtaining it, what did you find out?

4

A. There was no alcohol in his system.  I believe he showed something else.  I can't find it in here.  But it was a result of the medication that he got at the hospital, I was told that.

Q. Was there any indication that he used drugs other than the medication that was administered at the hospital?

A. I found no evidence of that, sir."

The pertinent copy of the transcript is annexed as Exhibit C.

I respectfully submit that I have read the defendants' motion papers that seek to preclude my expert testimony in this case upon the grounds that it would be unreliable, irrelevant, and not based upon sound science, and find that the defendants' characterization of the facts, my deposition testimony, and my opinions to be inaccurate and lacking merit.

First of all, my opinions are not solely based on my experience and expertise, although, I do admit to being schooled and trained in the fundamental concepts involved in this case.

As will be further documented in this affidavit, my methology was to carefully compare the facts or evidence of this case to known scientific data, documented testing, accepted texts and authorities, all of which furnish independent validation of my methology.

Furthermore, as will be seen, I have assessed other possible causes of the loss of control, and either ruled them out completely, or determined that those causes or factors were not the primary causes of the loss of control.  By that I mean, without the primary cause of the loss of control, the accident would not have taken place.

5

For example, there is general agreement between myself and defendants' proposed expert driver, Norris Hoover, on the issue that speed was not the primary cause of the loss of control. Mr. Hoover testified at pg. 26, line 5 as follows:

"Q. Now, tell me how you came to the conclusion that steering control was the prime issue in this case, and not speed?

A. Well, the directional control of the vehicle is paramount in maintaining control of the vehicle in the lane. That's obtained through steering wheel, through acceleration, through deceleration, through brakes. But you have to maintain the vehicle on the roadway in order to maintain control over it.

Q. So when you say that speed is not the primary consideration, did you come to some determination as to the speed of the tractor-trailer as it entered the curve?

A. Just from testimony of Mr. Wightman, police, and the expert reports.

Q. And so are they all in agreement that Mr. Wightman was going 57 or 58 miles an hour?

A. Well, they're all in agreement that he was going too fast for the conditions. There are various different ranges of speed that each of the experts have.

Q. But what you're saying is, whatever his speed, had he maintained steering control of the vehicle, he would not have had a problem?

MR. WILLIAMS: objection as to form.

A. True. If he would have maintained directional control of the vehicle, he wouldn't have impacted the right-hand—

THE REPORTER: "Impacted the right-hand"?

6

THE DEPONENT: Jersey barrier.

Q. (By Mr. Gilberg) So his inability to maintain steering control and not the speed was the prime reason why he impacted the barrier onto his right?

MR. WILLIAMS: Objection as to form.

Q. (By Mr. Gilberg) Is that what you're saying?

A. Speed could have been contributory to it.  But yes, you have to maintain the directional control of the vehicle.

Q. What I'm trying to establish and what you're telling me is that despite the speed, that had he maintained directional control of his steering, the accident wouldn't have occurred?

A. Correct."

A copy of the applicable pages of Mr. Hoover's testimony are annexed as Exhibit D.

My methology to determine the how and why of the loss of control which initiated the accident was to first physically inspect the tractor and trailer to see if there were any mechanical and pneumatic failures which could have contributed to or caused the loss of control.

On November 6, 1999, I conducted a full and thorough inspection of both the tractor and trailer at Crawdford's Auto Center in Downingtown, Pennsylvania which took many hours.  The inspection was done with the permission of the insurance company for the lessee of the tractor with the proviso that my inspection be witnessed by their Automotive Consultant, Philip J. Fekete and their lawyer, Lawrence M. Silverman.  A representative of Crawdford's was also present at all times.

It was apparent to me that the vehicles were in a secured environment which is buttressed by the deposition testimony of Eric Svege, brother of the deceased, Thor Svege, Jr. who has testified at his deposition (pgs.36-39) that on the day after the accident, September 17, 1999 he was taken by a police officer to retrieve personal effects of the family from the SUV, but did so in the presence of the owner or an employee of Crawford's Auto and the police officer, he did not go into the tractor, and was told that the policy was not even to permit pictures of the tractor to be taken. Likewise, Elizabeth Ann Flynn, who photographed the SUV at Crawford's Auto on October 6, 1999 on behalf of Leo Gilberg, testified at her deposition (pgs 36-37) that she was not permitted to take photos of the tractor or trailer, and that "the employee of Crawford's was with us at all times as well".

Their deposition testimony is annexed as Exhibit E.

Inspection of the tractor included the exterior, the cab's interior, the brake system, tires, ABS system, engine, steering and suspension systems, tire tread depth, brake adjustment on all brakes, and the brake system was aired up and all pneumatic valving was tested.

With regards to the trailer, the inspection included the trailer's load and securement devices, brakes, suspension, tires, ABS was visually inspected, and the brakes were aired up and the pneumatic valving was tested.

Destructive testing was not done.

I found that the tire tread depth on the rear axles or drive tires of the tractor were generally worn and thin, though they were legal. I measured tread depth of 4/32", 3/32",

5/32" in the various rear axle tires. Although a tire is legal as long as the tread depth is not below 2/32", a new tire generally has tread depth in the rage of 12/32" to 14/32".

Although my conclusion and that of the police, who did their own inspection before I did, are the same, that no mechanical or pneumatic failures in the tractor or trailer contributed to the cause of the accident and the loss of control which initiated it, my inspection differed in one respect.

Where as the police concluded that the brake system was not functional due to the accident, I was able to air up the brake systems using external air pressure from a tow truck supplied by Crawford's, to test the brakes and ascertained that all brakes functioned, that they held their air pressure, and that were balanced.

As a result, I was able to rule out brake imbalance, a known cause of loss of control, as the cause of loss of control in this accident.

Verification of the above is found in the Inspection Notes of Philip Fekete dated November 6, 1999 who also noted tread depth thickness of the rear tires were generally around 4/32", and includes his CV, all of which are annexed as Exhibit F.

I also went to the cab of the tractor to try to ascertain which gear the tractor had been in. Although it was not possible to do so, I did note that the two (2) engine brake switchers on the dash were in the UP or ON position, with the switch to the right being broken.

Mr. Feteke took numerous photographs that day including the positions of the engine brake switches on the dash of the cab, which was marked as an Exhibit at the deposition of the Freightliner witness, Donald Barnes, and is annexed hereto as Exhibit G.

As well, I inspected the SUV that day and found, as did the police, that no mechanical or pneumatic failures in the SUV contributed to this accident.

After my inspections were completed, I went to the scene of the accident, and made various measurements including that it was approximately 1100' from where the curve began to the point where it ended and that the calculated radius of the curve was approximately 1900 feet.

I also reviewed a copy of the police report and noted that the police diagram shows various positions for the tractor-trailer during the accident sequence.  The second position drawn indicates that the tractor had jack-knifed clockwise into the south concrete barrier on the eastbound side of the Turnpike.

Based upon what I did and learned on November 6, 1999, I came to no assumptions or conclusions at the time other than that no mechanical or pneumatic failure of the tractor was responsible for its loss of control.

A record of the police inspections are contained in the Police Report, pages 14-17, and the diagram, which has no page number on the bottom, but is found after page 19, is annexed as Exhibit H.

Besides my inspections of the subject vehicles and the accident site, my opinions and conclusions in this case are based upon my review of the other material after November 16, 1999 which are listed below:

1.    Photographs taken by the investigating police officers

2.    Photographs taken by Mr. Gilberg's investigator

3.    Photographs taken by Phillip J. Fekete of the subject truck and trailer

4.    The deposition of Scottie Wayne Wightman

5.    The deposition of Ian McKenzie

6.    The deposition of Don Barnes

7.    The deposition of Trooper Martin Long and Timothy Markely

8.    Jacob vehicle system Professional Driver Techniques and Owner's Manual

9.    Freightliner vehicle specifications

10.    Freightliner FLD conventional 1997 driver's manual

11.    The Wabco Manuals titled Anti-lock Braking System Training Program Student Manual, the Anti-lock Braking System (ABS) for Trucks, Tractors, and Buses, Rockwell WABCO D-Version ABS, Service Manual, Freightliner Service Bulletin, June 1997.

12.    FMCSA Vehicle Inspection reports for Hensley industries

13.    FMCSA Accident records for Hensley industries

14.    Other documents from the FMCSA for Hensley industries

15.    The Freightliner Engineering Technical Report

16.    DDEC IV application installation manual

17.    DDEC III Functional Test Plan J1621

18.    DDEC engine control system specifications

19.    DDEC III and DDEC IV serial communication specifications

20.    DDEC IV software strategy manual

21.    Reports of Plaintiffs' experts, Samuel J. Sero, P.E. and David E. Clement, Ph.D.

22.     Reports of Defendants' experts, Norris Hoover, Bruce Koepke, P.E. and

William Howerton, Principal.

As well, I have reviewed and will cite various authoritative texts and papers to

establish scientific data that I am relying upon as reliable and tested, and having been

peer-reviewed and generally accepted as relating to the facts and evidence in this case.

They are as follows:

Northwestern University Traffic Collision Investigation Manual

Northwestern Traffic Accident Reconstruction Manual

Model CDL Manual

Bumper to Bumper

Jacobs Engine Brake Retarder, Ohio Traffic Engineering Manual

The Air Brake

Keller's Driver Training Manual

Jackknife

Physics

Geometric Design of Rural Highway

State of the Art Related to Safety

Criteria for Highway Curve Design

Motor Truck Engineering Handbook

Directional Control of Retarder-Equipped

Heavy Trucks Operating on Slippery Surfaces

Another mischaracterization in the moving papers is the assertion that I did not

analyze the vehicle dynamics of the tractor-trailer.

I am unsure why defendants make such a claim since I testified as follows on

page 108, line 10 of my deposition:

"Q. All right. So with respect to your opinion that the engine brake was engaged

at the time of the loss of control, that's not based upon any analysis of the

dynamic of forces involved; is that correct?

A. It's based on my analysis of the loss of control dynamics of the vehicle."

The pertinent transcript is annexed as Exhibit I.

In order to analyze the loss of control dynamics and compare them with known

and accepted scientific facts, it was essential to review Mr. Wightman's deposition

testimony of November 19, 2001 as to the sequence of events which he says led to the

loss of control.

He testified on page 188, line 21:

"Q. As you were coming towards and approaching that turn, do you remember

slowing down?

A. I just remember taking my foot off the accelerator.

Q. And why is that?

A. Downhill grade.

Q. Did you feel that your vehicle was going too fast coming into the grade?

A. No, it was just kind of a practice to release the accelerator.

Wightman testified on page 50, line 5:

"Q. Trooper Long said that you told him at the hospital twelve days after the

accident, "I started drooping gears"—before you said that, he said that you

said, "When I first entered the turn, the truck started to spin clockwise." Did

that happen?

A. After the popping noise, yes.

Q. How about when you first entered the turn, is that when the popping noise occurred?

A. Yes, it was.

Q. And when you said that the truck started to spin clockwise, what were you describing? What was happening?

A. The rear axles were starting to slide toward the center divider, and the front end was starting to slide toward the right-hand shoulder.

Q. Now, before you hit the guardrail, did you hit the concrete divider over to the right or—the concrete barrier over the right?

A. I don't recall, but I don't think so.

Q. When you refer to the rear axles, are you talking about the rear axles of the tractor?

A. Yes.

Q. And is this what is sometimes referred to as a fishtail?

A. What is taking place at this time is what's commonly known in the trucking industry at this time as a jackknife."

Mr. Wightman further testified that on hearing the popping noise there was a drop in the front end of the vehicle and, with the rear axles sliding to his left, steering became difficult, and almost non-existent. He testified on page 138, line 17:

"Q. Now, you testified that you heard a pop at some point before losing control of the vehicle, correct?

A. Correct.

Q. And you also testified later in testimony that you felt the left front portion of the vehicle drop?

A. That is correct.

Q. Have you ever experienced at any point in time in driving a vehicle, a tractor-trailer, that is, a blowout in any of the front tires?

A. No.

Q. So you wouldn't have firsthand knowledge of what that would actually feel like?

A. No, sir.

Q. Can you tell me, please, what happened immediately following the noise that you heard and the drop in the left front side?

A. At that point the steering wheel became very hard to turn, almost non-existent.

Q. Was it power steering?

A. Yes.

Q. So what you're testifying to is that you had difficulty physically maneuvering the steering wheel after hearing the pop and feeling the drop of the front end of the vehicle, correct?

A. That's correct."

The jackknife and loss of control came about suddenly, but only after Wightman's foot was off the throttle, page 89, line 18:

"Q. Now, when you first were aware of this jackknifing condition and you say that you began to steer the tractor to the left, did you have control of the vehicle at the time?

15

A. No, sir.

Q. When had you lost control of this vehicle?

A. Almost immediately after the jackknife started.

Q. Well, at the point of the jackknife, had you lost control?

A. Pretty much, yes.

Q. Did this jackknife come about suddenly?

A. Yes.

Q. Now, had you downshifted before you lost control at any time?

A. No, sir.

Q. You were in the twelfth gear?

A. Yes, sir.

Q. For how long had your foot been off the throttle before you lost control?

A. Approximately, I would say, maybe 3, 4 seconds.

Q. And what was the reason you took your foot off the throttle?

A. Because of the downhill grade."

When the tractor struck the guardrail on the right, the tractor and trailer were at an

L shape to each other, page 62, line 23:

"Q. Okay.  Now, what do you remember about hitting the guardrail on the right?

A.  The truck was already at what is commonly known as a point of no return.

Q. Where does this common understanding come from?

A. When the trailer reaches a point in a jackknife situation.

Q. And at what point is that?

A. Where the tractor and the trailer are at an L shape.

16

Q. And did you reach a point where the tractor and trailer where in an L shape to each other?

A. Yes.

Q. How did you know that?

A. By the mirrors.

Q. You were looking in the mirrors?

A. Yes."

On page 189, line 11; he identified the kind of jackknife he was in:

"Q. I just have a few others. I'm sorry. I take it from what you have testified to, Mr. Wightman, that this accident on the Pennsylvania Turnpike on September 16, 1999 you characterized as a tractor jackknife?

A. Correct.

Q. And not a trailer jackknife?

A. Correct.

Q. Is that right?

A. Correct.

Mr. Wightman testified whether the engine brake was on or off on page 53, line 20:

"Q. You don't have any independent recollection now as you sit here as to whether it was on or wasn't on; is that right?

A. That would be correct."

He further testified that if it was on that under the circumstances he would never have thought to turn the engine brake switches off. He stated on page 59, line 3:

"Q. I'm speaking about—we're talking about at the time of the accident. When you say you don't know whether it was on or wasn't on, wouldn't the first thing you would do before you started the steering would be to turn off the engine brake?

A. If it was off, there would be no need to reach and turn it off.

Q. But if it was on, would that be the first thing you would do?

A. In reaction time, no.

Q. So the first thing you would do would be to steer the vehicle in the way that you did?

A. You are correct.

Q. And the second thing would be to apply the hand brake—

A. Yes.

Q. –to the trailer. And the third thing would be to drop gears?

A. Yes.

Q. And when would you turn off the engine brake?

A. If the engine brake would have been on at that particular time, there is no way that I would think to reach and turn it off."

Wightman admitted that taking his foot off the throttle (accelerator) would activate the engine brake if it was on, page 47, line 21:

"Q. If your foot was off the throttle and the engine brake was on, that would activate the engine brake, wouldn't it?

A. Yes, it would."

At the time the tractor struck the concrete center divider, Mr. Wightman's hands were on the steering wheel and his foot was off the throttle, page 69, line 8:

"Q. Well, were your hands on the steering wheel when you hit the center divider?

A. To the best of my recollection, yes.

Q. Was the throttle still off?

A. Yes."

The pertinent pages of Mr. Wightman's deposition testimony are annexed as Exhibit J.

Contrary to the defendants' claims, I have followed a methology and will now describe the "How and Why" of my conclusions.

The "How is" that I arrived at my conclusions by carefully comparing the facts of the case to known scientific data regarding the loss of control of trucks. The "Why is" after comparing the facts to this data I found that a preponderance of the evidence supported the conclusion that engine braking caused the loss of control due to loss of the ability of the driver to maintain directional control, without which, the accident would not have happened.

Sources, which have been tested and/or pre-reviewed, are provided to support the known facts.

**Known Fact 1-** Use of the engine brake on wet or slippery roads can result in loss of vehicle control.

FLD Driver's manual for tractor involved in this accident, Jacob Engine Brake, Chapter 7.30 and 7.31

Detroit Diesel Engine Operator's Guide (2002), pg. 42

Jacob Vehicle Systems Professional Driver

Techniques and Owner's Manual (1997) pgs. 12-15

Defendants' proposed expert driver, Norris Hoover, testified on Pg. 55, Line 3 as to the industry practice in following the driving recommendations by Jacobs for wet weather use of the engine brake in its Manual.

"Q.    Now – now, before this case, had you ever seen this Professional Driver Techniques and Owner's Manual by Jacobs?

A.    Yes, sir.

Q.    Is that a manual that's accepted in the trucking industry as being an authoritative manual on the use of Jake brakes?

A.    Yes, sir.

Q.    Is it used in – to teach drivers about Jake brakes?

A.    Yes, sir.

Q.    Have you used it when you taught drivers with regards to the use of Jake brakes?

A.    Yes, sir.

Q.    Do you provide them with copies, or do you refer to it? How does that work?

A.    Both.

Q.    It's part of the course materials?

A.    Yes.

Q.    And – and the one that you have in your file, is that copyrighted 1997 in the lower left-hand corner?

A.    Yes, sir."

Mr. Hoover further commented on industry practice when he testified on Pg. 56, Line 7:

"Q.    (BY MR. GILBERG)   Now, did you consider this manual, Plaintiff's Exhibit 5, in coming to some of your opinions and conclusions in this case?

A.    Yes.

Q.    And what about the Freightliner Driver's Manual?  Did you review that with regards to this case?

A.    Yes, sir.

Q.    Does your bill indicate that you did that?

A.    It doesn't specifically identify that.

Q.    Now, in the lower right-hand corner of each page – I don't know if you have it in your copy – no, okay.  Well, could you get to 7.31?

A.    We are there.

Q.    Okay.  That is a warning by Freightliner, is it not, as to when not to use the engine brake; is that true?

A.    Yes.

Q.    And it says, "Don't use the engine brake if road surfaces are slippery. Using the engine brake on wet, icy or snow-covered roads could result in loss of vehicle control, possibly causing personal injury and property

damage." Now, is that consistent with the Professional Driver Techniques and Owner's Manual issued by the – by Jacobs?

A.    I think Jacobs takes a little different approach to it. Freightliner's is a very conservative approach, because you definitely can use the Jake brakes when it's wet conditions.

Q.    So you don't agree with that warning that's in the FLD Conventional Driver's Manual?

A.    Well, I agree in its general presence. Yes, I do.

Q.    But you, as a driver, you use the Jake brake on roads that are wet?

A.    Yes."

and on Pg. 57, Line 21:

"Q.    Okay. so you, as a person that's presenting yourself as an expert on how tractor-trailers should be driven, do not point-blank say that any driver that uses an engine brake when the – when the roadway is wet is doing something incorrect?

A.    Correct."

All of the above annexed as Exhibit K.

**Case Facts**- It is not even arguable that the pavement at the time of the accident was extremely wet and slippery. Trooper Long on pg. 2 of his Investigative Report (Exhibit B) describes the weather as "Torrential Rain (8.6")".

**Known Fact 2-** An engine brake is engaged by the driver by, first, having the dashboard switches on and, second, by taking his foot off the throttle.

FLD Driver's Manual- chapter 7.30, 7.31

<u>Jacobs Professional Driver Techniques</u>- pgs. 4, 5, 12, and 13 (Exhibit K)

**Case Facts**

- The engine brake switches were both on, the switch on the right being broken.

  (Exhibit G)

- Mr. Wightman testified that he took his foot off the throttle <u>before</u> he lost

  control. (Exhibit J, pg. 188-21)

<u>**Known Fact 3**</u>- An engine brake when engaged produces a "popping" noise.

<u>Jacobs Engine Brake Retarder</u>- in a history of the Jacobs Brake states:

"To a motorist or bystander, the Jacobs Engine Brake commonly known as the

"Jake Brake" is sometimes associated with a characteristic "popping" exhaust noise heard

when a truck is decelerating or descending a hill."

<u>Ohio Traffic Engineering Manual</u>- states under 201-7:

"The engine brake is used instead of, or in addition to, the friction brakes and

produces an audible "popping" noise…"

The above are annexed as Exhibit L.

**Case Fact**

- Wightman testified that he heard a popping noise (Exhibit J, pg. 50, line 5)

<u>**Known Fact 4**</u>- A vehicle, when braking, will pitch forward.

<u>Northwestern Traffic Collision Investigation, Northwestern University</u> pg.119

Annexed as Exhibit M.

**Case Fact**

- Wightman testified that he felt the truck's front drop or pitch forward.

  (Exhibit J, pg. 138, line 17)

**Known Fact 5**- An engine brake when engaged provides braking only to the tractor drive wheels. Braking applied only to the drive axles on a road surface that is slippery can cause a tractor-trailer to skid, pushing the towing vehicle, the tractor, sideways, causing a sudden jack-knife.

Model Commercial Driver License Manual- pg. 2-49, 50, figure 2-14, figure 2-14 depicting a Tractor Jackknife from the CDL Manual is placed below. Notice how figure 2-14 is strikingly similar to the second position drawn by Trooper Long on his police diagram in the Police Report, Exhibit H, indicating that the tractor had jack-knifed clockwise into the south concrete barrier.



Figure 2-14

Tractor Jackknife

Bumper to Bumper- pg. 297

Both references are included as Exhibit N.

**Case Fact**-

- Wightman testified that the tractor drive axles lost traction and the tractor jackknifed and described exactly what figure 2-14 is depicting.

  (Exhibit J, pg. 50, line 5)

**Known Fact 6-** A vehicle operated in a curve has lateral acceleration. Lateral acceleration creates a demand for friction and reduces the friction available for braking. Physics pages 113 and 114, annexed as Exhibit O.

**Case Fact**

- Mr. Wightman testified that he lost control attempting to negotiate a curve in the road. (Exhibit J, pg. 50, line 5)

  My site inspection confirmed that the subject vehicle lost control on a highway curve.

  My calculations are that at 58 miles per hour on this highway curve, the subject vehicle will have about 0.13g's of lateral acceleration due to centrifugal force of the curve.

  As well, I have calculated additional frictional demand generated by activation of the engine brake as a Calculated Total Friction Demand.

  My calculations are annexed as Exhibit P.

  It is respectfully submitted that 0.13g's is not the same and not to be confused with the co-efficient of friction of 0.13 which has been referenced by the defendants in this case.

  The demand for friction comes from various dynamic situations including braking and cornering. Friction supply or the available friction is

created in large part by the roadway and roadway conditions and is measured

as a co-efficient of friction.

**Known Fact 7-** Other conditions and factors existed at the time of the accident besides the

centrifugal force of the curve and an extremely wet road which are known to lower the

supply of friction and skid resistance.

They are:

    **A.** A vehicle on a downgrade has a lowered available friction.

        (Northwestern University Traffic Accident Reconstruction Manual-

        page 62- 15 and 62-20) is included as part of Exhibit Q.

**Case Facts**

- Turnpike maps indicate a 1.7% downgrade and are annexed hereto as part

    of Exhibit Q but my own site inspection measurements show a 2.5%

    downgrade where the tractor-trailer lost control.

    **B.** Large trucks have lower available friction as compared to passenger

    vehicles. (Northwestern University Traffic Accident Reconstruction

    Manual, page 78-22)

    Annexed as part of Exhibit Q.

**Case Fact**

- The subject accident occurred on September 16, 1999.

    **C.** Tires with thin tread have a lowered available friction in wet weather.

    (Geometric Design of Rural Highway, page 141 figure 111-1.A)

    Annexed as part of Exhibit Q.

**Case Fact**

- Many of the subject Freightliner drive axle tires have thin (but legal) tread depth 4/32", 3/32", 5/32", 4/32". (vehicle inspection)

- The Freightliner was being operated in wet weather.

  **D.** Oil and tar on the tires is known to lower friction and skid resistance.

**Case Fact**

- Page 3 of the Police Report (Exhibit H) contains reference to an interview of Scottie Wightman by Trooper Long in which Mr. Wightman stated that before entering the turn he "ran into a construction zone that was down to one lane. I saw oil and tar beading up on the black top."

**Known Fact 8**- Directional control of retarder-equipped heavy trucks operating on slippery surfaces regarding the ability of an experienced driver to maintain directional control when a retarder is activated during a turning maneuver on a slippery surface has been the subject of testing, study, and experiments.

The vehicle tests and computer simulations performed in this study indicate that the improper use of retarders can significantly reduce the maximum controllable speeds that drivers can achieve without losing control in a jackknife mode of tractor-trailer instability.

Directional Control of Retarder Equipped Heavy Trucks Operating on Slippery Surfaces-SAE Paper 831788 Vehicle Research and Test Center, National Highway Traffic Safety Administration, pages 1, 2, 3, 4, 12, and 13

The above is annexed as Exhibit R.

For example, on page 2, examination of results from simulations of vehicle performance in turning maneuvers on wet road in which the retarder is applied, two (2) seconds after the turning maneuver, the simulation predicts that the vehicle, a prototype five axle tractor-trailer, will jackknife if its retarder is switched on while the vehicle is making a turn where the lateral acceleration is approximately 0.14g at 21.8 miles per hour with a peck friction 0.2 between the truck's tires and the road.

The driver would only have approximately 0.5 seconds to react between the time when the articulation level begins to increase rapidly at 2.5 seconds and the time when the jackknife approaches an uncontrollable level of articulation angle at approximately 3.0 seconds.  See figure 1 on page 3.

In this test and simulation, the amount of lateral force needed for directional control and stability is not available even though the wheel has not completely locked up.

**Known Fact 9-** According to the Traffic Accident Report Reconstruction Manual pages 78-22, heavy truck tires develop 75% of the co-efficient of passenger tire vehicles on a dry road, approximately the same on a wet surface, and approximately 50% on wet ice at approximately 30 degrees F., so that the supply friction on this wet asphalt for this subject tractor-trailer at speeds above 30 mph should be in the range of 0.30 to 0.48 (0.40 to 0.65 adjusted 75% for a truck.)

Another source shows that we should expect a 0.31 coefficient of friction for worn tires on wet pavement for passenger cars, and adjusting this for a truck we get 0.23. Geometric Design of Rural Highways, pg. 137)

Additional studies show that we should expect 35% of wet roads to have a coefficient of friction, which will be of less than 0.30 for passenger vehicles,

approximately 0.22 for trucks when adjusted. (<u>State of the Art Related to Safety Criteria for Highway Curve Design, pages 12-13</u>)

According to <u>Fitch</u>, a sliding co-efficient of friction on wet asphalt for a truck tire is about .32 (<u>Motor Truck Handbook, pg.81</u>)

A source offered by the defense shows a slide value of about .34 for a wet traction coefficient at 55 mph on a wet <u>concrete</u> rated road, which is not as slippery as asphalt. (<u>Heavy Duty Truck Tire Engineering, pg. 245, figure 45</u>)

The above authorities are annexed as Exhibit S.

**<u>Case Facts</u>**

- The road was wet
- The road was asphalt
- The vehicle speed was over 30mph
- The vehicle was a large truck

**<u>Known Fact 10-</u>** Full dynamic hydroplaning causes reactive tire forces to be lost. A hydroplaning vehicle will travel in the direction of the prevailing force. Centrifugal force (lateral acceleration) is the prevailing force. For a vehicle traveling on a highway curve the centrifugal force due to lateral acceleration is the prevailing force, which will cause the vehicle to move along a path tangent (or outward) to the highway curve. (<u>Highway Pavements Hydroplaning, Roadway Tort Liability page 1</u>)

Annexed as Exhibit T

**<u>Case Facts</u>**

- The truck, after losing control, moved to the right or the low side of the highway curve, not tangential to the curve, where it struck a concrete barrier

and Wightman testified that, although difficult, he began to steer to the left. (Exhibit J, pg. 89, line 18, Exhibit B, Trooper Long's Investigative Report; Exhibit H, Police Report.

The subject vehicle did not experience a full dynamic hydroplaning and the evidence does not support it. However, it is possible that some level of partial hydroplaning occurred under these extreme weather conditions further reducing the available supply of friction to the tractor-trailer.

The sources that I have reviewed indicate that an appropriate range for the available friction for a normal wet asphalt surface, after adjusting for grade and adjusting for a truck, is 0.19 and 0.45. **However, at the time of the accident, this was hardly a normal wet asphalt surface.** Under the extreme conditions including the factors previously recited that are known to lower available friction and skid resistance, I can state with reasonable certainty as an Automotive Technologist that it is more probable than not, that the available friction was lower than 0.19. To have loss of traction this available friction would have to be exceeded by the total demand for friction. The defense has produced a calculated demand for friction from engine braking this truck at 2, 100 engine rpm in the thirteenth gear. Their calculated 0.13 demand of friction was produced under the assumption that the engine produced only 373 horsepower and that the fastest the engine could go is 2,100 rpm. However, this engine can produce 390 horsepower and go as fast as 2, 500 rpm. At 2,500 rpms and 390 horsepower the friction demand from engine braking will be higher. These values when combined with the frictional demand from the curve's lateral acceleration created the total demand for friction. **The defense completely ignored the demand for friction from the curve,**

which when combined with the friction demand from engine braking exceeds the available friction under these conditions.

Engine brakes causing lost of traction and jackknifing is a topic that is cited in an endless number of references and even the ones produced by the defense.  In all my research, I have never found a source that raises any doubt that this happens.  The subject accident involved some of the most extremes weather conditions one could encounter.  If an engine brake induced loss of traction could not occur under these conditions, as the defense claims, then it is unlikely that it could happen under any wet conditions, and therefore, all the references that say loss of traction can occur in wet weather, including the FDL Driver's Manual and Jacobs Professional Driver Techniques Manual, would have to be wrong.

The fact is that all the elements required to have a jackknifing caused by engine braking were present and the subject driver offered a "textbook" description of what occurs during wet-weather engine-brake induced jackknife.  Furthermore, the subject driver did not testify that the truck lost control as he entered the highway curve; therefore, he did not lose control simply due to speed, nor did he lose control due to full dynamic hydroplaning.

**However, he did testify that he was on a highway curve, that he took his foot off the accelerator, and then he heard a loud popping noise before the tractor started to jackknife.**

The defense has claimed that I discredited the evidence and testimony in arriving at my opinions.  The testimony of Wightman, in which they have characterized him as

stating, the engine brake was off and their alleged evidence that he would have "surely" been aware that the engine brake was on because it made it noise.

Wightman testified that he had no independent recollection whether the engine brake was or wasn't on. (Exhibit J, pg. 53, line 20 and pg. 59, line 3)

However, it should be noted that defendants' proposed expert engineer, employed by Freightliner, testified that in regarding to the depositions of Scottie Wightman, the driver, Koepke's understanding was that Wightman believed he had the Jake Brake on.

Bruce Koepke testified on page 107, line 10:

"Q. Let me just ask you this: Did you dismiss in any conclusions you made about whether the engine brake was on and off the testimony on page 53 that we've just read that Scottie Wightman didn't have any independent recollection as he was taking that deposition whether or not it was or wasn't on?

MR. WILLIAMS: Same Objection.

A. Well, I have read both of his depositions, and as I said, it is confusing. But my understanding of these depositions is that he believed he had the Jake Brake on. But in my conclusions, I go on basically to prove that it doesn't matter if he does or not."

Transcript is annexed as Exhibit U.

Thereafter, Mr. Koepke offered a correction which changed the above testimony to the effect that Scottie Wightman did not believe he had the Jake Brake on.

Had Wightman testified that he did turn off the engine brake, that testimony not only would be in conflict with his other testimony, that he heard a popping noise and felt

the vehicle's front drop, but also would be in conflict with his testimony that the tractor jackknifed, which could have only been caused by engine braking.

The defense has repeatedly cited the loud noise made by the engine brake as evidence that the engine brake was off. Curiously, they have never characterized that noise, which is a popping sound. Wightman did testify that he heard a popping noise before he lost control.

I have not ruled out speed as a contributing factor. In fact, the vehicle speed is a part of my conclusion. Very simply put, had the vehicle been traveling at 5 mph, all other things equal, then the loss of control would not have happened. The vehicle traveling around this curve at approximately 58 mph creates a lateral demand for friction and this demand contributed with the longitudinal demand from engine braking is what caused the loss of friction. At this speed on this highway curve, this subject vehicle will have about 0.13g's of lateral acceleration. This vehicle would not have lost control with 0.13g's of lateral acceleration and this speed alone would not cause the loss of traction. However, the application of the engine brake would increase the demand for friction and this demand combined with the demand from lateral acceleration would exceed the available supply of friction and cause the loss of traction.

My review of the DDEC IV Application and Installation Manual, Engine Brake Control, pgs. 5-39, and 5-40 shows that the engine brake had the ability of a number of forms of control:

An engine brake disable function which is switched to the ground whenever a vehicle system, such as a traction control device, does not allow engine braking to occur. This function is a digital input that can be generated by any system such as the ABS unit

output on a condition such as described in (2), **but only if the ABS is engaged by the service brake.** Engine Brake Disable, DDEC IV Application and Installation page 5-39 (Exhibit W.).

"Rockwell WABCO ABS is an electronic system that monitors and controls wheel speed during braking." Rockwell WABCO D-Version ABS, Service Bulletin, 42-27, Service Bulletin, Pg. 1, Freightliner Service Bulletin, June 1997. (Exhibit W.)

The dynamics of vehicle deceleration using service brakes is significantly different than vehicle deceleration using an engine brake.

During a service brake application, all of the truck's wheels are braked and the wheels are decelerated by the force of the brake shoes on the brake drums. During low roadway friction conditions, the brakes can decelerate the wheels very quickly and, absent an ABS event, lock the wheels while the vehicle decelerates at the maximum rate allowable by the roadway conditions.

During an ABS event, the ABS system cycles the brakes using the Apply, Hold, Release method. This occurs just as it sounds. The brakes are Applied and can be Held at their application pressure, then if a pending lock up is detected, the system will Release the affected brakes allowing the wheels to roll free. Once the affected wheel is rolling again, the brakes can be reapplied. The Release mode, which can completely Release the brake allowing the wheels to start rolling, this is what enables the vehicle to maintain directional stability.

During an engine brake application, only the drive wheels are decelerated through the power train. During low friction conditions, the engine brakes can decelerate the wheels quicker than the road conditions will allow the vehicle to decelerate. This will

cause the wheels to lose traction and start skidding. This situation creates the same vehicle dynamics as the brake-induced locked wheel skid and is also often referred to as a lock up. However, the wheels during an engine brake application can only decelerate to the slowest speed for the gear being used. Therefore, during the engine braking, the drive wheels will never truly lock up.

Wabco's description, in their Anti-lock Braking System Training manual, of an ABS event is as follows: "The ECU is programmed to identify if the decelerating wheels are going to lock. If the ECU determines that any of the wheels are approaching lockup, it controls ABS valve operation to modulate brake pressure and prevent the wheels from locking." Wabco Vehicle Control Systems further states, "During an ABS event, the ECU sends a signal to shut off the retarder."

Don Barnes, employed by Freightliner as manager of the electrical test department testified on Pg. 27, Line 25 of his deposition, as follows:

"Q.      What are the circumstances that would occur that would cause the engine brake to be turned off when the engine brake switch is on?

A.      We discussed that earlier, and I described it as an ABS event.

Q.      And such an ABS event would require application of the service brake by the operator?

A.      Yes."

There is also Service Brake control, which can be implemented, or not. This can allow the operation of the engine brake only when the service brake is engaged and the engine brake function in on. Page 9 of Combined Vehicle Specifications/TSO Report

shows that "Service Brake Activates Retarder—off" was actually wired into the tractor involved in this accident, but had never been made operational.

This option was available at no cost.

Authorities annexed as Exhibit W.

Ian Daniel McKenzie, Director of Electronic Systems for Detroit Diesel testified at his deposition on page 60, line 6 as follows:

"Q.    Is there a service brake control which could be implemented that would allow the operation of the engine brake only when the service brake is engaged and the engine brake function is on?

A.    I'm not sure what you mean by the engine brake function is on, so could please restate your question?

Q.    Well, if the engine brake switch is on – in other words, there will be a service brake control that would allow the operating of the engine brake only when the service brake is engaged and the engine brake switch is on.

A.    I think I understand the question now.  Thank you for restating.  Yes, that was a customer selectable option.

Q.    And where are you reading from?

A.    The DDEC Software Strategy Manual, Section 8.3.2.2.6, vehicle speed conditions, where it states the brake release switch is off or Jake service brake enable is not set.

Q.    And at what is the cost of such on option?  I'm not asking for an exact figure, but to create this kind of an option what kind of a cost are we talking about?

36

A.    It was at the time a standard feature of the DDEC IV control module and is available to the end customer at no cost, he simply needs to turn it on or off."

Transcript annexed as Exhibit X.

I have reviewed Exhibit R annexed to these papers, on SAE paper titled "Directional Control of Retarder- Equipped Heavy-Trucks Operating on Slippery Surfaces which on page 2 reports simulations of heavy trucks in turning maneuvers in which the retarder is applied where the vehicle experiences such a sudden jackknife that the driver has only 0.5 seconds to react between the time the articulation angle of the jackknife begins to increase rapidly until the time the jackknife becomes uncontrollable.

A reading of Mr. Wightman's deposition gives vivid and textbook testimony of a sudden jackknife that in a mater of seconds became uncontrollable due to loss of directional control.

With typical driver reaction times (ideal conditions, no rain, no slippery roads, etc.) of about 1.5 seconds, drivers like Mr. Wightman cannot recognize the critical condition they are in and make a timely service brake application to actuate an ABS event.

This service brake control of the engine brake which allows operation of the engine brake only when the service brake is applied would have permitted Mr. Wightman to actuate ABS, release the air pressure in the skidding rear axle wheels, and disengage the engine brake.  In short, with a reasonable degree of certainty as an Automotive Technologist, in my opinion, implementation of the service brake option would have avoided the accident with the SUV.

37

With a reasonable degree of certainty as an Automotive Technologist, and based upon all of the above, my opinions are as follows:

1.     Wightman's description of the loss of control is consistent with the loss of control caused by engine braking, as is my analysis of the loss of control dynamics of his vehicle.

2.     Wightman testified he never applied the service brakes.   Absent an application of the service brakes, the ABS system would not have detected an impending wheel lockup or a full wheel lockup and the ABS event that disables the engine brake would not have occurred.

3.     For the ABS system to shut down the engine brake system absent a service brake application, requires the ABS ECU to be programmed to look for evidence specific to a loss of traction caused by engine braking.

4.     The Wabco Vehicle Control Systems documents that I have reviewed indicate that only during an ABS event is the engine brake ever disabled.

5.     If independent control of the engine brake was intended by Wabco Vehicle Control Systems, documentation of this function should exist.  Wabco Vehicle Control Systems would have supplied information to Detroit Diesel and Freightliner describing these functions, and Wabco Vehicle Control Systems would have documentation for testing of this function.

6.     The Detroit Diesel representative appears to be equating the Deactivation of the engine brake to the ABS Release mode.  However, deactivation of the engine brake would only reduce the braking, not suspend it as an ABS Release mode would.   This

reduction in braking will not allow the wheels to roll free and as they would during the Release mode of the ABS system.

7.    If the ABS system was designed to deactivate the engine brake during a non-ABS event, it would likely be ineffective in stopping a loss of control. At the point the ABS system is able to identify loss of traction, the loss of control progression could only be prevented if the drive train was disengaged or if the engine was accelerated allowing wheel speed to increase.

8.    Detroit Diesel should not have recommended the use of engine brakes on ABS equipped trucks in slippery weather without testing the system to ensure both that it was safe to use and that it functioned as they claim it does.

9.    Detroit Diesel's recommendation assumes that the ABS has a level of control that Wabco Vehicle Control Systems says it does not have.

10.    When Detroit Diesel sells an engine to a vehicle manufacturer, the engine can be used with several different brands of ABS systems. Before making this recommendation, Detroit Diesel would need to test their system with all ABS systems to determine if it can perform as they assumed it does.

11.    The Wightman driver was operating his truck in accordance both with the recommendations in the Professional Driver Techniques manual supplied by freightliner with this truck and with the recommendations of Detroit diesel. These recommendations approve the use of the engine brake on slick roads if the driver is experienced or if the truck is equipped with ABS brakes. These recommendations advise the driver to turn off the engine brake when "fishtailing" occurs.

12.     At highway speeds, by the time the driver notices this "fishtailing", he would be out of control at which time turning the engine brake off would accomplish nothing.

13.     Many truck drivers believe that they should not apply their service brakes during an emergency because steering control would be lost.  They are often taught to steer out of or around an emergency rather than braking.  Additionally, drivers are taught to stop braking and counter steer during drive wheel skids.

14.     These recommendations are reasonable if the vehicle being operated does not have ABS brakes.  However, the recommendations for drivers of ABS vehicles should be very different.

15.     Little has been done to educate drivers about how to drive with ABS or inform them that steering control is maintained during braking with ABS.

16.     Wightman demonstrated his use of these recommendations during the subject accident.

17.     Had Wightman been instructed how to stop with an ABS brake system, and had he been instructed that during ABS braking he would maintain steering control, then more probably than not he would have applied his ABS service brakes, which would have slowed his truck down in a controlled manner and prevented him from crossing into oncoming traffic.

18.     If Wightman had been adequately warned not to use his engine brake in conditions where traction is unpredictable, and had Wightman adequately been advised that he was driving a tractor equipped with ABS, and had he been advised to use his ABS

service brakes to slow and stop his vehicle under these conditions, he would NOT have lost control of the truck.

19.   The use of the engine brake on the tractor in wet slippery weather, known to cause loss of vehicle control, made the tractor unreasonably dangerous and defective.

20.   The practice of using engine brakes in bad weather conditions when traction is unpredictable and attempting to turn off the system to prevent a loss of control if "fishtailing" is experienced, is unsafe in that the probability of loss of control is very high.  This recommended practice is reckless and in complete disregard for the safety of the motoring public.

**Contingency:**

The conclusions and opinions contained in this report are based on the information available to JCGC.  These opinions and conclusions are therefore contingent upon the information available to JCGC as of the date of this report.  If additional information should become available, we reserve the right to revise our opinions based on our review of the newly available information.

**Author:**

This report was authored by John C. Glennon, Jr.  The vehicle inspections and site inspection were performed by John C. Glennon, Jr.   The author's curriculum vitae is attached.


John C. Glennon, Jr.