UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ALICE G. SVEGE, Administratrix of )
the ESTATE OF THOR SVEGE, SR.,     )
ALICE G. SVEGE, Guardian of the    )
Estate of Minor Children, THOR     )
SVEGE, JR., and BRIANA SVEGE,      )
                                   )
         Plaintiffs,               ) Case No.
                                   )
    vs.                            ) 301CV1771 (JBA)
                                   )
MERCEDES-BENZ CREDIT CORPORATION,  )
DAIMLER CHRYSLER CORPORATION,      )
FREIGHTLINER CORPORATION and       )
DETROIT DIESEL CORPORATION.        )
                                   )
         Defendants.               )
_____)

COPY

DEPOSITION OF BRUCE B. KOEPKE

Taken in behalf of Plaintiffs

* * *

July 22, 2003

620 Southwest Main Street, Courtroom 71

Portland, Oregon

Maureen Gager, CSR, RPR
Court Reporter

LORD REALTIME REPORTING
*** (503) 222-3222 ***

35

BRUCE B. KOEPKE  -  X

1      A.      I think it's internal to Meritor WABCO.

2      Q.      You don't know the algorithm?

3      A.      I know what it does, but I couldn't

4   describe the algorithm.

5      Q.      Do you have any document that you've seen

6   that describes it?

7      A.      I have a -- well, it's alluded to in their

8   maintenance and training manuals, and I observed it

9   and had a screen print to show the J1922

10  communications that are -- that are broadcast by the

11  ECU.

12     Q.      Is that Exhibit 6?

13     A.      Yes.

14     Q.      Now, on Exhibit 6, how was this generated

15  again?

16     A.      This is a screen print from a display that

17  was on a laptop computer that has a diagnostic

18  program in it to monitor the activities of the

19  Meritor WABCO ABS system.

20     Q.      And is this a system that produced this

21  screen that has automatic traction control?

22     A.      No.  The ECU that was on this -- it was on

23  a test, a bench test setup, was the same type as on

24  the vehicle in this case, a 4S/4M basic without

25  traction control.

BRUCE B. KOEPKE  -  X

1      Q.      And when was this bench test done?

2      A.      There have been many over the years.  I

3 wanted to see it for myself, so I asked to observe

4 how the system operated and looked at it last Friday.

5      Q.      Last Friday would have been what day?  July

6 18th?

7      A.      Yes.

8      Q.      Okay.  So you didn't have that when you

9 made your report, of course, on June 27th?

10      A.      No.  I was aware of the interaction between

11 the ECU and the engine computer, but I had not ever

12 observed this screen before and played with a bench

13 test setup.

14      Q.      When you say "played with a bench test

15 setup," did you, yourself, do this test on July 18th,

16 2003?

17      A.      I basically just watched it.

18      Q.      Where was it done?

19      A.      Freightliner Test Center.

20      Q.      Where is that?

21      A.      It's on Swan Island here in Portland.

22      Q.      Okay.  Did you look at the other bench

23 tests that you say have been done numerous times?

24                  MR. WILLIAMS:  Objection as to form.

25 BY MR. GILBERG:   (Continuing)

BRUCE B. KOEPKE    -    X

1     Q.     Do you know -- assuming in this accident

2   that the engine brake was on -- to what degree of

3   wheel slippage occurred to the tractor in the

4   accident?

5     A.     There's various facts in there.  The

6   testimony is that the engine controller was off.  But

7   the same algorithm is used to sense wheel slippage

8   for any reason.  It doesn't matter if it's from

9   braking or engine brake; and as I testified earlier,

10  I don't know the details of the algorithm to what --

11  to tell you what the threshold is.  I can tell you it

12  happens very fast, and it allows the driver to remain

13  in control of the vehicle.

14    Q.     Can you point me to one document that you

15  know of and you can identify which says what you've

16  just testified to; that under wheel slippage

17  conditions whenever the wheel speeds varies between

18  one or more of the other wheels on the rear axles

19  that the ABS computer will disengage the engine

20  brake?

21                MR. WILLIAMS:  Objection as to the

22  form.

23  BY MR. GILBERG:   (Continuing)

24    Q.     Do you have any document here that says

25  that?

BRUCE B. KOEPKE   -   X

1    Q.    Now, you did this because you knew you were

2  going to be deposed today?

3    A.    Yes.

4    Q.    You didn't consider doing it before you

5  issued your report of June 27th?

6    A.    I had probably thought about it, but I

7  was -- I didn't do it.  I was very busy at that time.

8    Q.    Going over the railroad tracks, were you on

9  a curve?

10    A.    No.

11    Q.    Were you on any kind of a grade, going up

12  or down?

13    A.    I think at the time of the event, no.  I

14  entered a ramp into kind of a parking area, but I

15  believe over the railroad tracks where I got the ABS

16  event to happen, it was -- other than the bumpiness

17  of the tracks and the gravel, it was level.

18    Q.    When you say "ABS event," you are not

19  saying an impending lockup, are you?

20    A.    Yes.

21    Q.    You got an impending lockup?

22    A.    Enough to deactivate the Jake Brake.

23    Q.    Okay.  And you got an impending lockup and

24  didn't apply the service brake?

25    A.    Correct.

BRUCE B. KOEPKE - X

1    manufactured and, to an extent, the testimony of

2    Mr. Wightman.

3         Q.    Do you accept with regards to

4    Mr. Wightman's testimony that he had his foot off the

5    throttle before the accident took place?

6              MR. WILLIAMS:   Objection as to form.

7         A.    I don't recall specifically what he said.

8    I believe that's what he said, but he also said he

9    shifted down through gears; in which case, he would

10   have to put his foot back on the throttle.

11   BY MR. GILBERG:   (Continuing)

12        Q.    Was that before or after his rear axle

13   wheel started to slide towards the center of the

14   roadway?  Do you know?

15        A.    Well, his rear tires wouldn't slide, at

16   least, as a result of engine braking.  But if you

17   shift down gears in a truck of this type or any truck

18   with a manual nonsynchronized transmission, to get

19   from one gear to a lower gear, you have to raise the

20   RPM of the engine to match the speed it will be when

21   you shift it into the next gear.  That means you have

22   to apply the throttle to shift down.

23        Q.    And when you say that his rear axles didn't

24   slide, is that because of your earlier testimony that

25   the engine brake would have been disengaged?

BRUCE B. KOEPKE  -  X

1    A.    Well, all of the things I said. One: That

2  my understanding of his testimony, which is somewhat

3  confusing, is that he had the Jake Brake off or he

4  drove with the Jake Brake off when it was wet.

5          The second thing is --

6    Q.    He was talking about his custom, wasn't he?

7    A.    Well, he said he couldn't recollect for

8  sure, but he said that -- well, I can't remember his

9  words exactly but that he said that was what he did

10  because he knew you were supposed to not have the

11  Jake Brake on.

12          Then the second thing is that, if you do

13  get wheel slippage with the Jake Brake on, the ABS

14  computer would disengage the engine brake very

15  quickly. And the third thing is that -- from my

16  calculation, is that in 13th gear, which was the

17  lowest gear that you could do 55 miles per hour,

18  there's not enough torque from the Jake Brake through

19  the transmission and axles and tires to cause the

20  wheels to slip on a wet road.

21    Q.    Now, in doing that, in your report you say

22  that in order for the Jake Brake to cause wheel

23  slippage -- this is on your 3rd page in your second

24  paragraph -- the coefficient of friction or the tires

25  on the ground would have to be less than 0.13, on the