1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT

2

3    ALICE G. SVEGE, Administratrix of the
     Estate of THOR SVEGE, SR., ALICE G. SVEGE,
4    Guardian of the Estate of Minor Children,
     THOR SVEGE, JR., and BRIAN SVEGE,

5
                        Plaintiffs,
6
              vs.                    CASE NO. 301CV1771(JBA)
7
     MERCEDES-BENZ CREDIT CORPORATION, DAIMLER
8    CHRYSLER CORPORATION, FREIGHTLINER CORPORATION
     and DETROIT DIESEL CORPORATION,           COPY

9
                        Defendants.
10

11   DEPOSITION OF: DAVID E. CLEMENT, Ph.D.

12   DATE:             May 28, 2003

13   TIME:             9:00 a.m. to 2:00 p.m.

14
     LOCATION:         Courtyard at Marriott
15                     347 Zimalcrest Drive
                       Columbia, SC  29210

16
     TAKEN BY:         Counsel for the Defendants
17
     REPORTED BY:      Janet L. LeVeque
18                     Court Reporter

19

20

21

22
                        COMPUSCRIPTS, INC.
23          A Full-Service Court-Reporting Agency
                       Post Office Box 7172
24          Columbia, South Carolina  29202
                        803-988-0086
25                     1-888-988-0086

David Clement  5/28/2003

15

1      Q.    With respect to the methodology and information in

2   there, you attempt to be careful?

3      A.    Yes.

4      Q.    It sets forth the basis of your opinions; is that

5   correct?

6      A.    Yes, sir.

7      Q.    And the reasons for them?

8      A.    Yes, sir.

9      Q.    And it identifies the data and the information that

10  you considered in formulating your opinions?

11     A.    Yes, sir.

12     Q.    Now, Doctor, what is your area of expertise?

13     A.    It's experimental psychology and the applications

14  of that, including human factors psychology and parts of

15  industrial organizational psychology.

16     Q.    With respect to your involvement in this case,

17  Doctor, do you hold yourself out as an expert in engineering?

18     A.    No, sir.

19     Q.    Do you hold yourself out as an expert with respect

20  to accident reconstruction?

21     A.    No, sir.

22     Q.    Do you hold yourself out as an expert with respect

23  to the operation of Jake brakes?

24     A.    No, sir.

25     Q.    Or engine brakes?

David Clement  5/28/2003

1       A.   No, sir.

2       Q.   How about as an expert with respect to the

3   application of ABS brake systems?

4       A.   No, sir.

5       Q.   Do you hold yourself out as an expert with respect

6   to the operation of Freightliner trucks and tractors?

7       A.   Not that brand of trucks in general, but to the

8   behavior of people who are drivers of trucks.

9       Q.   But not with respect to the design or

10  specifications of any truck?

11      A.   That is correct. I don't.

12      Q.   Doctor, as part of your analysis in this case, have

13  you assumed that the Jake brake was on at the time of the

14  accident?

15      A.   Yes, sir.

16      Q.   And if that were not the case, would you agree that

17  your opinions in this case are irrelevant?

18      A.   They are irrelevant to this case.   I have the same

19  opinion about the need for warnings, but clearly the whole

20  idea is predicated, in terms of this case, on the Jake brake

21  being in operation at the time of the accident.

22      Q.   Right.  And you also assumed as part of your

23  opinions in this case that the Jake brake caused the skid or

24  contributed to the skid; is that correct?

25      A.   Yes, sir.  To be more specific, in both those

1    instances I accept conclusions drawn by other people.   I

2    mean, it's not an independent assumption, but it is -- for me

3    it's an assumption, but it's based upon other people's

4    assumptions.

5         Q.   You agree that if the Jake brake did not cause the

6    skid, then your opinions, again specific to this case, would

7    be irrelevant?

8         A.   I agree.

9         Q.   You are relying on the opinions of Mr. Glennon; is

10   that correct?

11        A.   Well, actually, I'm relying -- it turns out that

12   that is consistent with the opinions of Mr. Glennon, but I've

13   been informed about that via pleadings and things of that

14   nature earlier.

15        Q.   So you were relying on Mr. Gilberg?

16        A.   Yes, sir.

17        Q.   Apart from Mr. Gilberg, what else were you relying

18   upon in assuming that the Jake brake was, number one, on,

19   and, number two, played a role in this skid?

20        A.   I was relying on his statements initially when I

21   formed my opinion.

22        Q.   Whose statements?

23        A.   Mr. Gilberg's.  Subsequently, after receiving the

24   opinions of two of the other experts, those are consistent

25   with what he told me.  But I didn't have those at hand when I

David Clement  5/28/2003

18

1    wrote the opinion.

2        Q.   With respect to Mr. Glennon's testimony, do you

3    know if he did an accident reconstruction?

4        A.   I believe he did not.  Remembering now, I've only

5    read about 32 pages of his testimony.

6        Q.   Do you know of anyone who has done a reconstruction

7    on behalf of Mr. Gilberg to determine if -- or offer an

8    opinion that the Jake brake caused the skid?

9        MR. GILBERG:  Note my objection to the form.

10       THE WITNESS:  No, sir

11   BY MR. WILLIAMS:

12       Q.   Did you inspect an exemplar truck?

13       A.   No, sir.

14       Q.   Did you see any photographs of the truck?

15       A.   Yes, sir, but not prior to finishing my report.

16       Q.   Where are they?

17       A.   I don't have them.  I saw them yesterday evening

18   when I met with Mr. Gilberg.

19       Q.   Did you take any dimensions of the truck?

20       A.   No, sir.

21       Q.   Did you compare the Freightliner to any other

22   trucking company's with respect to the warnings of Jake

23   brakes?

24       A.   No, sir.

25       Q.   Did you determine if there are, in fact, any trucks

David Clement    5/28/2003

19

1    that have labels or warnings concerning engine brake

2    operation on the dash?

3        A.   No, sir.

4        Q.   Do you know, as you sit here, if there are or not?

5        A.   I do not know.

6        Q.   In your undergraduate or Ph.D. work, Doctor, did

7    you take any courses on human factors?

8        A.   No, sir.

9        Q.   Have you ever worked as a -- practiced as a

10   clinical psychologist?

11       A.   Oh, no, sir.  I'm not a clinical psychologist.

12       Q.   Exhibit 4, your resume, indicates that you are a

13   certified professional ergonomist; is that correct?

14       A.   Ergonomist, yes, sir.

15       Q.   Pardon me.

16       A.   That's all right.

17       Q.   Could you please me what was required for you to

18   achieve that?

19       A.   I had to submit several kinds of work product.  Of

20   course, submit credentials in terms of degrees and experience

21   and things of that nature, and that was it.

22       Q.   Was there any standardized tests to become a

23   certified ergonomist?

24       A.   No, sir.

25       Q.   And how long has the Board of Examiners and

David Clement   5/28/2003

22

1    product?

2         A.   That wasn't your prior question.  I haven't been

3    involved in providing any kind of instruction since then.

4    And I can't answer yes or no on consumer products, because

5    aside from anything that was involved in litigation, other

6    kinds of consulting is confidential and can be released by

7    the person who hired me to do the consulting, but I don't

8    have that authority.

9         Q.   Okay.  So are you saying that you have produced

10   warnings for consumer products?

11        A.   No, sir.

12        Q.   You're not saying that?

13        A.   That's correct.

14        Q.   And apart from your Kodak experience, you haven't

15   prepared any instructions for any consumer products?

16        A.   That is correct.

17        Q.   Have you ever been consulted by a trucking company?

18        A.   No, sir.

19        Q.   Have you ever prepared any warnings or instructions

20   for automobile or automotive operation or operator manuals?

21        A.   No.  I have done some of that related to

22   litigation, and I'm reasonably certain that I've been

23   involved in designing things for use in the classroom and my

24   teaching.  You said in general.  I didn't know if you --

25        Q.   Okay.  But for all manufacturers, you've not done

1   that work?

2        A.   Again, I can't answer that question yes or no, and

3   I'm not claiming any kind of experience, but my --

4        Q.   Okay.

5        A.   I can't answer.

6        Q.   You're not claiming any experience?

7        A.   Good.  Yes, sir.

8        Q.   Have you prepared any alternate designs for the

9   warnings or instructions in this case?

10       A.   No, sir.

11       Q.   Now, Doctor, are you full-time, teaching full-time

12   currently?

13       A.   I'm employed full-time on a nine-month contract for

14   the University of South Carolina, yes, sir.  I answered that

15   way because as of today I'm not teaching until doing some

16   teaching in the summer, but that's my real job, yes, sir.

17       Q.   And that's a full-time position?

18       A.   Yes.

19       Q.   And how long have you been there?

20       A.   I just finished 25 years.

21       Q.   And when did you start consulting in matters

22   involving litigation?

23       A.   Approximately 1987, I think.

24       Q.   How did you become involved in that?

25       A.   I got a call from an attorney in Mamou, Louisiana,

David Clement   5/28/2003

27

```
 1        Q.    Do you hold any patents?

 2        A.    No, sir.

 3        Q.    Have you ever been involved any studies concerning

 4   the design of trucks or truck occupant compartments?

 5        A.    No, sir.

 6        Q.    Have you published in the area of dashboard

 7   warnings of any trucks or motor vehicles?

 8        A.    No, sir.

 9        Q.    Did you do any research to determine if there were

10   any other accidents arising out of engine brakes as part of

11   your work in this case?

12        A.    No, sir.

13        Q.    Apart from Mr. Gilberg, have you spoken to anyone

14   else concerning this matter?

15        A.    No, sir.

16        Q.    You've never spoken to Mr. Glennon?

17        A.    Oh, no, sir, no one involved in the case.  I was

18   trying to think if I've ever talked to a secretary or

19   something of his, but he's the only person.

20        Q.    You've not spoken to Mr. Glennon or Mr. Sero?

21        A.    That's correct.

22        Q.    Have you spoken to any members of the plaintiff's

23   family?

24        A.    No, sir.

25        Q.    Have you reviewed your opinions in this case with
```

1    any other human factors experts?

2        A.    No, sir.

3        Q.    Have you raised your opinions in this case with any

4    colleagues at the university?

5        A.    No, sir.

6        Q.    Have you published opinions or letters, for that

7    matter, concerning your -- well, let me withdraw that.

8              With respect to opinions that you have in this

9    case, have you shared them with any governmental agencies?

10       A.    No, sir.

11       Q.    Have you written to anyone or prepared any written

12   documents outlining your opinions that there should be

13   additional warnings or labels for Jake brakes, other than the

14   report provided to Mr. Gilberg?

15       A.    No, sir.

16       Q.    Okay.  Are you familiar with the operation of an

17   engine brake?

18       A.    I basically understand that you're talking about

19   Jake brakes in particular.

20       Q.    Yes.

21       A.    Yeah, I have some understanding of the principles

22   involved, but that's very fuzzy.

23       Q.    And the understanding is related to what?

24       A.    Simply that, we'll say, in contrast to the kind of

25   engine braking you can get in a car with standard

David Clement  5/28/2003

29

1    transmission.  If you have a diesel engine, Jake brakes

2    change the timing of the exhaust valves and essentially take

3    away the downward, some of the downward force that comes from

4    pistons when you get ignition, but then requires more force

5    produced by the vehicle in terms of compressing the air at

6    the top of the cylinder during the compression cycle.  So

7    unlike a normal kind of firing where the piston is driven

8    downwards and you have momentum as it's driven back up, as it

9    goes downwards, the force behind it is released so that when

10   the valves are closed, it increases the amount of force taken

11   to compress.  And that's essentially taking energy away from

12   the drive wheels.

13        Q.  Did you have any information concerning Jake brakes

14   or engines brakes prior to your involvement in this case?

15        A.  Yes, sir.

16        Q.  In what respect?

17        A.  At one point somebody was -- it was another

18   trucking accident, which did not involve this, but somebody

19   mentioned Jake brakes and I went and looked them up because I

20   hadn't heard that name before.

21        Q.  Do you remember that case?

22        A.  Well, no.  And as I say, the case didn't involve

23   Jake brakes.  The trucker happened to mention them.

24        Q.  So this is the only case that you've ever been

25   involved in concerning Jake brakes?

David Clement    5/28/2003

30

1       A.    I believe so.  At least where that is a point at

2  issue, yes, sir.

3       Q.    Well, are --

4       A.    I'm sorry.  There may be cases where there was a

5  truck involved and the truck may have had Jake brakes, but

6  that didn't become an issue in the litigation.

7       Q.    Okay.  You're not aware of any other cases that

8  you've been involved in where it is claimed that Jake brakes

9  caused the skid that caused an accident; is that right?

10      A.    That is correct.

11      Q.    And, in fact, you're not aware of any other

12 accidents anywhere where that is the allegation as to the

13 cause of the accident?

14      A.    That is correct.

15      Q.    Have you ever operated a truck with a Jake brake?

16      A.    No, sir.

17      Q.    Have you ever been a passenger in a truck with a

18 Jake brake?

19      A.    Not that I'm aware of.

20      Q.    Does your board certification require any

21 recertification process?

22      A.    Currently it does not.

23      Q.    Of your 55 publications, Doctor, how many relate to

24 human factors in the operation of machinery?

25      A.    None are specific to the human factors in the

David Clement   5/28/2003

31

1    operation of machinery.  My opinion is that about

2    three-fourths or more of them relate to human factors.  But

3    understand that means that those studies that deal with

4    information processing and perception and so forth, that

5    serve as the research basis for human factors, are included

6    in that, but I don't have anything that focuses just on human

7    factors in the operation of machinery.

8         Q.   Okay.  Is it your opinion that the Freightliner

9    vehicle did not meet applicable standards?

10        A.   That's correct.

11        Q.   What standard is it that you're claiming it did not

12   meet?

13        A.   The standards in the safety profession requiring

14   when there are hazards and subsequent dangers that can apply,

15   requiring as sort of a last resort warnings and instructions

16   specific to the danger, and that emphasizes the need for

17   putting these at the point where they are relevant, which

18   means available to the operator.

19        Q.   Okay.  Apart from the safety professional

20   standard -- and I'll ask for the detail of that -- are you

21   claiming that there is any federal motor vehicle safety

22   standard that's been violated?

23        A.   No.

24        Q.   Do you claim that there is any specific engineering

25   standard violated, either promulgated by an organization or

David Clement    5/28/2003

32

1    governmental body?

2        A.    Well, remembering that my engineering is way out of

3    date, and I'm not an industrial engineer where most human

4    factors engineers come from, I am assuming that human factors

5    engineers, and particularly those trained in industrial

6    engineering, are equally aware of these kinds of basic safety

7    standards and so they probably have accepted the same kinds

8    of professional standards.

9        Q.    So I'm clear, Doctor, there's not a code or

10   regulation or statute that you're claiming that Freightliner

11   Truck violated; is that correct?

12       A.    That is correct.

13       Q.    And there's no specific specifications with respect

14   to the location, identity, size and color of the label that

15   you're claiming had to be used in this case; is that correct?

16       A.    Not exactly.

17       Q.    Okay.

18       A.    For example, ANSI standards on warnings include

19   statements with regard to having -- well, certainly includes

20   statements about visibility and certain colors and things of

21   that nature, but, more importantly, talk about the need to

22   provide information at the point of its use and warnings at

23   the point of use so that the operator can have maximum

24   protection.

25       Q.    Okay.   Is there a particular ANSI standard you are

David Clement    5/28/2003

47

1    human factors and machine operation?

2        A.    I've read literally hundreds.

3        Q.    Do you refer to any with respect to this case?

4        A.    No, sir.  I referred to my recollection.

5        Q.    What about, are you familiar with any research

6    concerning human factors issues and the operation of motor

7    vehicles?

8        A.    Yes.  Fewer than the hundreds that -- machines,

9    I've probably -- not obviously, but I have read a lot of

10   abstracts, but I would say probably no more than 50 to 100

11   that deal with the operation of motor vehicles in general.

12       Q.    Any specific to trucks that you can refer us to?

13       A.    Wonderful question.  I don't think so.  Wonderful

14   question, because the answer doesn't pop up in my head.  I

15   don't believe so.

16       Q.    Just to be clear, you didn't do any research to

17   attempt to determine if such studies exist?

18       A.    That is correct.

19       Q.    Do you own any trucks?

20       A.    Remember, I'm in South Carolina.  I've got a

21   full-size van, which often gets called a truck here, but it's

22   not.  It's what any commercial driver would talk about as a

23   little four-wheeler.

24       Q.    Okay.  Do you have a commercial driver's license?

25       A.    No, sir.

David Clement    5/28/2003

51

1    A.    No, sir.

2    Q.    Am I correct, Doctor, that the time that you spent,

3  I guess the days that you spent, that time prior to the

4  preparation of your report, you have no records of that?

5    A.    Only the cumulative total, because, as I say, once

6  I made up the bill, I just threw away the sticky.  Those are

7  my, almost literally, window-dressing because they are around

8  the frame of my computer screen.

9    Q.    Okay.  And you met with Mr. Gilberg yesterday for

10  an hour and a half?

11    A.    Yes, sir.

12    Q.    Where was that meeting?

13    A.    Here.  Well, not in this room, but in this motel.

14    Q.    What did you do over that hour and a half?

15    A.    Again, talked about what was in my report.

16  Mr. Gilberg showed me a couple of photographs of the dash of

17  the vehicle involved in the accident.

18    Q.    I believe you said this earlier, Doctor, that's the

19  first time you saw any photographs, is that correct, of this

20  truck?

21    A.    I think so.  I'm trying to remember, frankly,

22  because I visualized the dash and I don't think there were

23  any unless in the trooper's report.  I don't think there were

24  any -- there could have been a black and white copy of some

25  of these, but I hadn't seen any color photos before, that's

1    positive.  I'm sure I saw it when I was reading, but I just

2    don't remember.

3        Q.   And is there any indication to the driver that the

4    Jake brake is on, if it is on?

5        A.   There's information available on the dash in terms

6    of the position of the switches.

7        Q.   Is there anything else?

8        A.   Well, under two circumstances:  Relatively low

9    level of outside noise compared to the noise from the truck

10   itself, and a clear ability to hear the engine noise.  There

11   is a difference in loudness when the Jake brake is on.  The

12   problem with that is that in the middle of a storm,

13.  windshield wipers going, road noise from -- and air noise

14   from the rain and things of that nature, I don't know whether

15   that's a very audible difference.

16       Q.   Okay.

17       A.   I accept, because I'm not an expert on this -- but

18   I accept if it's known -- if you could somehow get out on a

19   deserted road, and it was absolutely peaceful and clear, I

20   accept that there's a very audible difference between having

21   the brake engaged and not having it engaged.

22       Q.   With respect to even just listening to a Jake brake

23   in this model truck, you've not done that?

24       A.   That's correct.

25       Q.   With respect to trying to test the audible notice

1   that the Jake brake is on under rainy conditions, you've

2   certainly not attempted to do that; correct?

3       A.   That is correct.  I'm drawing on, for instance,

4   from Mr. Wightman's testimony, because since he was not

5   positive whether it was on or not, I'm drawing the inference

6   from that that he doesn't recall hearing the specific noise,

7   but he also doesn't state that since he didn't hear the

8   noise, he knows it wasn't on, which means he's got enough

9   background noise that that was not an obvious thing to him.

10      Q.   Well, he wouldn't hear the noise of the Jake brake

11  if it wasn't on.  You would agree with that?

12      A.   He would not hear the noise of the Jake brake if

13  the Jake brake wasn't making noise, but he doesn't make the

14  statement that I didn't hear it, therefore it wasn't on, from

15  which I infer that the background level of noise is high

16  enough, he's accepting the possibility that it was on and he

17  simply didn't hear the difference.

18      Q.   Are you saying it's your opinion --

19      A.   No one asked him that question; that's why I'm just

20  inferring it.

21      Q.   Is it your opinion that the Jake brake is not a

22  noise sufficient to alert the operator even under any

23  conditions?

24      A.   Under any conditions?  I have no information that

25  would support that.

1      Q.    What about rainy conditions?

2      A.    Again, I don't have the information.  I understand

3  it was windy and rainy and so forth.

4      Q.    So you don't have an opinion concerning that?

5      A.    Well, I have an inference, but I don't have an

6  opinion about the loudness, the actual loudness level, no,

7  sir.

8      Q.    And in human factors is audible notice or an

9  audible warning an acceptable method under some

10  circumstances?

11      A.    Depending on what the warning is and the

12  circumstances, it may be the best.

13      Q.    Certainly buzzes or bells are used; is that

14  correct?

15      A.    Yes, sir.

16      Q.    Beepers are used on some machinery when they are

17  put in reverse, for example?

18      A.    Right.  And actual language is used in terms of

19  like cockpit warnings on aircraft.

20      Q.    And do you have an opinion as to whether or not the

21  audible sound of a Jake brake is a warning or a notice to the

22  operator that it's on?

23      A.    I believe statements have been made that you can

24  tell the difference under the right circumstance.  I don't

25  have an opinion that would expand that to say you can always

1    tell the difference.

2        Q.    You just don't know?

3        A.    I don't know.  And, in fact, on Jacobs Web site

4    they're fairly dismissive of the magnitude of noise

5    differential.

6        Q.    When did you go on the Jacobs Web site?

7        A.    Sometime in the last few weeks.

8        Q.    Okay.  Did you go on any other Web sites?

9        A.    Well, where I found out about -- the reason I found

10   the Jacobs Web site is I went back and was looking at "How

11   Things Work," Web site, which I highly recommend.  It's got

12   nice elementary explanations of all sorts of things.  That's

13   where I first learned about the -- physically how the Jake

14   brake operated.

15            And when I went back to look at that to see if I

16   was remembering it correctly, I also saw -- they gave a link

17   to what turns out to be the Jacobs -- I think it's Jacobs

18   Corporation home site.  And I scanned around a few things on

19   that and noticed that one of them had to do with, some places

20   apparently have put up signs that say "no Jake brakes in this

21   vicinity," and not -- I wasn't terribly surprised that Jacobs

22   Corporation thought that that was unnecessary.

23       Q.    When you went to "How Things Work" Web site, that

24   was in the last few weeks?

25       A.    That was when I went back to look to make sure that

1    I hadn't mis-recalled things from it that I had seen a couple

2    years back.

3        Q.    Did you go to the "How Things Work" Web site prior

4    to you preparing your report?

5        A.    As I say, a couple years ago.

6        Q.    But not at the time you prepared your report?

7        A.    No, no, because I'm not speaking to how the Jake

8    brake operates in my report.

9        Q.    Would you agree that based upon Mr. Wightman's best

10   recollection, he turned off the Jake brake when he got on the

11   Pennsylvania turnpike?

12       A.    I would agree that he said that.  But I also

13   understand that in several places in his deposition, he made

14   statements either in that direction or in the direction of "I

15   really don't recall," and those are not mutually exclusive,

16   but they aren't confirming of each other.

17       Q.    Would you agree that if you credit Mr. Wightman's

18   best recollection testimony --

19       A.    Just that one part.

20       Q.    Yes.  Then there is no basis for this lawsuit

21   against Freightliner?

22       A.    If that is a correct recollection, you are correct.

23   Well, there is no basis for this lawsuit from my point of

24   view, because I'm speaking to the warnings aspect and

25   specifically with regard to the operation of the Jake brake

1    A.   I believe he has a CDL and well over a decade worth

2   of driving over the road.

3    Q.   And did he testify that he was taught on -- let me

4   withdraw that.

5         What is your understanding of how he learned how to

6   operate a Jake brake?

7    A.   I don't remember specifically what he said, so this

8   may be wrong memory, but I believe that he -- because he's

9   operated a lot of equipment that had Jake brakes on a lot of

10  trucks, and that he had simply learned by experience or with

11  instructions from other drivers.

12   Q.   Did he go to a driving school, do you know?

13   A.   Well, he had to go to driving school to get his

14  CDL.  I, frankly, don't remember whether he went to anything

15  after that.  I also don't remember whether the pre-CDL

16  driving school involved instruction on Jake brakes.

17   Q.   Do you know if he read the operator's manual that

18  was provided with the truck?

19   A.   My recollection is he said in general he didn't

20  read manuals, that he had gone -- I think he had gone through

21  some of the truck manual -- but I'm not sure if that's what

22  he was talking about -- but through one of the manuals when

23  he was bored one day and had nothing else to do.

24   Q.   With respect to the subject truck that he was

25  operating, do you have an understanding whether or not he

1   read those manuals?

2       A.   I'm pretty sure he did not read them thoroughly.

3   He may not have read them at all.

4       Q.   Would you agree that it was Mr. Wightman's habit to

5   shut off Jake brakes on wet roadways?

6       A.   That's what he said.  I have no reason to

7   disbelieve that.

8       Q.   Yesterday, when you first saw photographs of the

9   dashboard, did you notice any damage?

10      A.   I was just focused on the area with the two control

11  switches for Jake brakes, and the enabling switch.  The one

12  on the left, as you face the dash, was up, and the one on the

13  right was broken off.  I'm sorry, the lever part of the

14  switch was broken off.

15      Q.   Do you have any information as to how that

16  occurred?

17      A.   No, sir.

18      Q.   Is it your understanding that this was a severe

19  accident?

20      A.   Oh, yes, sir.

21      Q.   Was there heavy damage sustained by both vehicles

22  involved?

23      A.   Yes, sir.

24      Q.   Is Mr. Wightman a smoker?

25      A.   I don't know.

1          I'll end the quote there.  By whom is it argued?

2     A.   Certainly by the pleadings in the case, and that

3  was subsequently -- I didn't know at the time I wrote --

4  well, I knew, but I hadn't seen the documents at the time I

5  wrote the report.  Well, the electrical engineer and the

6  mechanical expert that were employed by Mr. Gilberg to

7  evaluate this, both argue that.

8     Q.   Okay.  Following that paragraph, then, that you

9  assume these arguments to be correct, is that right, in

10  formulating your opinion?

11    A.   Yes, sir.

12    Q.   And if they are not correct then your opinions are

13  not relevant to this specific case?

14    A.   That is correct.

15    Q.   And your opinions are outlined in numbers 1 through

16  4, immediately after on page 3; is that correct?

17    A.   Correct.

18    Q.   You first indicate that the warnings regarding the

19  use of the engine brake and wet pavement conditions, as

20  provided in the owner's and operator's manual weren't

21  adequate.

22    A.   Yes, sir.

23    Q.   Could you tell us what you mean by that?

24    A.   Each of those, as I'm sure you're aware, I've

25  expanded subsequently.  But, essentially, just to paraphrase

1          And then they give a description of how to engage

2     the brakes, how to operate it and so forth and so on.

3          Q.   Do you have an opinion whether or not that's an

4     adequate warning?

5          A.   Yes, sir.

6          Q.   What is it?

7          A.   It's not adequate because it doesn't emphasize the

8     predictable outcome, potential outcome of having a jack-knife

9     as opposed to simply having some slithering down the road or

10    something like that, or slower brake time or things of that

11    nature.  It isn't specific enough about what the consequence

12    is that would be likely to be most impressive to a driver.

13         Q.   What is your basis for saying that the jack-knife

14    is predictable?

15         A.   If the -- which is what I understand to be the

16    sequence here -- and again, this is not my expertise, but

17    from what people have said, that I have read, if the Jake

18    brakes are engaged, and someone acts as though they don't

19    have Jake brakes on and, therefore -- for example, when

20    beginning to get some sway in the back end of the trailer, in

21    the tractor-trailer combo, start applying the trailer brakes

22    in an attempt to bring the back end in line so that then

23    using the service brakes would not create a skid potential,

24    is actually creating the skid potential as soon as they start

25    slowing down the trailer, because that, in fact, is operating

1    a label on the dashboard for its safe operation?

2        A.    I'm sure there are others that have it, and I

3    didn't make any assessment of that.  And the reason I'm sure

4    there are others that have it is that I've -- without knowing

5    about this specific vehicle, I would be shocked if there

6    weren't at least a warning light to notify, for example, if

7    the brake pressure had dropped too low, since this is an air

8    brake, things of that nature to get -- that would come on and

9    flash to get the driver's attention if suddenly he was in

10   danger of losing brakes, for example.

11        This was not a brand new kind of truck, so it

12   probably didn't have sensors for tire pressure.  It might

13   have.  But on new trucks, some of them have that, and those,

14   again, use warning lights to indicate where there may be low

15   pressure.  And those kinds of things certainly are very

16   important and typically are not -- the tire pressure thing is

17   relatively recent, but things like the brake pressure, things

18   of that sort are typically provided, not only by gauges but

19   with warning lights that catch attention when they get below

20   an acceptable value.

21        Q.    Do you know what warning lights were on this truck?

22        A.    No, sir.  Like I say, I'm assuming they had that

23   kind of light for such things as brakes and so forth, but I

24   don't know.

25        Q.    Did Mr. Wightman know of the potential hazards

1    associated with the use of Jake brakes in wet road

2    conditions?

3        A.    I think he did.  He certainly was aware that he --

4    he said it was his practice, and I'm pretty sure that one of

5    the four or five times he was asked about this, he said that

6    you shouldn't use the Jake brakes when it was -- when the

7    roads were slippery.

8        Q.    Because he knew of the hazard associated with that

9    use?

10       A.    Well, that would be my assumption.  I, frankly,

11   don't think -- I'm not sure.  He may not have ever said that

12   that would be more likely to cause a jack-knife, but he

13   was aware that he shouldn't use it.

14       Q.    With respect to your criticisms of the warnings in

15   the operator's manuals provided in this case, isn't it true

16   that Mr. Wightman said he didn't read them?

17       A.    That's my recollection, yes, sir.

18       Q.    And based on upon what you just said, you at least

19   inferred that he understood the risks associated with the use

20   of Jake brakes on wet roadways?

21       A.    I'm not positive he understood that specific risk,

22   but he understood that there were risks.

23       Q.    He understood they shouldn't be used on wet roads?

24       A.    Yes.

25       Q.    So it's true that Mr. Wightman was aware of the

1    Q.    That's what you are relying upon?

2    A.    Yes.

3    Q.    Anything else about him or about professional

4    drivers or any additional information that you are relying

5    upon?

6    A.    I am accepting, because I see no evidence of the

7    contrary, that he would fit within that middle 90 percent

8    professional drivers with a CDL, who have more than a year's

9    or so worth of experience in over-the-road, who were aware of

10    the stricture about not using Jake brakes when the road is

11    wet.  From his own statements, he fits within that, and I see

12    nothing that would put him outside of that group.

13        For somebody in those circumstances, providing an

14    active kind of notice that the brake is on should be

15    sufficient because they would be motivated to bring their

16    situation in conformity with what they wanted to do and what

17    their typical practice was.

18    Q.    And the active notice, do you have an opinion about

19    what that active notice should be?

20    A.    It could be a variety of things.  It could be a

21    flashing light, which would get irritating after a while.  It

22    could be an LED display that has a dark background strip

23    light that says "engine brake on."  But anything that can

24    change states and would specify the state when it was on.  It

25    could be simply blank when the engine brakes were off.

1    Q.    Did you determine the size of this active notice?

2    A.    I didn't design something and test it out.

3    Certainly, if it were -- if letters were, you know, something

4    on the order of magnitude at that distance of an inch, inch

5    and a half high, and the whole strip could probably be

6    something less than ten inches long, that probably would be

7    sufficient.

8    Q.    And where would it be located?

9    A.    I'd put it underneath the location of the switches

10   on that particular dash.  There's a blank space there.

11   Q.    You said one of the potential active notices would

12   be a flashing light?

13   A.    Yes.

14   Q.    And when would it flash?

15   A.    When the engine brake is on.

16   Q.    What do you mean when you say the engine brake is

17   on?

18   A.    When it's enabled.  I'm sorry.  Not just when it's

19   acting, but when the switch is in the on position.  That's a

20   better way of phrasing it.

21   Q.    You mentioned earlier how some lights on displays

22   become washed out by daytime; correct?

23   A.    Correct.

24   Q.    Would that be a risk with respect to your display

25   you are suggesting here?

1       A.     That is a risk.  And depending on its location and

2   what the overhang of the cab transom and things like that

3   happen to be, it might be that a combination of little -- a

4   tiny little strobe light that would flash in daylight, simply

5   to attract attention to the visual display, and then maybe

6   the visual display by itself when it gets darker outside

7   would be sufficient.  If it were a strobe light, that's why I

8   made that comment it could get irritating.  If you want

9   something that catches attention and the person now sees

10   that, you want to make sure they see it and process it, but

11   you don't want them to be so angry at the thing that they

12   break the light.

13          So a strobe that comes on for five or ten seconds

14   or something like that, every minute or so, until the switch

15   gets turned off, should be enough to get attention without

16   suggesting to the operator that they don't want to be

17   bothered with that again.  But, on the other hand, a display

18   that just says "engine break on," that's not irritating.

19      Q.     But with respect to these various potential notices

20   you've just described for us, either blinking or an LED

21   display or just a solid bar of light near the engine brake

22   switch, you've not done anything to determine if any of these

23   would work appropriately; correct?

24      A.     That is correct.  I've done no study on it.  I

25   didn't suggest a solid light would be good.

1    Q.    You didn't suggest a solid light?

2    A.    No.  I think an indicator light.  You said solid

3    bar light.

4    Q.    I thought that was one of your options.

5    A.    No.  I was describing the strip where you would

6    have written "engine brake on."

7    Q.    With respect to the human factors aspect of such a

8    device, to determine whether it works, would you need to do a

9    study?

10    A.    To determine how well it works, I would need to.

11    To determine whether it works better than what is currently

12    there, I don't need to do the study.

13    Q.    And what would the study involve?  If you're going

14    to do a study to determine how well it works, what would that

15    involve?

16    A.    You do some pilot work to make sure that it's for

17    people that are more or less instructed to process what's

18    visually available to them, not out on the road.

19    Q.    What does that mean, pilot work?

20    A.    It means instead of a full-blown study, you're

21    grabbing a handful of people, sitting them down at some kind

22    of simulation, in other words, a mimic, mock-up of the dash,

23    and asking them to report what they see.  And if you don't

24    have 100 percent of them reporting within a few seconds that

25    they've seen this light come on that says, or the panel that

1 says this or they saw the light flashing, that's not good
2 enough. So that's more or less to knock out anything that
3 turns out to be a truly disastrous kind of design.

4      Having done that, then the next step is getting
5 information from over-the-road drivers about what they think
6 of a potential placement of such a sign, such an indicator
7 and so forth on the dash of their vehicle, and processing --
8 if you get feedback from them, well, that would be fine, but
9 it's in the wrong place, then consider a location. If you
10 get feedback from them that I really don't need that, but it
11 wouldn't hurt to have it over there as a back-up or something
12 like that -- and a lot of times that's sort of the end of
13 studies, because if nobody is objecting to it and it seems to
14 be potentially workable, it gets installed.

15      But a real good subsequent follow-up to that would
16 be actually installing this into some trucks, and simply
17 hooking it up with some recorders that can identify when the
18 light is on and when it gets turned off, and where you have
19 some pretty good knowledge about whether where the drivers
20 are so you could anticipate whether they were in wet
21 conditions or not, and see if in fact you get 90 percent of
22 these people turning it off when they were in a situation
23 where it should be turned off.

24      That at least means that it's potentially a good
25 warning. Even there you still have to use "potential"

1   because some of them might have turned it off anyway, and the

2   question is whether or not this has provided that necessary

3   kind of information.

4        Q.   Anything else in the study or is it that?

5        A.   That's a little further than most places are going

6   to go.

7        Q.   Okay.  You've not done any of these steps with

8   respect to your opinions in this case; is that correct?

9        A.   That is correct.

10       Q.   Have you ever done a full, complete study of this

11  type for any consumer product?

12       A.   That's one of those questions I can't answer yes or

13  no.

14       Q.   Are you claiming any expertise with respect to a

15  complete study for a consumer product?

16       A.   No.  I've done studies up to that point of getting

17  opinion, observing on small scale, not in consulting for

18  people, but simply in some research I was interested in and

19  in some things for my classes, but I can't speak to any

20  issues about things that might have been done in consulting.

21       Q.   Okay.

22       A.   And I won't, so I'm not going to sand-bag.

23       Q.   When you say in your opinion that the owner's

24  manuals are inadequate, do you rely upon any standard that we

25  have not already discussed?

1    A.   Yes, sir.

2    Q.   Is that what we just discussed, the LED or the

3    indicator light?

4    A.   Yes.  And, actually, probably as an expert opinion

5    it should have the statement there should have been a

6    warning, because what I stated I understand to simply be

7    fact.  Then I expand on paragraph 2 on the next page, which

8    is essentially giving the opinion that there should have been

9    a warning because it would then have this information

10   immediately available to the operator.

11   Q.   In human factors, does the frequency of accidents,

12   associated with a product or a component, factor into whether

13   you believe the operator of that product is sufficiently

14   warned?

15   A.   Yes, sir.

16   Q.   I understood you to say earlier that you're not

17   aware of any other accidents where it is claimed the engine

18   brake caused the jack-knife; is that correct?

19   A.   I'm not aware of any, no, sir.

20   Q.   And do you have an opinion as to what other modes

21   of operating a tractor could cause jack-knife other than

22   engine braking?

23   A.   I have some general knowledge, but I'm not an

24   expert on that.

25   Q.   Do you know if there are other ways in which a

David Clement   5/28/2003

106

 1   because danger means if you contact, you're in big trouble.

 2              Warning should get some attention, maybe not as

 3   much as the danger.

 4        Q.   Do you have any information as to how many hazards

 5   there are on this tractor that require warnings?

 6        A.   No.

 7        Q.   Do you have to warn of open and obvious conditions?

 8        A.   Human factors folks, and safety people in general,

 9   have a different definition of that term than in law.  Where

10   I'm absolutely in agreement with the legal definition is if

11   somebody, at the moment that they encounter a hazard, is

12   aware of it and is aware of the consequences, then it is open

13   and obvious.

14              Safety folks will deviate, from what I understand.

15   I understand -- and, understand, I'm no expert in the law,

16   but from what I've heard people use as a legal definition,

17   that if it's there so that somebody could be aware of it,

18   then it is open and obvious.  And safety folks say, huh-uh,

19   it's open and obvious if it's something that the person is

20   aware of.  If it's there and a person could have knowledge of

21   it, and be aware, but a person could also have knowledge of

22   it and not be aware of it; that is not open and obvious.

23              A classic description is if you're walking through

24   a parking lot in a shopping mall or something like that.  If

25   there's a cover to a service access, manhole cover, and its

David Clement   5/28/2003

107

1  been left off, and it's in between two cars, my understanding

2  of the way I've heard attorneys use it is, well, if you were

3  looking down and saw that, it's open and obvious.  But from a

4  safety standpoint, if you're walking through a parking lot,

5  looking for your car, and you turn between two cars, you're

6  unlikely to take a glance straight down at where your feet

7  are because you are still processing other things, and so for

8  you that's not open and obvious.

9      Q.   So as you use the term, if a consumer or an

10  operator is aware of the hazard --

11      A.   At the time that they need to make some decision

12  about whether to go near it, contact it, ignore it, whoever.

13      Q.   Then it is open and obvious?

14      A.   Yes, sir.

15      Q.   And it does not need to be warned about?

16      A.   For that person, it doesn't.  The problem is

17  assuring that people are aware of it, and that's the

18  secondary function that's very important.  The secondary

19  function of the warning is the reminder function.

20      Q.   Are you aware of any research which involves adding

21  labels to existing products -- let me withdraw that.

22          Are you aware of any research involving

23  knowledgeable users and the effect of added labels to the

24  products?

25      A.   There's a fair amount of research that's been done

David Clement    5/28/2003

108

1    on a variety of circumstances involving things like that.

2    The outcome is very specific as to what the product is, what

3    the person's experience is, and exactly what kinds of

4    information is being added via the labels.

5        Q.    Are there any studies that you could refer us to at

6    this time concerning knowledgeable users?

7        A.    No single study comes to mind, no, sir.

8        Q.    In those studies, based upon your reading of them,

9    is there a consistency to the way in which knowledgeable

10   users interact with a new label on a product?

11       A.    Again, it's a function of the specific

12   circumstances as a study.  But as an example, for

13   knowledgeable users who are comfortable that they understand

14   everything there is to know about the product, you have close

15   to zero possibility that they will attend to any kind of

16   informational label that's on there.  That's not the same as

17   if you suddenly put a danger label on.  Even though somebody

18   thinks they are totally understanding of it, they will the

19   first time stop and read what that label is.

20            At the other extreme, somebody who is working with

21   a fairly complex piece of equipment, feels very comfortable

22   with it, and sees, for example, a new warning, is more likely

23   to at least do a quick scan of it to see if they are

24   knowledgeable about whatever it is it's dealing with.  So

25   there's a difference in terms of somebody's certainty that

David Clement   5/28/2003

117

1  an industrial psychologist?

2      A.   That was received in either late fall or early

3  spring '68 -- '78 to '79.

4      Q.   And what was required for you to receive that

5  designation for that license?

6      A.   They waived any written examination and I had to

7  stand an oral examination.  The reason for the waiver was I

8  was already licensed in Florida.  That was my South Carolina

9  license, is my South Carolina license.

10      Q.   Did you have to take the test in Florida?

11      A.   No, because the test didn't exist.  I had to do a

12  rather extensive kind of oral exams plus send in credentials,

13  that sort of thing.

14      Q.   What is an industrial psychologist?

15      A.   Industrial, or nowadays we really talk about

16  industrial/organizational psychology, is a study of behavior

17  in groups, and particularly in work groups.  And,

18  historically, that included human factors psychology as part

19  of it; but like most things, as people study it more and more

20  and more, it grows wider and wider and starts to split into

21  segments.  And human factors psychology is now frequently not

22  even taught in graduate programs of IO psychology and has

23  more of an independent kind of existence.  But industrial

24  psychology, organizational psychology, and human factors

25  psychology all arose from the applications of research to the

1    workplace.

2        Q.    Outside of your academic appointments, how did you

3    use your license in industrial psychology?

4        A.    Because since about 1966, I've been involved in

5    sporadic independent consulting, and that's -- well, now it's

6    illegal.    In those days I'm not sure which places it was, but

7    anyway, it was ideal to get a license, because, like most

8    people in the profession, I supported the idea that a license

9    should be required, although I wasn't as concerned about

10    people doing the things I do as I was with most psychologists

11    about clinical kinds of psychology, where you wanted to

12    protect the public from folks that would go and possibly

13    cause damage to them.

14            As I joke with my students, if I cause damage to a

15    client, they can hurt me a lot more than I can them, because

16    it's typically a corporation or something like that who is

17    looking for particular services from me, and if they don't

18    get it, well, I probably won't get any more consulting.    But

19    I can't call myself a psychologist and consult without a

20    license now.

21        Q.    You indicated earlier that you've had very little

22    in the way of nonlitigation consultations in the last decade;

23    is that correct?

24        A.    That's correct.

25        Q.    That also includes consultations as an industrial

## CERTIFICATE OF REPORTER

I, Deborah L. Dusseljee, Registered Professional Reporter and Notary Public for the State of South Carolina at Large and President of CompuScripts, Inc., do hereby certify:

That the foregoing deposition was taken before *Janet Levegue* a subcontracted court reporter of CompuScripts, Inc., on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn by said court reporter to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically and transcribed by said court reporter and were thereafter deposited into CompuScripts, Inc.'s archives; that the foregoing deposition is a true, accurate and complete record of the testimony of the deponent and all objections made at the time of the examination as transcribed by said court reporter and as archived in our office.

I further certify that I am neither related to, nor counsel for, any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this *2nd* day of *June* , *2003* , at Columbia, Richland County, South Carolina.

Deborah L. Dusseljee,
RPR, CP, Notary Public,
State of South Carolina at
Large.
My Commission expires
April 29, 2007.