1               IN THE UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF CONNECTICUT
2
                              - - - -
3
ALICE G. SVEGE,                      )
4 Administratrix, et al.,            )
                                     )
5                                    )
                   Plaintiffs,       )
6                                    )
                 -vs-                )   Civil Action No.:
7                                    )   3:01cv01771 (JBA)
MERCEDES-BENZ CREDIT                 )
8 CORPORATION, et al.,               )
                                     )
9                                    )
                 Defendants.         )
10                                              ORIGINAL

11

12                            - - - -

13        DEPOSITION OF:  SAMUEL J. SERO, P.E.

14                            - - - -

15                    DATE:     May 30, 2003
                                Friday, 10:02 a.m.
16

17

18                    LOCATION:  Hyatt Regency Hotel
                                 1111 Airport Boulevard
19                               Lindbergh B Meeting Room
                                 Coraopolis, PA  15108

20

21                    TAKEN BY:  Defendants Mercedes-Benz
                                 Credit Corporation, Detroit
22                               Diesel Corporation and
                                 Freightliner Corporation

23

24                    REPORTED BY:  Catherine C. Leverty
                                    Notary Public
25                                  AKF Reference No. Cl75708



1  A.    The only person other than myself that was

2        involved in this was the first meeting I had

3        with Mr. Gilberg, a forensic mechanical expert

4        that I work with, Bill Davison, sat in.  We

5        talked briefly about it, but that was it, after

6        that.

7             He sat in, realized that his services

8        wouldn't be required for this, for what I was

9        asked to do, and that was it, I never have

10       spoken with him about it again.

11  Q.    Is Bill Davison a coworker of yours?

12  A.    He is an associate, we help each other on

13       cases, but he's not my employee, nor am I his,

14       type of thing, we just --

15  Q.    Where is he located?

16  A.    In the Pittsburgh area.

17  Q.    And do you remember when this meeting was?

18  A.    March 7th, 2003.

19  Q.    And how is it you recall that meeting date?

20  A.    Because it's marked on my invoice.

21  Q.    And where was that meeting held?

22  A.    At my office.

23  Q.    And who was there?

24  A.    Myself, Mr. Gilberg and Mr. Davison.

25  Q.    Apart from Mr. Davison being at that meeting on

1  A.    No, again, I'd just have to go back and check

2        every one.

3  Q.    So it's a mixed bag?

4  A.    Yes.

5  Q.    Do you have any cases involving Freightliner?

6  A.    No, I don't, just this one right here.

7  Q.    Do you have any cases involving Detroit Diesel?

8  A.    No.

9  Q.    Mercedes-Benz Credit Corporation?

10 A.    No.

11 Q.    Do you have any cases involving engine brakes?

12 A.    No.

13 Q.    Have you ever had a case involving engine

14        brakes?

15 A.    No.

16 Q.    Do you have any cases involving anti-lock

17        braking systems?

18 A.    On cars, yes.

19 Q.    And, could you tell me, what is your

20        involvement with respect to those cases, I mean

21        what do you do in them?

22 A.    I analyze the system operation from an

23        electronic and electronic hydraulic standpoint.

24 Q.    And what do you do, do you determine if it

25        operated properly in a given scenario?

1      that correct?

2  A.   No, I haven't.

3  Q.   And you've not studied in ergonomics?

4  A.   No.

5  Q.   Have you prepared any warnings or instructions

6      for consumer products?

7  A.   For consumer products, no.

8  Q.   And have you testified in the past that you do

9      not hold yourself out as a human factors

10     expert?

11 A.   I answered it the same way that I answered you,

12     that I do consider what people do in everything

13     I do, and from that aspect the people who teach

14     those things, that's how they got to where they

15     are to teach it, that they've done years of

16     those considerations.

17 Q.   But that consideration and that specialty that

18     they have is not something that you've done;

19     correct?

20 A.   I don't devote my full life to it, no.

21 Q.   Have you inspected any exemplar vehicles in

22     this case?

23 A.   No.

24 Q.   Have you done any testing in this case?

25 A.   No.

```
 1        Light.
 2   Q.   Really?  Do you know the lawyers involved in
 3        that case?
 4   A.   I'm working for John DeLia.
 5   Q.   And who took your deposition?
 6   A.   I'm sorry, I'm drawing a blank.  I'm terrible
 7        with names.
 8   Q.   Am I correct the case is pending in
 9        Connecticut?
10   A.   Yes.
11   Q.   Where was your deposition taken?
12   A.   In Hartford.
13   Q.   And is that a contact case, it sounds like one?
14   A.   Yes.
15   Q.   Have you ever been employed as an automobile
16        mechanic?
17   A.   No.
18   Q.   Are you trained as an automobile mechanic?
19   A.   No.
20   Q.   Have you ever designed any components of an
21        ABS system?
22   A.   No.
23   Q.   Have you ever designed any components of an
24        engine brake?
25   A.   No.
```

50

1  Q.    Do you hold a commercial driver's license?

2  A.    No.

3  Q.    Have you driven this class of Freightliner

4        truck?

5  A.    No.

6  Q.    As part of your work in this matter I know you

7        indicated that you didn't inspect an exemplar,

8        but just to be clear, have you driven in a

9        truck of a similar style as part of your work

10       in this case?

11 A.    As part of this case, no.

12 Q.    Prior to this case did you have any familiarity

13       with engine brakes?

14 A.    I know what they are, how they work.

15 Q.    How did you have that familiarity prior to this

16       case?

17 A.    My dad was an over-the-road driver for over

18       40 years.

19 Q.    Did he own his own tractor?

20 A.    At one point in time, for a few years he did,

21       and then after that he worked for other

22       companies.

23 Q.    What years did he drive?

24 A.    Oh, boy, that's a good question.  He's been

25       retired now for about 16, 17 years, so he drove

1        was working and whether or not the operator had

2        down -- was going to downshift, had not applied

3        the service brake, and what the interfaces --

4        he wanted to know if I could help him with what

5        the interfaces were on the various computers

6        and elements, electrically, electronically, on

7        the unit.

8   Q.   And did you agree to assist him?

9   A.   Yes.

10  Q.   And had you ever done that before with respect

11       to a tractor?

12  A.   No.

13  Q.   So am I correct, Mr. Sero, that you were

14       interpreting materials received in this case

15       that you had not seen before?

16  A.   I'm sorry, I don't follow your question?

17  Q.   Well, prior to this case had you ever inspected

18       any specification drawings or description of

19       engine brakes?

20  A.   No.

21  Q.   Prior to this case had you ever reviewed any

22       specifications for the DDEC system?

23  A.   No.

24  Q.   Do you intend to offer any expert testimony as

25       to whether or not the engine brake was on at

1          this case?

2    A.    No.

3    Q.    And you've done no analysis to determine what

4          the -- whether or not the engine brake actually

5          caused the skid in this case?

6    A.    No.

7                MR. GILBERG:  I'm going to object,

8          there's no information here that there was --

9          I'm going to withdraw it, I'll withdraw that

10         objection.

11   BY MR. WILLIAMS:

12   Q.    You've done no independent analysis to

13         determine the speed at which the truck was

14         traveling when the deceleration event began; is

15         that correct?

16   A.    That's correct.

17   Q.    Do you know what gear the truck was in when the

18         deceleration event began?

19   A.    No.

20   Q.    What was the engine rpm when the deceleration

21         event began?

22   A.    I don't know.

23   Q.    What's the normal engine torque at the rpm

24         level?

25   A.    What rpm level?  I don't know what the level

1       was so I can't tell you what the torque was at

2       any given time.

3  Q.   Do you know what -- so it's also true, then,

4       you wouldn't know what the torque would be at

5       the drive shaft; is that correct?

6  A.   That's correct.

7  Q.   Or what the applied torque is for the axle; is

8       that correct?

9  A.   That's correct.

10  Q.   What was the coefficient of friction at the

11       time of the accident?

12  A.   I don't know.

13  Q.   Have you done any testing on any trucks in

14       formulating your opinions in this case?

15  A.   No.

16  Q.   Or any road surfaces?

17  A.   No.

18  Q.   Are you trained, have you taken any courses in

19       accident reconstruction?

20  A.   No.

21  Q.   But are you saying that despite that you have

22       formulated an independent opinion that the jake

23       brake was on at the time of the accident?

24  A.   Yes.

25  Q.   And that's based upon what you've already told

1 Q.    Okay.  But nothing more?

2 A.    No.

3 Q.    And your determination that the lamp is a

4       better system than some other system, what is

5       that based upon?

6              MR. GILBERG:  Objection.  I don't

7       think there's anything about another system.

8       Could you just clarify, maybe there is?

9              MR. WILLIAMS:  Sure.

10 BY MR. WILLIAMS:

11 Q.    Have you prepared an alternate design?

12 A.    An alternate design to what, I don't follow

13       what you're talking about?

14 Q.    Let me start again, perhaps I'll clear it up

15       for you.  In your first opinion you said that

16       it should have incorporated a simple indicator

17       lamp; is that correct?

18 A.    Yes.

19 Q.    Have you prepared a drawing of where it would

20       be located?

21 A.    No.

22 Q.    Have you done any other type of drawing or

23       specification for that part that you say this

24       should have been there?

25 A.    No, I didn't feel it was necessary since it was

```
 1            considered as an option in the design,

 2            apparently Freightliner or -- had a way that

 3            they would have done it, otherwise they

 4            wouldn't offer it as an option.

 5    Q.      And how did you determine that the lamp was --

 6            let me ask it this way, did you do anything to

 7            determine whether the lamp would, in fact,

 8            result in better information to the truck

 9            operator?

10    A.      Well, some data is better than no data at all,

11            in this case it would have been data as opposed

12            to nothing.

13    Q.      Okay.  My question was did you do anything to

14            determine or try to assess whether the lamp

15            would provide more information to the operator?

16    A.      Other than common sense, no.

17    Q.      Okay.  Have we discussed your basis for your

18            first opinion, is there anything else upon

19            which you rely?

20    A.      Not that I can t ink of.

21    Q.      With respect tc opinion twc you state, quote,

22            "The fact that the vehicle was equipped with

23            ABS was not prominently displayed for

24            notification to the operator," end quote, and

25            again, is that -- is it your opinion that the
```

1      vehicle, or the tractor, was defectively

2      designed because the ABS was not prominently

3      displayed?

4  A.    Yes.

5  Q.    What is your basis for that opinion?

6  A.    The basis is that the ABS, the whole function

7      of it is to prevent jackknifing situations by

8      taking control of the spinning of the wheels,

9      that you should be -- a driver and operator

10     should know when they get into a rig what

11     safety features or lack thereof they're going

12     to have to deal with, and since this had an

13     engine brake which was deleterious under a

14     slippery road condition and an ABS system which

15     was meritorious under that situation then the

16     driver and operator should have been notified

17     of all of that to know so that they knew in

18     advance what they were dealing with.

19  Q.    Did Mr. Wightman know that the tractor had ABS?

20  A.    I don't remember if he said he knew or not,

21     but, like I say, if you get in and you're

22     driving it's better to have notification in

23     front of you at all times than nothing at all.

24  Q.    Is there any indication that there is an ABS

25     system?

1  A.    In the cab?

2  Q.    Yes.

3  A.    Not from the photographs I saw.

4  Q.    Do you know if Mr. Wightman had driven that cab

5        before?

6  A.    I believe he had.

7  Q.    In formulating your second opinion, then, is it

8        true to state that you don't know if

9        Mr. Wightman, whether or not Mr. Wightman was

10       aware that there was ABS on this tractor?

11 A.    Like I say, I don't remember whether he was or

12       not, I have this recollection that even he was

13       confused as to whether he knew it had it or

14       not.

15 Q.    Okay.  And would you agree if Mr. Wightman was

16       aware that there was ABS in the tractor that

17       your second opinion would not be relevant to

18       this particular accident?

19 A.    No.

20 Q.    And why not?

21 A.    Because whether he was aware when he first got

22       in and started driving it and then gets into a

23       panic situation, there is a whole world of

24       difference involved there as to what the

25       operator's reaction's going to be.  Without

1   having something in front of you that reminds

2   you all the time, especially when you get into

3   a panic situation, then, no, it really wouldn't

4   have any bearing one way or another.

5  Q.   So you're saying there should have been

6   additional instruction or a warning about the

7   ABS system in the cab?

8  A.   Sure.  You put in warnings about supplemental

9   restraint systems that are monstrous things in

10   front of you all the time, and this is an

11   inherent safety factor in the vehicle and the

12   necessity of it -- yes, there should be large

13   signs in there telling you what you have for

14   safety or lack thereof.

15  Q.   And as far as you know there aren't any

16   indications that there's an ABS system?

17  A.   That's correct.

18  Q.   And do you hold yourself out to be a warnings

19   expert?

20  A.   I've designed a lot of warnings for things,

21   yes.

22  Q.   Where have you done that?

23  A.   For industrial complexes, equipment that I've

24   designed for people and put in.

25  Q.   When was the last time you designed any warning

```
 1  A.    There was a requirement, I believe prior to
 2        1998, that came out, that they were required to
 3        have them, but I don't remember the exact date.
 4  Q.    So would that mean that all the vehicles of
 5        this vintage would have ABS?
 6  A.    If that -- if what I believe is true then, yes,
 7        they should.
 8  Q.    Did you compare the Freightliner cab with any
 9        other trucks to determine how they identify ABS
10        systems on board?
11  A.    No.
12  Q.    Are you aware of any truck manufacturers that
13        have ABS placards or signage as you described?
14  A.    No.
15  Q.    And have you prepared any warning or design
16        that you believe should be placed in this
17        specific tractor?
18  A.    No.
19  Q.    Do you plan to do that?
20  A.    Not at this time.
21  Q.    And with respect to your second opinion, sir,
22        are there any other bases upon which you rely,
23        any specific documents or anything in your file
24        that we've not discussed?
25  A.    I don't believe so.
```

1  Q.  Your third opinion, then, is, quote, "Warning

2      regarding the need to disengage the engine

3      brake and use only the ABS service brake in wet

4      conditions was not prominently displayed," end

5      quote (indicating).  Am I correct that this is

6      another opinion where you're saying that a

7      warning should have been provided?

8  A.  Yes.

9  Q.  And do you have an opinion as to where that

10     warning should have been provided?

11 A.  No, I haven't done any study in that regard.  I

12     assume from your question you're asking about

13     in the cab of the vehicle?

14 Q.  Right.  I'm assuming -- well, given your

15     opinion is that what you're saying, that you

16     think that there should be a warning in the cab

17     of the vehicle?

18 A.  Yes.

19 Q.  But the location or what it looks like, you've

20     not done any analysis of that?

21 A.  No.

22 Q.  And would I be correct that you've not compared

23     it with any other vehicles to determine if they

24     give any warnings concerning using the ABS

25     under wet conditions?

1 A.    In the cab, not that I'm aware of, but, like I

2       said, I didn't go in and investigate them so --

3 Q.    Now, in the last paragraph, sir, of that

4       section on page 3, opinions, are you offering

5       any further opinions in that paragraph, I'm not

6       really sure?

7 A.    I'm just stating things that I found out of the

8       documents that I looked at that -- you know,

9       nothing -- that the fact that they could have,

10      at the very minimum, put in warnings, and they

11      were available and cost-effective and would

12      have prevented harm to the plaintiffs, but also

13      when I talk about means there is that there are

14      plenty of things that were available that are

15      actually good safety issues and should not have

16      been options, or anything.

17              For instance, there's a safety brake

18      control which can be implemented or not, this

19      can allow the operation of the engine brake

20      only when the service brake is engaged and the

21      engine brake function is on.  You know, it's

22      things like that.

23              There's even talk given that the

24      ability -- although I didn't find any

25      documentation about it, but both Detroit Diesel

1       in your file; is that correct?

2   A.  Yes.

3   Q.  So you've not given us any information

4       concerning the incidence of jackknifing or if

5       it is ever related to engine brakes?

6   A.  No, I haven't.

7   Q.  And with respect to -- continuing with this

8       paragraph first, then I'll go back to some of

9       your other remarks, the last sentence in that

10      paragraph states, quote, "Such means and

11      warnings were available and cost-effective and

12      would have prevented harm to the plaintiffs,"

13      end quote; now, when you say would have

14      prevented harm to the plaintiffs, did you -- do

15      you assume, in making that statement, that the

16      jake brake caused the loss of control?

17  A.  The fact that it was on under these conditions,

18      yes, caused the loss of the control, yes.

19  Q.  Okay.  So that's an assumption you're making in

20      formulating your opinions here?

21  A.  Yes.

22  Q.  All right.  And if that assumption is wrong

23      then would you agree that your testimony is

24      incorrect?

25  A.  Well, it's only part of what's wrong, I mean,

1     the other part is that -- the need to use the

2     ABS is the rest of it, I mean, it's -- it isn't

3     just -- I mean, you have something that starts

4     the incident, which is the jake brake being on.

5     Okay, well, the jake brake, your assumption is

6     that it isn't on, but the vehicle still goes

7     out of control, and it's out of control because

8     of fishtailing or a jackknifing condition, then

9     your best possible weapon to overcome it is the

10    ABS, there still should be notification that

11    you've got to use this ABS system.

12  Q.  What is your training on truck ABS systems?

13  A.  Just whatever I've learned myself, I don't --

14  Q.  Do you have any training on ABS systems?

15  A.  If you're asking me have I gone to school for

16    it somewhere, no.

17  Q.  And, in fact, when you do your own inspections

18    in cases involving sudden acceleration do I

19    understand that you bring Mr. Davison to do the

20    mechanical analysis?

21  A.  Yes, but ABS systems are not totally

22    mechanical, they're electrohydraulic.

23  Q.  And with respect to this case and the operation

24    of the ABS system, I know I'm plowing things

25    we've already gone through, but have you done

1      say, one of the things that's written up on

2      page 539 of the DDEC IV application and

3      installation manual is an engine brake disable

4      function which is switched to ground whenever a

5      vehicle system such as a traction control

6      device does not allow engine braking to occur,

7      this function is a digital input that can be

8      generated by any system such as the ABS unit

9      output on a condition such as described in 2

10     above, but only if the ABS is engaged by the

11     service brake (indicating), and that's how it

12     is set up right now, that you have to have the

13     ABS engaged by the service brake, so that,

14     really, what it's telling you is that the way

15     they have it right now is that you have to

16     engage the service brake in order for this

17     function to occur that it will take the engine

18     brake out, but it had the ability, according to

19     Detroit Diesel and Freightliner people, that it

20     could have independently done it.  My question

21     is, well, why didn't you do it?  It's a safety

22     device; why didn't you do this?

23  Q.  But just so I understand, your position is that

24     the tractor that was involved in this subject

25     accident, that ABS system did not have the --

1          could not disengage the engine brake without

2          depressing the service brake?

3    A.    To the best of my knowledge that's true.

4    Q.    And if that is not true does it in any way

5          affect your opinions in this case?

6    A.    No.

7    Q.    Do you claim expertise in tractor driving?

8    A.    No.

9    Q.    Could you identify the materials that you have

10         that were not provided to you by Mr. Gilberg?

11   A.    Well, the only things I have -- of course, my

12         CV, my report, the invoice, and I guess these

13         couple of sheets that I have here -- oh, my

14         notes, which is Exhibit 4, Exhibit 7 and

15         Exhibit 8, I believe, are the only things that

16         were not supplied by Mr. Gilberg (indicating).

17   Q.    Could you pull those out, please?  May I see --

18   A.    And, like I said -- do you want the report and

19         invoice, CV?  We've been through all those.

20   Q.    Now, Exhibit 4 you've identified as your note,

21         and it's not dated, do you recall when it was

22         that you prepared it?

23   A.    Oh, it would have been right after our 3-7-03

24         meeting, so it would have been sometime in

25         March.

1  Q.    Okay.  But you don't hold yourself out as an

2        expert on the use of engine brakes; is that

3        correct?

4  A.    No, I do not.

5  Q.    Could you tell us why Exhibit 7, a copy of the

6        Bosch automotive handbook, third edition,

7        appears in your file?

8  A.    Well, it's a -- just a brief discussion of

9        operating behaviors, and it -- the operating

10       behaviors being discussed as jackknifing, and,

11       basically, it's the last sentence that says

12       installation of an anti-lock braking system

13       represents the most effective means of

14       preventing jackknifing (indicating), and this

15       is from a respected group who design and

16       developed this and do tremendous amounts of

17       testing and engineering.

18 Q.    And is that text authoritative, in your

19       opinion?

20 A.    Yes.

21 Q.    Are there any other texts that you view as

22       authoritative in engineering?

23 A.    All kinds.  Where do you want to start?  That's

24       sort of a very broad question.

25 Q.    Well, with respect to ABS systems.

1   A.    With respect to ABS there are various

2         publications in SAE, there are a number of

3         books that have been written on ABS systems,

4         descriptive of them, how they work, whatever.

5   Q.    Any particular one that you rely upon as

6         authoritative?

7   A.    I can't think of any of the names of them or

8         authors, as we sit here, but nothing that I,

9         you know, would bother to consult here because

10        I thought it was fairly good, common knowledge

11        and -- as well as in the documents provided

12        from the various manufacturers that the ABS was

13        a method of safety device.

14  Q.    Are there any authoritative texts with respect

15        to the engine brake?

16  A.    Oh, I imagine there are.

17  Q.    No, I mean with respect to these questions I'm

18        talking about, what you view as authoritative.

19  A.    Oh, I really haven't looked up any or read

20        them.

21  Q.    Okay.  Are there any authoritative texts, in

22        your opinion, with respect to trucking accident

23        reconstruction?

24  A.    I don't do reconstruction, I couldn't tell you.

25  Q.    Are there any authoritative texts, in your

1       opinion, with respect to warnings or

2       instructions?

3  A.    Oh, I've got a number of them in my own

4       library, but, again, the names of them, I

5       couldn't begin to tell you what they are, at

6       the moment.

7  Q.    So as you sit here none comes to mind?

8  A.    No.

9  Q.    Do you have a professional license?

10  A.    Yes.

11  Q.    And what is that?

12  A.    I'm a registered professional engineer in

13       Pennsylvania.

14  Q.    And how long have you had that status?

15  A.    Since, let's see -- since, I believe, 1974.

16  Q.    And is it in any particular discipline?

17  A.    Well, in Pennsylvania -- I took my exam in

18       electrical engineering.

19  Q.    Have you ever sat for any mechanical

20       engineering?

21  A.    No.

22  Q.    Is there any additional testing or

23       recertification required as the years go by?

24  A.    No.

25  Q.    Could you tell me why Exhibit 8 is in your

1          the form of the question.  Are you asking him

2          his opinion whether it would have, or --

3                    MR. WILLIAMS:  I've asked him if he's

4          done anything to determine if it would have.

5                    THE WITNESS:  No --

6                    MR. GILBERG:  Other than this report?

7                    MR. WILLIAMS:  Could you read the

8          question back, please?

9                    MR. GILBERG:  What do you mean by

10         determine?  Did he go out and perform tests,

11         did he look at the tests that someone did?  I

12         mean, what is it, determine?  In other words,

13         my objection is just clarify for the witness.

14                    He said he reviewed all the documents

15         that are in front of him.

16  BY MR. WILLIAMS:

17  Q.    Mr. Sero, I'll ask the question again, with

18        respect to your opinions that additional

19        warnings were needed in the cab did you do

20        anything to determine whether that would have

21        changed Mr. Wightman's actions at the time of

22        the accident?

23  A.    I don't know what I could have done to

24        determine that so I -- I can only --

25  Q.    Other than offer the opinion with respect to

1    how it would affect actual drivers you've done

2    nothing; correct?

3   A.   That's correct.

4   Q.   All right.  In your forensic work you've told

5    us that you've been involved in slip and fall

6    accidents; is that correct?

7   A.   Yes.

8   Q.   And those are cases where you've testified on

9    behalf of the plaintiff you find that a

10    condition or premises is defective?

11   A.   Yes.

12   Q.   And you've testified in cause and origin of

13    fires?

14   A.   Yes.

15   Q.   And in -- elevator cases, you've found

16    defective?

17   A.   Yes.

18   Q.   Escalators, you've found defective?

19   A.   Yes.

20   Q.   Conveyors, you've found defective?

21   A.   Yes.

22   Q.   Punch presses, you've found defective?

23   A.   Yes.

24   Q.   You've found backup alarms defective?

25   A.   Wait, now, let's go back, let's go back to

129

1  COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2  COUNTY OF ALLEGHENY              )        SS:

3       I, Catherine C. Leverty, a Court Reporter and

4  Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  SAMUEL J. SERO, P.E., was by me first duly sworn to

7  testify to the truth; that the foregoing deposition

8  was taken at the time and place stated herein; and

9  that the said deposition was recorded

10 stenographically by me and then reduced to printing

11 under my direction, and constitutes a true record of

12 the testimony given by said witness.

13      I further certify that the inspection, reading

14 and signing of said deposition were NOT waived by

15 counsel for the respective parties and by the

16 witness.

17      I further certify that I am not a relative or

18 employee of any of the parties, or a relative or

19 employee of either counsel, and that I am in no way

20 interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22 and affixed my seal of office this 31st day of May,

23 2003.

24      _____

25             Notary Public

Notarial Seal
Catherine C. Leverty, Notary Public
Pittsburgh, Allegheny County
My Commission Expires Aug. 31, 2004

Pittsburgh, PA  /  Greensburg, PA     Pittsburgh, PA
412-261-2323      724-853-7700         412-261-5700

AKF