

**RENAISSANCE ENGINEERING**
3352 Perrysville Avenue
Pittsburgh, Pennsylvania 15214-2209
(412) 321-5423

February 3, 2004

RE:  Svege Supplemental Expert Report
     Svege v. Mercedes-Benz et al.

I, Samuel J. Sero, P.E., am a 1967 graduate from Carnegie Institute of Technology, now Carnegie Mellon University, with a Bachelor of Science degree in Electrical Engineering, and am a licensed Professional Engineer.

While in college my electrical engineering specialty was computer design. Over the course of nearly 37 years of professional practice I have designed numerous microprocessor based control systems for use in HVAC systems, industrial machine control, and industrial processes. In my forensic experience I have evaluated the operation and failure modes of the electronics for engine controllers, cruise control systems, ABS systems, and air bag systems for some fifty cars and trucks, and electrically based problems associated with vehicle fires in over fifty cases.

The use and understanding of microprocessor based controls, whether for a vehicle or an HVAC system, is a matter of understanding the logic functions and the switching which is required. Simply stated, for any given set of inputs some output is desired and the logic and sensors must be available for them. The control of truck

functions by a microprocessor through programming and design lies within the expertise of an electrical engineer with the education, training and experience which I possess. What is required is to have knowledge of what the input signals are and what output is desired of any combination of them. These input and output signals, if digital in nature, are simply on or off values.

I am a member of the Institute of Electrical and Electronic Engineers and the Society of Automotive Engineers and have worked for over thirty years in various industries requiring my expertise as an electrical engineer.

My Curriculum Vitae and a list of cases in which I have testified both in Court and upon depositions is annexed to and immediately follows this report.

As owner of Renaissance Engineering, I have been employed as a forensic engineer engaged in the investigation and reconstruction of accidents since 1989. I have investigated over one hundred automobile accidents to determine their probable cause, including over twenty accidents involving sudden unintended accelerations. I have qualified as an expert witness in court on approximately thirty-two occasions, including several automobiles cases, which included the electrical circuitry of motor vehicles, and have specifically been affirmed as qualified to testify as an expert witness by the Second Circuit in the case of Jarvis vs. Ford Motor Co. regarding a Daubert challenge in the lower court. (283 F. 3rd 33, 2nd Cir. 2002).

I respectfully offer this supplemental report in opposition to the application which seeks to disqualify me as an expert in this case.

I have been retained by attorney Leo Gilberg on behalf of the plaintiff with regard to my expertise as an electrical engineer to evaluate and analyze the electrical systems

and the electronics of the Freightliner tractor that was involved in the accident on September 16, 1999, and to determine, within a reasonable degree of engineering certainty, whether any form of failure or lack in the electronic controls of the 1998 Freightliner truck, driven by Mr. Wightman, caused or contributed to the accident.

Mr. Gilberg had asked me to do this evaluation and analysis for a number of reasons.

One is that defendants, Detroit Diesel and Freightliner claim that the ABS monitoring was on and that the tractor ABS computer or ECU was capable of independently, disengaging the engine brake upon sensing a wheel slip, lock up condition or loss of traction in the drive wheels of the tractor, associated with engine brake use on wet roads.

The defendants therefore contend as a defense to this lawsuit, that assuming that the engine brake was enabled on a wet and slippery pavement, when Wightman took his foot off the throttle, causing the rear wheels to decelerate on the wet pavement, the tractor ABS computer was so designed that it would have disengaged the engine brake during the "ABS event", which did not require the application of the service brake by the driver.

I have also been requested that I make an analysis of the electronic system of the tractor to determine whether full use of the electrical capabilities of its engine, engine brake, microprocessors, and ABS would have prevented this tragedy, either by designing out and significantly limiting the inherent nature of the engine brake in wet and slippery weather to suddenly jackknife and lose directional control, and to assess what electronics in the system could have been utilized to have adequately warned the driver of the danger of jackknife and loss of control in using the engine brake in wet weather conditions in a

3

manner that would have changed the driver's manner in operating the tractor-trailer, based upon the tractor's electronic capabilities to do so.

I have read the motion papers that seek to disqualify me and the claim that as an electrical engineer I cannot fulfill the assignment given to me because I have no expertise in accident reconstruction, loss of control analysis, or human factors psychology.

It is an assertion that has no rhyme or reason.

I claim only expertise in the field of electronic engineering.

To program, design and evaluate microprocessor controls for a truck does not require that I be an expert in accident reconstruction, loss of control analysis, human factors psychology, or mechanical engineering.

I have employed the same methodology that I have employed for over 30 years, namely by relating known and accepted electronical engineering principles that have been accepted, tested or peer-reviewed to the facts or evidence of the case.

My analysis and evaluation that follows is based upon sufficient facts, practically all of which are found in documentation generated by the defendants, Freightliner and Detroit Diesel Corporation themselves, reliable electronic engineering principles, and a reliable application of these principles to the facts.

In conjunction with my analysis and evaluation in this case, I have reviewed the following documents:

  Defendant Detroit Diesel Objections and Responses to plaintiffs' Interrogatories and Requests for Production dated 12/9/02
  Detroit Diesel (DD) Series 60 Engine Operator's Guide
  Rockwell WABCO D-Version ABS 42-27 Service Bulletin
  DDEC IV Application and Installation Manual
  Freightliner Heavy-Duty Trucks maintenance Manual

4

Freightliner FLD Conventional Drivers Manual

Combined Vehicle Specifications/TSO

DDEC III Functional Test Plan

DDEC IV Software Strategy Manual

DDEC III/IV Serial Communications Specification

DDEC Engine Control System Specification

DDC 00191-00200

Photos PASP 1-48

Freightliner Engineering Technical Report, Winter Test T021-97/12

DD- Engine Troubleshooting
    Electronic Troubleshooting
    ProDriver

SAE J1621

SAE J1922

DD Series 60 Service Manual Section 1-29

Depositions with attachments:
    Scottie Wightman 11/19/01
    Don Barnes 11/21/02
    Ian McKenzie 3/13/03
    Trooper Martin C. Long

Rockwell WABCO ABS for Trucks, Tractors and Buses, Maintenance Manual No. 30

Revised 2-97 WABCO ABS Training Program Student Manual

Experts reports of John C. Glennon, David E. Clement, Norris Hoover, Bruce Koepke, and William Howerton

Review of excerpts of the depositions of Norris Hoover, Bruce Koepke, and William Howerton

Directional Control of Retarder-Equipped Heavy Trucks Operating on Slippery Surfaces (SAE)

As a point of reference and without any assumptions or conclusions as to the accuracy of the statement, I have a history that on 9/16/99 Mr. Wightman was driving a Freightliner tractor-trailer on the Pennsylvania Turnpike in wet weather with the engine brake on and experienced a jackknife condition and lost control of the vehicle.

A review of voluminous material including over 3000 pages of DDEC material reveals that the Rockwell WABCO D-Version ABS on the subject tractor is an electronic system that monitors and controls wheel speed during braking.

<u>Rockwell WABCO D-Version ABS,</u> Service Bulletin, page 1

As well, during an "ABS Event", the ABS computer sends a signal to shut off the engine retarder (<u>WABCO ABS Training Manual, pg. 1-28</u>)

Authorities annexed as Exhibit V

Donald Barnes, manager of the electrical testing department of defendant Freightliner, with a B.S Degree in Electrical Engineering, and produced as a 306 (b) witness, was deposed and testified on page 17, line 6:

> "Q. When you use the term, "ABS event", what are you referring to? What's an "ABS event"?
>
> A. Well, ABS is an antilock brake system, and the antilock brake system control valves in the brakes, air brake system. And an ABS event is when you are in a braking situation and a wheel skids. And when a wheel skids, it loses contact, basically frictional contact, with the road surface. And in order to reestablish frictional contact with the road surface, the ABS System basically pulses the brakes, and it's a very complex algorithm which -- I don't understand all the algorithms developed by WABCO. And what it does is –as the system is described, it basically is antilock. It keeps the wheels from locking up in a brake, hard brake, situation.
>
> Q. The ABS system passively monitors the vehicle wheel speed at all times; isn't that right?

6

A. Yes.

Q. In itself, is that an ABS event?

A. No.

Q. Is an ABS event and event where the ABS controls the wheel speed during and emergency?

A. Yes.

Q. Now, for the ABS system to control wheel speed during and emergency, is something required of the operator of the tractor?

A. No.

Q. He's is not required or she's not required to make some application of the service brake in order to activate the ABS system?

A. Right. I was assuming that this was during a braking situation. Yes."

And on page 27, line 5:

Q. What are the circumstances that would cause the engine brake to be turned off when the engine brake switch is on?

A. We discussed that earlier, and I described it as an ABS event.

Q. And such an ABS event would require application of the service brake by the operator?

A. Yes."

And on page 96, line 16:

"Q. (By Mr. Gilberg) Let's look at the page that's been designated 358 in Exhibit 5, FLD Conventional Driver's Manual and let me point out to you this paragraph on the left-hand side of the page. Do you see where it says, "The

7

Rockwell WABCO antilock braking system, ABS, is and electronic wheel-speed monitoring and control system that works with a standard air brake system", see that?

A. Mm-hmm. Yes, I do.

Q. That was true on this particular subject tractor?

A. Yes.

Q. You see the next line, "ABS passively monitors vehicle wheel speed at all times," comma? And can you tell me what's meant by passively?

A. Well, I can give you my interpretation.

Q. Okay.

A. In my opinion, the word "passively" means that it is sensing the wheel speed without influencing the rotations of the wheels.

Q. In other words, the ABS system is not controlling the wheel?

A. Well, "passively" means that the monitoring of the wheel speed, the actual monitoring and picking up the information about wheel speed, does not influence the rotation of the wheel.

Q. And it continues after the comma, "but controls wheel speed during an emergency or reduced traction stop."

A. Well, that means that it will apply control to the brake system to influence the rotation of that wheel.

Q. Now, how will it do that?

A. Okay.

Q. What mechanically takes place to control the wheel speed with the ABS?

8

A. My understanding of the system is that it pulses the brake air system, and those pulses are applied to the brake chamber, and then those pulses are transferred to the brake, foundation brakes, which, you know, push up against the brake drum.

Q. Are you saying that means that the brakes are activated?

A. Yes.

MR. WILLIAMS: Objection as to form

(discussion off the record)

Q. (By Mr. Gilberg) Now, this application of brakes initiated by the ABS system has nothing to do with what the driver does, or does it?

A. The driver applies the brakes.

Q. Okay, if the driver does not apply the brakes—Well, withdrawn. Let's go back. Did you tell me "controls wheel speed during an emergency reduced traction stop," meant that a pulse was sent to the brakes and activated the brakes? Is that what I understood you said?

A. Well, provided that the driver applied the brakes.

Q. Okay. So that control has to be in conjunction with the driver's decision to apply the brakes.

A. Yes.

Q. If the driver does not apply the brakes, the ABS will not send that pulse to the brakes? Is that what you're saying?

A. Yes."

Annexed as Exhibit Y.

9

After a very careful search of the documents in the Detroit Diesel Manuals, I have come to the opinion with a reasonable degree of certainty as an electrical engineer that although the ABS monitoring of wheel speed is continuous, no documentation exists that the tractor ABS communication is capable of independently disengaging the engine brake upon sensing a wheel slip condition or loss of traction such as is associated with engine brake use on wet roads.

Rather, the documentation indicates that the service brake must be applied for the full functioning of the ABS, and all of its peripheral controls, to take place. None of the WABCO documents support any claim of the ability of the ABS sensors to take control of the engine brake function without service brake application. For any such ability to exist the engine controller would have to be programmed to interpret and react to the signals from the various ABS systems, which is not the case.

My review of the DDEC IV Application and Installation Manual, Engine Brake Control, pgs. 5-39, and 5-40 show that the engine brake had the ability of a number of forms of control:

An engine brake disable function which is switched to the ground whenever a vehicle system, such as a traction control device, does not allow engine braking to occur. This function is a digital input that can be generated by any system such as the ABS unit output on a condition such as described in (2), **but only if the ABS is engaged by the service brake.** Engine Brake Disable, DDEC IV Application and Installation page 5-39.

Clutch released input will not allow the engine brake to be turned on when the clutch is engaged.

The minimum MPH function is also programmable into the unit. This will not allow the engine brake to function until a minimum speed is attained.

There is Service Brake control, which can be implemented, or not. This can allow the operation of the engine brake only when the service brake is engaged and the engine brake function is on. Page 9 of Combined Vehicle Specifications/TSO Report shows for the subject vehicle that "Service Brake Activates Retarder—off" was actually wired into the tractor involved in this accident, but had never been made operational.

This option was available at no cost.

Authorities annexed as Exhibit W.

Ian Daniel McKenzie, Director of Electronic Systems for Detroit Diesel testified at his deposition on page 60, line 6 as follows:

"Q. Is there a service brake control which could be implemented that would allow the operation of the engine brake only when the service brake is engaged and the engine brake function is on?

A. I'm not sure what you mean by the engine brake function is on, so could please restate your question?

Q. Well, if the engine brake switch is on – in other words, there will be a service brake control that would allow the operating of the engine brake only when the service brake is engaged and the engine brake switch is on.

A. I think I understand the question now. Thank you for restating. Yes, that was a customer selectable option.

Q. And where are you reading from?

A. The DDEC Software Strategy Manual, Section 8.3.2.2.6, vehicle speed conditions, where it states the brake release switch is off or Jake service brake enable is not set.

Q. And at what is the cost of such on option? I'm not asking for an exact figure, but to create this kind of an option what kind of a cost are we talking about?

A. It was at the time a standard feature of the DDEC IV control module and is available to the end customer at no cost, he simply needs to turn it on or off."

Authorities annexed as Exhibit X.

I have reviewed Exhibit R annexed to these papers, an SAE paper titled "Directional Control of Retarder- Equipped Heavy-Trucks Operating on Slippery Surfaces which on page 2 reports simulations of heavy trucks in turning maneuvers in which the retarder is applied where the vehicle experiences such a sudden jackknife that the driver has only 0.5 seconds to react between the time the articulation angel of the jackknife begins to increase rapidly until the time the jackknife becomes uncontrollable.

A reading of Mr. Wightman's deposition gives vivid and textbook testimony of a sudden jackknife that in a mater of seconds became uncontrollable due to loss of directional control.

With typical driver reaction times (ideal conditions, no rain, no slippery roads, etc.) of about 1.5 seconds, drivers like Mr. Wightman cannot recognize the critical condition they are in to make a service brake application and actuate on ABS event.

12

This service brake control of the engine brake which allows operation of the engine brake only when the service brake is applied would have permitted Mr. Wightman to timely actuate ABS, release the air pressure in the skidding rear axle wheels, and disengaged the engine brake. In short, with a reasonable degree of certainty as an electrical engineer, in my opinion, implementation of the service brake option would have avoided the accident with the SUV.

It is recognized that the safest mechanism for control of the tractor/trailer under inclement conditions is to have the ABS system in play. It is also recognized that under normal driving conditions the ideal is to have use of the engine brake system. In normal use the engine brake is turned on by the electronic control unit whenever the accelerator pedal is released. This means that an input value is sent to the controller whenever the accelerator is released, that a switch, on the accelerator pedal, is closed or opened to generate the appropriate input signal to the controller. It would be a simple matter to install a switch which transfers the on and off control from the accelerator to the brake pedal and back again as desired.

In operation, a function transfer switch would have parallel feeds from switches on both the brake pedal and the accelerator pedal (this is the present activation switch in use). Under inclement weather conditions the operator need only place the switch in the service brake/engine brake operation position to make sure that the operator has not only removed their foot from the accelerator, but has their foot on the brake and has full utilization of the engine brake, service brake and ABS for maximum vehicle control. This transfer switch would have input from switches on both the service brake and the accelerator pedal with a single output back to the presently used wire input from the

13

accelerator switch to the electronic controller. A sketch of this arrangement is attached as Exhibit Z.

This type of function transfer uses simple and commercially available switches in a proven technique. Further it does not require that any changes be made in then programming of the controller. The addition of two inexpensive switches and some wire along with indicator lights for indication of which mode is in use are minimal expense items. The transfer switch and indicator light, along with a decal describing the use of the switch could be placed at the engine brake switch location on the dash. The decal would state: **Place switch in this position for inclement conditions, this position for normal conditions**, or words/symbols to this effect.

In my opinion with reasonable degree of certainty as a licensed professional electrical engineer, the design of the subject tractor electronically which permitted it to be used in wet and slippery conditions, under conditions known to cause loss of vehicle control was unreasonably dangerous and defective, by not designing into it an operational service brake control feature that defendants had already made feasible and cost-effective.

An Engine Brake active light is an option. This would give warning to a driver that the EB is active under conditions when it should not be used. Page 5-40 A&I manual.

It would seem only prudent that any tractor trailer which employs ABS should be prominently labeled that it does and that any engine braking system should be prominently signaled of its operating condition at any time.

RENAISSANCE ENGINEERING   3352 Perrysville Avenue   Pittsburgh, Pennsylvania 15214   (412) 321-5423

I do not claim to be a warning expert, and my function here is to show that this option existed, and I leave to David E. Clement, Ph.D, the human factors psychologist, to express any opinions on this matter.

It is respectfully submitted that the above functions, the Service Brake Control and the Engine Brake active light are recognition by the product sellers that the engine brake has limited safe operating parameters on wet and slippery surfaces.

One of the most hazardous conditions facing an operator of a tractor trailer rig is the potential for the rig to jackknife. Freightliner and Detroit Diesel were and are cognizant of the conditions prevalent in a jackknife and have designed their systems with this in mind. However, they did not include in their designs and interfacing of their electronic equipment on the subject tractor an operational service brake control feature of the engine brake during wet and slippery weather conditions which would not interfere with engine brake operation during normal driving conditions, nor did defendants incorporate a simple indicator lamp into the dashboard location of the engine brake control to indicate the operating condition of the engine brake.

Such means and warnings were available and cost effective utilizing an electronic system on the subject tractor that was already designed to accommodate them, and would have prevented harm to the plaintiffs.

Basically, this is a case dealing with electronic devices about which I am qualified to testify, and I respectfully submit that my testimony will be helpful to the trier of the facts.

RENAISSANCE ENGINEERING   3352 Perrysville Avenue   Pittsburgh, Pennsylvania 15214   (412) 321-5423

Based upon all of the above, I respectfully request the Court to deny the defendants' motion and permit me to testify and the plaintiffs to have their day in Court.

*Samuel J. Sero* (signature)
Samuel J. Sero, P.E.

RENAISSANCE ENGINEERING   3352 Perrysville Avenue   Pittsburgh, Pennsylvania 15214   (412) 321-5423