UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALICE G. SVEGE, ADMINISTRATRIX, ET AL. | : | CIVIL NO. 3:01 CV 01771 (MRK) |
| Plaintiffs, | : | |
| VS. | : | |
| MERCEDES-BENZ CREDIT CORPORATION, ET AL. | : | |
| Defendants. | : | MAY 11, 2004 |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION TO PRECLUDE TESTIMONY OF DEFENDANTS' EXPERTS, BARNES, KOEPKE AND HOWERTON

Defendants Freightliner Corporation, Mercedes-Benz Credit Corporation and Detroit Diesel Corporation (hereinafter "Defendants"), respectfully submit this Memorandum of Law in opposition to Plaintiffs' Cross-Motion to preclude the testimony of their proffered experts, Donald E. Barnes, Bruce Koepke, and William M. Howerton ("Cross-Motion"). Plaintiffs, in their Cross-Motion, ask the Court to "examine the reliability and relevance of their testimony, sufficiency of their methodology and their testing done on August 11, 2003 and February 15, 2004." (Cross-Mot. at 1.) Notwithstanding occasional barbed remarks, Plaintiffs do not assert that any of Defendants' experts are unqualified, or that they have offered opinions outside their areas of expertise. Instead, Plaintiffs assert that various "tests" and simulations performed by Koepke and Howerton "do not pass Daubert muster." (Mem. of Law in Support of Cross-Mot. ("Pls.' Mem.") at 19, 29.) As set forth below, Plaintiffs' assertions are without merit. Although the Court has granted Plaintiffs leave to file this Cross-Motion despite its untimeliness, the fact that it was filed only after Plaintiffs received Defendants' motion to preclude Plaintiffs' experts, and the fact that the arguments made by Plaintiffs in support of their Cross-Motion are mixed

into the middle of their response to Defendants' motion to preclude, suggests that this Cross-Motion is merely a tit-for-tat response to Defendants' motion.

## I. DEMONSTRATIONS OF SUPPRESSION OF THE ENGINE BRAKE BY THE ABS SYSTEM WITHOUT APPLICATION OF THE SERVICE BRAKE

Both Koepke and Howerton performed demonstrations illustrating the fact that, when a Freightliner truck's anti-lock brake system ("ABS") senses wheel slippage, it will disengage the engine brake without application of the service brake. Plaintiffs' assertion that the Court should not permit testimony regarding these demonstrations is based on a hodgepodge of reasons, none of which is valid.

### A. These Demonstrations Are Reliable

As quoted by Plaintiffs, Defendants' expert Barnes said of the demonstration conducted by Koepke that "[i]t's purely a demonstration. It's not a test." (Pls.' Mem. at 21.) The fact that these were simple demonstrations makes several of the factors commonly considered under *Daubert* inappropriate in the present case.

As set forth by the Second Circuit,

> The Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique "can be (and has been) tested," *Daubert*, 509 U.S. at 593; (2) "whether the theory or technique has been subjected to peer review and publication," id.; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation," *id.* at 594; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community," *id.* . . . . <u>These factors do not constitute, however, a "definitive checklist or test."</u> *Daubert*, 509 U.S. at 593. Rather, "the inquiry envisioned by Rule 702 is . . . a flexible one," *id.* at 594, and "<u>the gatekeeping inquiry must be tied to the facts of a particular case</u>," *Kuhmo Tire*, 526 U.S. at 150 (internal quotation marks omitted).

*Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2002) (emphasis added). The first of these factors is clearly met, because the Koepke and Howerton's contention that the ABS on the pertinent

vehicle model will disengage the engine brake even without application of the service brake can be tested, and has been tested through the challenged demonstrations. Although Plaintiffs' experts have chosen not to replicate these demonstrations, or otherwise to test their theory that the ABS on the pertinent vehicle model will <u>not</u> disengage the engine brake without application of the service brake, the demonstrations performed by Koepke and Howerton could in fact be replicated very easily.

The very reliability of the challenged demonstrations make them ill-suited to some of the other factors frequently considered under *Daubert*. Koepke and Howerton sought merely to demonstrate that, if (a) a vehicle of the pertinent model was driven with engine brake on, (b) an ABS event was induced, and (c) the service brake pedal was not depressed, the result would be that the ABS would disengage the engine brake. It can hardly be denied that the most reliable way to determine whether the engine brake will be disengaged if factors (a), (b), and (c) are present is to create those three factors and observe whether the engine brake becomes disengaged. Plaintiffs assert that "opinions based on 'novel or unorthodox techniques that have yet to stand the tests of time to prove their validity' are the ones subject to challenge." (Pls.' Mem. at 19, quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995.)) Insofar as simple demonstrations such as these can be said to have a technique, it is hardly novel or orthodox.

Thus, Plaintiffs' contention that these demonstrations are unreliable because "[t]hese tests were not conducted pursuant to any scientific, published, or peer-reviewed standard" is absurd. (<u>See</u> Pls.' Mem. at 19.) It would be surprising indeed if a scientific journal set forth such a process or purported to subject it to peer review. Similarly, Plaintiffs' assertion that "[c]ompounding the unreliable nature of the defendants' experts' methodology is the fact that

-3-

these tests were done solely for the purposes of the instant litigation" is equally ridiculous.  (See id. at 20.)  They were done solely for the purposes of this litigation because there are merely demonstrations.

### B. The Absence of Literature Regarding Whether An ABS Can Disengage An Engine Brake Without Application of the Service Brake Is Irrelevant

Plaintiffs assert that it is the expert opinion of Samuel J. Sero "with a reasonable degree of certainty as an electrical engineer . . . that no documentation exists in support of" the fact that an ABS can disengage an engine brake without application of the service brake.  (Pls.' Mem. at 13.)  The Second circuit, however, has held that expert testimony need not be precluded on these grounds:

> This is not to suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions. See *Bonner v. ISP Techs.*, 259 F.3d 924, 929 (8th Cir. 2001) (observing that "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness'") (quoting [*Heller v. Shaw Indus.*, 167 F.3d 146, 155 (3d Cir. 1999]) . . . . In *McCullock*, for example, we affirmed the district court's admission of medical expert testimony despite the fact that the expert "could not point to a single piece of medical literature" that specifically supported the expert's opinion. [*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)]. Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may "go to the weight, not the admissibility" of the expert's testimony. *Id.* at 1044; see also [*Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 2000)].

*Amorgianos v. AMTRAK*, 303 F.3d 256, 266-67 (2002).

It would be particularly inappropriate to preclude testimony of Defendants' experts Koepke and Howerton regarding the demonstrations performed by them, given that Plaintiffs have offered no contrary evidence <u>other than</u> the lack of literature on the subject, and given the fact that, as explained above, these demonstrations have an exceedingly high level of obvious reliability.

### C. The Lack of Factual Similarity Between the Demonstrations and the Accident Is Irrelevant to Their Purpose

Plaintiffs also assert that the conditions under which these demonstrations were performed "were entirely unrepresentative of the Svege accident." (Pls.' Mem. at 28.) The factual differences between the circumstances of the demonstrations and those of the accident are not relevant, because the demonstrations are intended only to demonstrate the fact that, on the vehicle model at issue, the ABS will disengage the engine brake without application of the service brake. Various Circuits have held that "demonstrations of experiments used merely to illustrate the principles forming an expert opinion do not require strict adherence to the facts, and courts may admit such demonstrations so long as they are offered to illustrate scientific principles rather than as re-enactments." *Crossley by Crossley v. General Motors Corp.*, 33 F.3d 818, 822 (7th Cir. 1994) (citations and internal quotation marks omitted); *see also Gilbert v. Cosco, Inc.*, 989 F.2d 399, 402 (10th Cir. 1993); *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1278 (8th Cir. 1987).

The demonstrations performed by Koepke and Howerton are intended to illustrate one of the principles underlying their opinions that this accident was not caused by the engine brake, specifically, that the ABS will disengage the engine brake without application of the service brake. These demonstrations are not offered as reenactments. Consequently, the factual dissimilarities between the demonstrations and the accident are irrelevant. The only relevant circumstances surrounding the demonstrations are the facts that, in each case, (a) a vehicle of the pertinent model was driven with engine brake on, (b) an ABS event was induced, and (c) the service brake pedal was not depressed. These are the only pertinent facts, because the demonstrations are offered only to demonstrate what results from those three circumstances.

### D. Plaintiffs' Assertion That Howerton Should Not Be Permitted To Testify Regarding the Demonstration of Engine Brake Suppression Is Plainly Without Merit

Plaintiffs maintain that

> it is questionable that Howerton, who has never had a Commercial Driver's License and whose experience driving a heavy truck has been limited to a "couple of hours" since 1981, was legally driving the tractor, and he should not be permitted to testify about his observations of his February 15, 2004 test which was uninstrumented.

(Pls.' Mem. at 24.) The specific basis for Plaintiffs' claim that he should not be permitted to testify is not clear. The implication of this statement is that Howerton should not be permitted to testify for one or more of the following three reasons.

#### 1. Plaintiffs' assertion that it is "questionable" whether Howerton was legally driving the tractor

It is respectfully submitted that the Court should disregard this issue, for two reasons. First, despite calling it "questionable," Plaintiffs do not take a position on this "question," and, specifically, do not maintain that Howerton actually engaged in illegal conduct. Indeed, Howerton testified at his continued deposition that he drove the subject vehicle only at the premises of his professional offices, and not on the open road. (See Howerton Cont'd Dep. at 272, 312-13.)[1] Secondly, any illegality would be irrelevant anyway, as Plaintiffs do not maintain that expert testimony may not be based on knowledge gained through illegal conduct.

#### 2. "[H]is experience driving a heavy truck has been limited to a 'couple of hours' since 1981"

Plaintiffs do not assert that substantial, recent truck driving experience is necessary in order for an expert such as Mr. Howerton to determine whether an ABS or engine brake is engaged or disengaged at a particular point in time or to determine whether or when he himself

---

[1] Copies of relevant pages of Howerton's continued deposition taken on March 28, 2004 are attached hereto as Ex. 1.

depressed the service brake pedal. Any such assertion would be patently absurd. Therefore, it is respectfully submitted that Howerton's limited recent experience in driving heavy trucks is not reason for precluding his testimony regarding this demonstration.

### 3. Howerton's demonstration was "uninstrumented"

Plaintiffs note that Howerton testified that this demonstration was "uninstrumented," in that he did not "hook up any kind of data acquisition equipment to the tractor," such as attaching sensors to each wheel to monitor their speeds. (Pls.' Mem. at 25.) As Plaintiffs also note, however, when asked why he did not "have data acquisition equipment on this test tractor, Howerton replied that

> I didn't think it was necessary. It adds, you know – first of all, what is it that you would be interested in recording, and second, it would add a lot of additional expense and time, and the whole point of this test was to demonstrate in a very simple way this concept we talked about earlier, that the ABS system will suppress a Jake Brake, independent of anything else.

(Pls.' Mem. at 26.) Plaintiffs have not sought to undermine Howerton's contention that attaching additional instruments to the test vehicle would not have provided any information that is relevant to this demonstration. They certainly have not suggested any way in which the attaching of additional instruments to the test vehicle would be relevant. Defendants therefore respectfully submit that the fact that this demonstration was "uninstrumented" has no bearing on its relevance, reliability, or admissibility.

### E. Plaintiffs' Claims That Published Warnings Would Be "Redundant" if the ABS Could Disengage the Engine Brake Without Application of the Service Brake

These demonstrations by Defendants' experts Koepke and Howerton demonstrate that the ABS will disengage the engine brake even if the service brake pedal is not depressed. Plaintiffs assert that this leads to the conclusion that warnings provided by Defendants and Jacobs Vehicle

Systems are "redundant" insofar as they state that "the use of an engine brake on a wet and/or slippery road surface can result in loss of vehicle control" or advise vehicle operators that, if they do experience a loss of traction while the engine brake is on, that it should be shut off. (Pls.' Mem. at 17, 18.) When asked if such warnings were "redundant" in light of the demonstrations they had performed, Howerton answered "[i]n this context, yes." (Id. at 19.) Koepke's response was "[w]ith this particular tractor, it's probably redundant, but it's still good driving practice, and it's consistent with what drivers are instructed to do by the commercial driver training manuals." (Id. at 19.)

The issue of possible redundancy of warnings is not relevant to this Cross-Motion. It does not concern whether the methodology of the challenged demonstrations is somehow inadequate. Manufacturers of components, such as the engine brake, must provide manuals that are not limited to use of their products in trucks that have both an engine brake and an ABS, and therefore must advise of dangers that are of limited relevance to operators of trucks that do have an ABS. Similarly, commercial driver training manuals must prepare drivers for safe driving of trucks that lack an ABS as well as those that are equipped with one. At most, Plaintiffs' argument goes to show that Freightliner's inclusion of this warning with vehicles reflects an approach to warnings that is arguably more cautious than necessary. In light of Plaintiffs' claims that Defendants' warnings were actually inadequate, this is ironic indeed.

> **F.     The Plaintiffs Have Failed To Establish Any Basis To Warrant the Preclusion of the Defense Experts' Demonstrations**

In summary, the challenged demonstrations demonstrate that the ABS will disengage the engine brake without application of the service brake in the most straightforward possible way – by driving a Freightliner truck while the engine brake was engaged, inducing an ABS event without applying the service brake, and observing the engine brake disengage. Simply stated,

-8-

the methodology by which these demonstrations were made could not be more reliable. Furthermore, a demonstration – actually showing that in fact the ABS will disengage the engine brake without application of the service brake – is the most reliable means by which that fact can be highlighted for the finder of fact.

Defendants respectfully submit that Plaintiffs wish to preclude defense testimony on this issue not because it reflects "junk science" (see Pls.' Mem. at 34), but because they do not believe that they will be able successfully to undermine this testimony. If Plaintiffs thought that the fact demonstrated that the ABS will disengage the service brake without service brake application could be undermined, they could very easily have tested it themselves. Instead, they note only that various documents do not indicate whether the fact demonstrated is true, and offer the putative expert opinion of Samuel J. Sero "with a reasonable degree of certainty as an electrical engineer . . . that no documentation exists in support of" the fact demonstrated by Koepke and Howerton. (Pls.' Mem. at 13.) They offer no contrary evidence, and, specifically, do not assert that any manuals or other documents state that the ABS would not disengage the engine brake on the vehicle model at issue.

## II.  THE PC CRASH SIMULATION

Plaintiffs also challenge Howerton's use of the PC Crash accident simulation program in this case. Their assertions regarding this matter betray a lack of understanding of that program.

### A.  Howerton's Expertise in PC Crash

Plaintiffs assert that "Howerton's expertise in PC Crash is questionable." (Pls.' Mem. at 29 (emphasis added).) The only basis identified for this assertion is that he had no "formal training" that was "specifically" related to that program. (Id.) Howerton testified that, although he had no formal training that was specific to this program, he "read the manual." (Id.)

Plaintiffs do not actually assert that Howerton lacks the expertise necessary to make proper use of this program, and, in light of his extensive engineering background and experience, it is respectfully submitted that his lack of formal training regarding PC Crash specifically does not disqualify him from doing so.

### B.     Plaintiffs' Claim that PC Crash Is "Result-Oriented"

Plaintiffs assert that "[t]he PC Crash is result-oriented based upon what Howerton decided the beginning inputs would be." (Id. at 29.) As quoted by Plaintiffs, Howerton himself explained that "[a]ny number that you modify in terms of speed or position or steering angle is always going to have a change in what's going on. I mean, that's by definition." (Id. at 30.) That is, in fact, the point of operating the program. The results must be dependent on the numbers supplied by the operator, otherwise the program would provide no information regarding any specific accident, but instead, either would be random or remain constant regardless of data input. In either case, use of the program would be pointless and would yield no information.

It is certainly the case that, as asserted by Plaintiffs, the operator of the PC Crash program could misuse it and "inadvertently or intentionally bias the results" by putting in incorrect information. (Pls.' Mem. at 32.) As pointed out by Howerton, as quoted in Plaintiffs' Memorandum, "with any program that can happen." (Id. at 33.) That does not make the program itself unreliable.

### C.     Howerton's Actual Use of PC Crash in This Case

Plaintiffs attempt to buttress their criticism of PC Crash program as "result-oriented" by implying that Howerton's use of the PC Crash program reflects unwarranted assumptions. Specifically, they quote Howerton's testimony that he initially chose a number to input as a

-10-

steering angle, without apparent basis, and changed it until the input yielded the appropriate result. (See id. at 30.) As he explained at his deposition, however, this trial and error is simply the means of determining what the steering angle must have been in light of the fact that, at the pertinent time, the vehicle was staying in a lane with a particular curve:

> A.   It says "Steering angle, axle one, minus .5," and that's in degrees.
> Q.   What does that mean?
> A.   That's the steering angle of the front axle.
> . . . .
> A.   . . . . That's the steering angle he has to maintain in order to go around the turn.

(Ex. 1 at 360.) Howerton further explained:

> Q.   Okay. So where did you get this "axle one, 0.50"?
> A.   That's the steering angle that the axle -- that is required to maintain the turn around that curve.
> Q.   Well, where did you come up with that number?
> A.   Well, if you put in something larger, he turns sharper, and if you put in something shallower -- something less than that, he turns more of a shallow angle. You have to do a few analyses with a couple of different steering input angles until the truck tracks the curve.
> Q.   Is this just an assumption that you're making that it's minus 0.50?
> A.   No; no. The truck has to maintain some steering angle at the front wheel -- at the front axle in order to go around this turn at a constant rate, in other words, to stay in his own lane.

(Id. at 362-63.) The steering angle arrived at – 0.50 – is neither arbitrary nor undermined by other evidence; certainly, the driver did not provide testimony regarding the steering angle. It is determined by the curve of the road at the pertinent point, and does not reflect any unwarranted assumptions.

Finally, Plaintiffs assert that Howerton's use of the PC Crash program did not reflect an adequately reliable methodology because they allege that, in using the program, he did not reflect "what the driver testified to." (Pls.' Mem. at 30.) They note that various forms of driver

-11-

behavior, such as counter-steering or application of the service brake, were not <u>directly</u> input into the program by Howerton. (<u>Id.</u> at 30-32.) From this they incorrectly conclude that there are "glaring discrepancies between the driver's testimony and the simulation depicted on the PC Crash program." (<u>Id.</u> at 32.)

Plaintiffs have simply misunderstood the nature of this program. It does not produce a simulation of <u>driver behavior</u>, it produces a simulation of <u>vehicle motion</u>. (<u>See</u> Ex. 1 at 372 ("[t]hat's what the analysis attempts to show, is what is the <u>motion of the vehicle</u>"); <u>id.</u> at 375 ("The point of this analysis is to understand what the <u>motion of the tractor and the trailer</u> was and what's required in order to redirect it to the right."))

Thus, Howerton explained at his deposition:

> Q. Well, if you had inputted the claim of the driver that he was counter-steering, your PC Crash program would have a different result, wouldn't it?
>
> A. Well, not necessarily, because then, what I have to do is I have to produce the motion that's correct; in other words, taking him into the Jersey barrier at the appropriate angle and the appropriate speed.
>
> If I go to introduce some counter-steer, then that means that I would have to have introduced some front axle steer that was greater than what I chose as minus ten degrees that reproduced the correct motion.
>
> So what happens is, you end up with a very complex analysis where you lose track of what the real dynamics are. The purpose of this analysis is not to judge what the effect of this counter-steering would have been or what the effect of applying some braking at the rear of the trailer would have been. That's not the purpose of this analysis.

(<u>Id.</u> at 373.) Similarly, when asked if "none of what [the driver] did is part of [Howerton's PC Crash] inputs," Howerton responded:

> A. No, that's not necessarily true. Like I started to explain to you, what I have done, I have reduced the inputs to the simplest level possible to still produce dynamic behavior.
>
> As I said to you, he could have been applying counter-steering, could have been applying some braking at the rear of the trailer, but in terms of the vehicle motion, it falls within this particular steering parameter.

> This particular steering parameter produces the same kind of motion we're talking about.
>
> I'm not trying to say, "okay. We introduced ten degrees of axle steering and that's what caused this accident," all right? That's not the point of this analysis. The point of this analysis is to understand what the <u>motion of the tractor and the trailer was</u> and what's required in order to redirect it to the right.

(<u>Id.</u> at 375 (emphasis added).)

Plaintiffs do not assert that, in using the PC Crash program, Howerton failed to input accurate data regarding vehicle motion, nor do they assert that the simulation of vehicle motion produced by Howerton using that program was inaccurate. Their only challenge to the use of the program by Howerton is, at bottom, the fact that it does not simulate driver behavior. This objection simply misses the point.

## III. THE EDSMAC SIMULATION

Plaintiffs' only criticism of the EDSMAC[2] simulation is that it does not "depict an articulated vehicle like the tractor-trailer." (Pls.' Mem. at 33.) As quoted by Plaintiffs, Howerton explained that, in response to this limitation of EDSMAC, " … what I do is I use the representation for the tractor and add weight to the rear wheels." (<u>Id.</u> at 34.) Howerton further noted at his initial deposition that EDSMAC's inability to depict articulated vehicles is only relevant to part of the sequence of events:

> A.  EDSMAC doesn't allow you to use articulated vehicles. That's why really it's only appropriate for the initial crash event.
>
> Q.  So that if you did EDSMAC on the eastern-bound side of the highway, we would get a better -- I don't know if the word is definition of a better dynamic look at the contacts that took place on the eastbound side?
>
> A.  For the brief period of time when the tractor is striking the wall. Now, as the trailer becomes more of a factor in this, then the analysis begins to become --

---

[2] EDSMAC stands for "Engineering Dynamics Simulation Model of Accident Collisions." (<u>See</u> Howerton Initial Dep. at 243.) Copies of relevant pages of Howerton's initial deposition taken on July 25, 2003 are attached hereto as Ex. 2.

> Q. It's not appropriate?
>
> A. -- less effective. Well, it still is, but you have to understand what it is that you're modeling.

(Ex. 2 at 255-56.)

Howerton further noted that it was due to this limitation that he also uses the PC Crash program to study accidents involving articulated vehicles before forming opinions about them:

> Q. Now, how many times have you done this kind of PC Crash and EDSMAC in cases that you've been involved in?
>
> A. Well, EDSMAC I typically use in almost any automobile accident reconstructions I've done. PC Crash I tend to use when we have issues concerning articulated vehicles. So not nearly as often.

(Id. at 257.)

In short, it appears that Plaintiffs could find little basis for calling into question Howerton's use of the EDSMAC program. Although all simulations have limitations that make their replication of actual events imperfect, any shortcoming of the EDSMAC program is not sufficiently great as to justify precluding Howerton's testimony, particularly in light of the facts that he was able to compensate for the inability to depict an articulated vehicle by adding weight to the rear axle, he is aware of the limits of the program and has not given inordinate weight to those of its results – those relating to the period after the initial crash – that are less reliable, and he has confirmed the opinions based in part on the EDSMAC program by use of the PC Crash program.

## IV. CONCLUSION

In summary, Plaintiffs have provided no valid basis for excluding the testimony of Defendants' experts or any portion thereof. For all of the reasons stated above, Defendants respectfully request that, if their Motion for Summary Judgment is denied, the Plaintiffs' Cross-Motion also be denied.

```
                                    DEFENDANTS,
                                    FREIGHTLINER CORPORATION,
                                    MERCEDES-BENZ CREDIT
                                    CORPORATION, and
                                    DETROIT DIESEL CORPORATION



                                    By_____
                                        Paul D. Williams (ct05244)
                                        Daniel J. Foster (ct24975)
                                        Day, Berry & Howard LLP
                                        CityPlace I
                                        Hartford, Connecticut 06095-3499
                                        (860) 275-0100
                                        (860) 275-0343 (fax)
                                        Their Attorneys
```

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed, on this date, postage prepaid, to:

| | |
|---|---|
| Leo Gilberg, Esq. | Jeffrey C. Pingpank, Esq. |
| 305 Broadway | Cooney, Scully & Dowling |
| New York, NY 10007 | Hartford Square North, 10 Columbus Blvd. |
| | Hartford, CT 06106-5109 |

_____
Daniel J. Foster