Page 268

```
1                UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
2
     -------------------------------)
3    ALICE G. SVEGE,                )
     ADMINISTRATRIX, ET AL.,        )
4                                   )
          Plaintiff(s),              ) Civil Action No.
5                                   )
          vs.                        ) 3:01CV01771 (JBA)
6                                   )
     MERCEDES-BENZ CREDIT           )
7    CORPORATION, ET AL.,            )
                                    )
8         Defendant(s).              )
     -------------------------------)
9

10           DEPOSITION OF:  WILLIAM M. HOWERTON
                            VOLUME II
11              DATE:  March 28, 2004
                       HELD AT:
12           DAY, BERRY & HOWARD, LLP
                      CityPlace I
13              Hartford, Connecticut

14                       - - -

15

16

17

18      Reporter:  SUE A. TERRY, RPR/CRR, LSR #SHR.372
                BRANDON SMITH REPORTING SERIVCE
19                 44 Capitol Avenue
                Hartford, Connecticut 06106
20                  (860) 549-1850

21

22

23

24

25
```

COPY

Svege vs Mercedes-Benz

3/28/2004                                                William M. Howerton

Page 272

1

2    (Deposition commenced at 11:00 a.m.)

3    WILLIAM M. HOWERTON

4        having been duly sworn, deposes and

5        states as follows:

6                    DIRECT EXAMINATION

7    BY MR. GILBERG:

8        Q.    Good morning. Mr. Howerton. I would like to
9    ask you some questions, if I may.

10             To begin with, concerning a test that you did
11   on February 15th, 2004, can you tell me where that test
12   was done?

13       A.    It was done at my offices, Scientific Boston
14   in Boxborough, Massachusetts.

15       Q.    Do those premises contain the facilities that
16   I have seen on the DVD you provided?

17       A.    Yes.

18       Q.    And how big are those premises? I'm speaking
19   not about the office, but outside.

20       A.    Well, it's about fourteen and a half acres.

21       Q.    And what's the address of that facility?

22       A.    1120 Mass. Avenue.

23       Q.    And is that facility contained? Does it have
24   a fence around it?

25       A.    No.

Page 312

1    A.    It was ready for sale, so it was prepped and
2    ready to go; yes. All the brakes were adjusted.
3    Everything was running.
4    Q.    How do you know that?
5    A.    I mean, I'm assuming that's their standard
6    procedure. The truck was -- in fact, it was going to
7    be delivered within a couple of days, so my
8    understanding is that it had gone through a standard
9    checkup.
10   Q.    Did you speak to anyone at this Freightliner
11   dealership?
12   A.    Not directly.
13   Q.    No. Did you take any steps to find out, for
14   instance, whether the brakes were balanced?
15   A.    I did not measure the brakes individually,
16   no.
17   Q.    Okay.
18   A.    But I drove the truck for a while.
19   Everything was fine.
20   Q.    When you say you drove it for a while, was
21   that on February 15th?
22   A.    Actually -- well, I certainly drove it on
23   February 15th, and I drove it on Sunday just to check
24   it out.
25   Q.    Okay. And did you just drive it on the

Page 313

1   premises or did you take it out on the road?

2       A.   No, just on the premises.

3       Q.   Okay.  And how far did you drive it?

4       A.   Oh, a period of five minutes just checking

5   out the brakes and the transmission, checking and

6   seeing what speeds I could get to given the length of

7   driveway we had.  That was the principal reason for

8   that.

9       Q.   What's the length of your driveway?

10      A.   Well, the straight section, I think, is on

11  the order of a hundred yards -- maybe a little bit

12  more.

13      Q.   And this test was performed on the straight

14  section?

15      A.   Yes.

16      Q.   So that's a distance of about 300 feet?

17      A.   That's correct.

18      Q.   Okay.  Did you use any diagnostic tool with

19  regards to the engine?

20      A.   No.

21      Q.   Did you find out how this engine had been

22  programmed?

23      A.   In terms of what?

24      Q.   In terms of various features that the engine

25  has?

Page 360

1           See the bottom right, it says, "Page 1 of
2   39," you can just make it out.
3       Q.  Okay.  I can't make it out here, but --
4       A.  If you go to Page 32 of 39.
5       Q.  Didn't come out that well on the copy, but I
6   think I have it.
7           Is that a page that begins on top, "Axle one,
8   right"?
9       A.  "Zero," but the more important part is "Start
10  Values," velocity is 60, "Friction Coefficient" is .5.
11      Q.  Yes.
12      A.  "Brake," so what you have here is from then
13  on, you can see what the steering inputs are.  If you
14  run down there, you'll see a heading that says
15  "Steering."
16      Q.  I see it.
17      A.  It says, "Steering angle, axle one, minus
18  .5," and that's in degrees.
19      Q.  What does that mean?
20      A.  That's the steering angle of the front axle.
21      Q.  And where is that being steered to?  What
22  does that tell us?
23      A.  That's the part where he's stable in the
24  curve.  That's the steering angle he has to maintain in
25  order to go around the turn.

Page 362

1  Q. What I'm interested in is the starting inputs
2  to your PC Crash program, and on Exhibit 10-J, you had
3  a starting value of velocity, miles per hour of 60.
4  A. Right.
5  Q. Okay?
6  A. Okay.
7  Q. Now, what steering input do you have at that
8  point when you say he's going 60 miles an hour?
9  A. That's what I just gave you. That's the
10 beginning of the analysis.
11 Q. That's a starting value?
12 A. Right.
13 Q. Okay. So where did you get this "axle one,
14 0.50"?
15 A. That's the steering angle that the axle --
16 that is required to maintain the turn around that
17 curve.
18 Q. Well, where did you come up with that number?
19 A. Well, if you put something in larger, he
20 turns sharper, and if you put in something shallower --
21 something less than that, he turns more of a shallow
22 angle. You have to do a few analyses with a couple of
23 different steering input angles until the truck tracks
24 the curve.
25 Q. Is this just an assumption that you're making

Page 363

1   that it's minus 0.50?

2       A.    No; no.  The truck has to maintain some

3   steering angle at the front wheel -- at the front axle

4   in order to go around this turn at a constant rate, in

5   other words, to stay in his own lane.

6             When I first start my analysis, the first

7   thing I do is I put in a couple of different steer

8   values to see what steering angle is necessary to

9   maintain his position in that lane.

10      Q.    Well, aren't there a range of values that he

11  could be in?

12      A.    Very narrow range.  It could be .051, could

13  be .049.  It couldn't be 1.0, for instance.

14      Q.    Could it be minus 0.53?

15      A.    That gets to be a little high -- probably

16  not.

17      Q.    Okay.  So could it be minus 0.48?

18      A.    Possibly.

19      Q.    Okay.  So there are a band of values that you

20  can -- or let's call it a range of values, and you

21  arbitrarily picked one?

22            MR. WILLIAMS:  Objection as to form.

23      A.    No, it's not arbitrary at all.  It's the

24  value that gives us the best position within the road

25  over that distance.  In other words, it's not

Page 372

1  actions were were only minor in terms of directing or
2  redirecting the vehicle.
3          What I have done is I have input a steering
4  angle at the steer axle that would provide the right
5  direction of travel for impact with the wall.  I mean,
6  that's what's required in terms of input -- steering
7  input in order to take the tractor to that wall in the
8  way it did, all right?
9          That's what the analysis attempts to show, is
10 what is the motion of the vehicle; what's required to
11 carry it to the first Jersey barriers that it strikes?
12 It's not -- it's not a mechanism to say, "Okay.  Had
13 he -- if we believe he applied his trailer brakes or he
14 did some counter-steering at some point, what was that
15 and what was the outcome," because whatever it was, it
16 wasn't sufficient, number one, because he still went
17 into the wall, all right?
18         And we don't know what level that is.  We
19 have no way to judge that, all right?
20    Q.   Well, you don't know --
21         MR. WILLIAMS:  Please let him finish.
22         MR. GILBERG:  I thought he was finished.
23    A.   So in order to keep the analysis as clean as
24 possible, what I have done is I have reduced it to
25 inputting a steer at the steer axle that would provide

Page 373

1   or produce the correct vehicle motion.

2   BY MR. GILBERG:

3       Q.   Well, if you had inputted the claim of the

4   driver that he was counter-steering, your PC Crash

5   program would have a different result, wouldn't it?

6       A.   Well, not necessarily, because then, what I

7   have to do is I have to produce the motion that's

8   correct; in other words, taking him into the Jersey

9   barrier at the appropriate angle and the appropriate

10  speed.

11           If I go to introduce some counter-steer, then

12  that means that I would have to have introduced some

13  front axle steer that was greater than what I chose as

14  minus 10 degrees that reproduced the correct motion.

15           So what happens is, you end up with a very

16  complex analysis where you lose track of what the real

17  dynamics are.  The purpose of this analysis is not to

18  judge what the effect of this counter-steering would

19  have been or what the effect of applying some braking

20  at the rear of the trailer would have been.  That's not

21  the purpose of this analysis.

22      Q.   And all the inputs concerning the driver or

23  before contact with that right concrete barrier, they

24  are all assumptions on your part, aren't they?

25           MR. WILLIAMS:  Object to the form.

Page 375

1        MR. WILLIAMS: Objection as to form.

2   A.   No, that's not necessarily true. Like I
3   started to explain to you, what I have done, I have
4   reduced the inputs to the simplest level possible to
5   still produce dynamic behavior.
6            As I said to you, he could have been applying
7   counter-steering, could have been applying some braking
8   at the rear of the trailer, but in terms of the vehicle
9   motion, it falls within this particular steering
10  parameter.
11           This particular steering parameter produces
12  the same type of motion we're talking about.
13           I'm not trying to say, "okay. We introduced
14  ten degrees of axle steering and that's what caused
15  this accident," all right? That's not the point of
16  this analysis.
17           The point of this analysis is to understand
18  what the motion of the tractor and the trailer was and
19  what's required in order to redirect it to the right.
20           Minus 10 degrees of steer is a significant
21  level of steering. In fact, it's a tremendous amount
22  of steering, especially at these high speeds. That
23  implies that these lateral forces are very high, all
24  right? That's separate from what the driver might have
25  been trying to do, all right?