UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALICE G. SVEGE, ADMISTRATRIX, ET AL., : CIVIL NO. 3:01 CV 01771 (MRK)
:
             Plaintiffs, :
vs. :
:
MERCEDES-BENZ CREDIT :
CORPORATION, ET AL :
: May 21, 2004
             Defendants. :

**PLAINTIFFS' MEMORANDUM OF LAW IN
REPLY TO DEFENDANTS' OPPOSITION TO
PLANTIFFS' CROSS-MOTION TO PRECLUDE
EXPERTS, BARNES, KOEPKE, AND HOWERTON**

A few enduring rules have emerged from the trilogy of *Daubert*, *Kumho* and *Joiner*:

First, expert testimony will be allowed only if it is based on a methodology shown to be both reliable and relevant in, that the case facts fit the methodology used to support the conclusions reached. (*Daubert*)

Second, the trial court gets broad leeway in selecting the criteria it will use to analyze experts' methodologies. (*Kumho*).

Third, *ipse dixit* – Latin, roughly, for "because I'm an expert, and I say so" -- no longer suffices as a basis for the expert's conclusion – whether founded in scientific experimentation, application of physical principles, or experience and observation – must be explained and supported. (*Joiner*, 522 U.S. 136, 146).

Fourth, the reliability and relevance of expert testimony depends on whether an expert – basing testimony on either professional studies or personal experience – uses "the same level of intellectual rigor" characteristic of experts in the relevant field. (*Kumho*).

Since the basis of the Opposition Memorandum is that their experts' opinions are reliable because their "demonstrations" are reliable (Page 2, Defendants' Memorandum IA), the failure

1

of the three (3) defendants' experts to use "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" is especially glaring.

It begs the question as to why the defendant Freightliner did not use its own testing department with its established protocol to meet the level of intellectual rigor that *Kumho* requires in this case?

Freightliner, one of the largest manufacturers of trucks and tractors in the world, maintains its own testing department with test facilities and equipment, staffed with test engineers and professional test drivers, and access to sophisticated state-of-the-art data acquisition equipment and "otherwise reliably utilizes scientific methods to reach a conclusion." (*Zuchowicz v. United States,* 140 F.3rd 381, 387 (2nd Cir., 2000).

According to Barnes, the Freightliner test department maintains an engineering library containing reports of its testing, but no reports of the tests conducted on August 11, 2003 by Koepke and February 15, 2004 by Howerton will be reduced to writing and included in the Freightliner library because they were "demonstrations" not tests. (Pg. 20, Plaintiffs' Memorandum, Cross-Motion).

Annexed hereto as Exhibit O is the Freightliner Engineering Technical Report dated 4/22/97 which was marked as Exhibit 24 and Exhibit 65 respectively at the Barnes and Koepke depositions of April 1, 2004, and which includes testing which makes comparisons to the WABCO D-Version ABS, the same ABS system that was on the 1998 Freightliner tractor involved in the subject accident (See Exhibit W of Glennon's Supplemental Report, Exhibit A of Cross-Motion).

Exhibit O is indicative of the intellectual rigor that characterizes Freightliner's practice as an expert in the relevant field.

Page 7 of Exhibit O documents instrumentation used as Labeco fifth wheel velocity/time/distance recording system and WABCO supplied and controlled individual wheel velocity recording system.

Such instrumentation permits recording of wheel speeds that the sensors pick up and activation of the modular valves by pulsing. (Barnes Pg. 20, Plaintiffs' Memorandum, Cross-Motion).

According to the summary of Opinions by Don Barnes in his expert report of April 1, 2004 (Exhibit F, Plaintiffs' Memorandum, Cross-Motion), before the ABS system would send a J1922 message to engine control disabling the engine brake, "it is necessary that the wheel speed data from the four wheel ends to be such that it meet WABCO's criteria that wheel lockup has occurred" or is "immediately pending."

Furthermore, it is defendants' experts claim that the modulator valves being pulsed is a pre-condition to the ABS controller or ECU sending a J1922 message to engine control to disengage the Jake brake.

Instrumentation would also verify when the throttle was being applied or released, whether the brake was being depressed or not, and the speed of the tractor. (Howerton, Pg. 25, Plaintiffs' Memorandum, Cross-Motion).

As can be seen on Page 5, third paragraph of Exhibit O, the WABCO individual speed data can even indicate information as to the co-efficient of friction of the surface.

Exhibit O also states that "during normal highway driving the D-Version system has shown to maintain acceptable air pressure during an <u>ABS event</u>" (emphasis supplied).

Since air pressure can only be generated by application of the service brake, this statement further support plaintiffs' experts' opinion that service brake application is required for

3

an ABS event as was testified to by Barnes on Page 35 of Glennon's supplemental Report, (Exhibit A of Plaintiffs' Memorandum, Cross-Motion).

It is an ABS event that is necessary in order to have the ABS computer send a J1922 data link message to disengage the Jake brake.

Instrumentation would also permit verification that the ABS computer had sent a J1922 message to disengage the Jake brake.

Inexplicably, the defendant Freightliner spurns its own testing department, and turns to Bruce Koepke and William Howerton "to demonstrate that, if (a) a vehicle of the pertinent model was driven with engine brake on, (b) an ABS event was induced, and (c) the service brake pedal was not depressed, the result would be that the ABS would disengage the engine brake. It can hardly be denied that the most reliable way to determine whether the engine brake will be disengaged if factors (a), (b), and (c) are present is to create those three factors and observe whether the engine brake becomes disengaged." (See Page 3, second paragraph, Defendants' Memorandum in Opposition to Cross-Motion).

And how do we know that the engine brake is on, an ABS event was induced, the service brake was not depressed and the ABS disengaged the engine brake?

Without wheel speed data, how do we know that WABCO's criteria that "wheel lockup" has occurred" or is "immediately pending"?

How do we know the modulator valves have been pulsed?

How do we know a J1922 message has been sent?

Well, Mr. Koepke and Mr. Howerton say so, and so does Barnes who was not even present when the tests took place.

As for such an analytical approach, the Court in *Kumho*, Id. at 157, said:

> "Of course [the expert] himself claimed that his method was accurate, but, as we pointed out in *Joiner*, nothing in either

4

> *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

In this case, we don't even have existing data.

Compounding the *ipse dixit* of Koepke and Howerton is that they are not professional tractor drivers.

Howerton has admitted he has never had a Commercial Driver's License, has driven "a couple of hours" since 1981, and made his conclusions as to what was happening with the test tractor while driving it (Exhibit J, Page 308, Line 5, Plaintiffs' Memorandum, Cross-Motion).

The Court may consider taking judicial notice that without a CDL, Howerton is not qualified to drive a commercial vehicle.

Federal Motor Carrier Safety Regulations, Sec. 390.5 entitled "Definitions" states "Highway" means any road, whether on public or private property that is available to the public without restrictive gates.

Mr. Howerton testified about where he did his test on Page 272, Line 18:

"Q. And how big are those premises? I'm speaking not about the office, but outside.
A. Well, it's about fourteen and a half acres.
Q. And what's the address of that facility?
A. 1120 Mass. Avenue.
Q. And is that facility contained? Does it have a fence around it?
A. No.
Q. Does it have any roadway that you enter onto the premises from?
A. I'm not sure I understand what you mean.
Q. Well, when you – when you are on the road where you say the address is –
A. Yeah.
Q. -- is there some sort of a gate that you go through to get into the premises?
A. Well, you would have to turn off of the main road on to a driveway, right.
Q. Is there a gate there?

5

  A. No.

  Q. It's not a secured facility, is it?

  A. In terms of restriction – you mean entrance?

  Q. Yes.

  A. Right, no."

Howerton's deposition testimony is annexed as Exhibit P.

Federal Motor Carrier Safety Regulations, Sec. 390.5, as it pertains to the definition of "Highway" is annexed as Exhibit Q.

Koepke has a CDL, but his experience is limited according to his testimony on Page 49, Line 15:

  "Q. Have you ever driven a heavy truck for a living?

  A. No, I have not.

  Q. How many miles do you think that you've accumulated driving heavy trucks in 25 years?

  A. Not a lot. Probably 10,000 miles or so."

His deposition testimony is annexed as Exhibit R.

The inexperience of Koepke and Howerton heightens the potential for error both in their driving technique and in their ability to make accurate observations based on their subjective interpretation in the absence of instrumentation to validate their methodology.

Koepke testified at Page 250, Line 5 of his 4/1/04 deposition annexed as Exhibit R herein:

  "Q. Now, the WABCO supplied and controlled individual wheel velocity recording system that's spoken about in the engineering test report that's Exhibit 65, did you ever inquire of the Freightliner test department as to what instrumentation they had available for you in doing what you did on August 11, 2003?

  A. No, I didn't think that I needed any instrumentation."

And on Page 337, Line 22:

6

"Q.  In order to get disengagement of the engine brake, don't you have to have a message across the -- to the engine data link to turn off the engine brake from the ABS computer?

A.  Yes.

Q.  And couldn't you have had data acquisition equipment to measure whether that was done in this demonstration?

MR. WILLIAMS: Objection. Asked and answered.

A.  Yeah, I think probably."

Defendants' Memorandum in opposition to the Cross-Motion takes the position that their label of "demonstration" rather than "test" somehow insulates them from the gatekeeping scrutiny of the Court as being "ill-suited to factors frequently considered under *Daubert*." (Page 3, Defendants' Opposition, 2nd TP).

However, Howerton, in his expert report of March 11, 2004 (Exhibit D, Plaintiffs' Memorandum, Cross-Motion) states he "conducted testing."

More important than the semantics is that the reports of Barnes, Howerton and Koepke are based upon their training in the field of engineering. Engineering is a discipline based on scientific principles and theories (See *Kumho*, 119 S. Ct. at 1175). Therefore, their opinions should be subject to scrutiny under the factors outlined in *Daubert*.

Subjecting their opinions to *Daubert* scrutiny exposes the defendants' experts' unreliability since all three experts admit that their tests upon which they base their opinions were not conducted pursuant to any scientific, published, peer-reviewed standard.

In *Demaree v. Toyota Motor Corp.*, 37 F.Supp. 2d 959 (W.D. Ky. 1999), proposed testimony is "a near-classic example of the completely unsupported opinion in a scientific field of the kind which *Daubert* condemns." Expert admitted that there is no literature,...that advocates an air bag threshold deployment of 20-25 m.p.h.

7

In *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 8th Cir. 2000), Plaintiff's expert's causation opinion was rejected because it was not based on a methodology that had been tested, subjected to peer review and generally accepted in the medical community.

The video films submitted by defendants, included as Exhibits H and I on the Cross-Motion, as representations of the Koepke and Howerton tests by which they seek to establish that the engine brake will be disengaged without service brake application when an ABS event occurs are confusing and misleading.

The laptop computer connected by Barnes to the Koepke test tractor and seen in video films included as Exhibits G and H is not a substitute for instrumentation because there is no way that the viewer can reasonably connect what you see on the laptop in the video with what the tractor is doing in the video.

This is so because it is either-or – either you see the laptop or you see the tractor – you never see them together, and there is no timeline that connects one with the other.

Koepke verified this when he testified on Page 324, Line 17:

"Q.   Okay. So how do we know what is taking place with regards to the laptop at the various times that the videotape shows the outside of the tractor?

A.   Well, you can't tell that from the video.

Q.   Well, for instance –

A.   But it's connected to the monitoring circuit that has no control over the vehicle.

Q.   Yes, but we have no photograph, we have no film of that?

A.   That's correct.

Q.   What I'm saying is, all the time that you are on the pavement and you say that the Jake brake has decelerated the drive axles and is the cause of the slowing of the vehicle that we see, that's not verified by the laptop?

A.   Well, it wasn't recorded on the video anyway.

Q.   Okay. Well, it wasn't recorded on the video?

A.   Right.

8

Q. That's correct, okay. So there is no laptop verification of those decelerations on the hard pavement?

A. Well, I have to look at the tape. I don't believe so. I think when he zoomed in on the laptop, you can hear the Jake cutting in and out so we are on the gravel.

Q. Well, we will see the laptop later, and I think as you recall, when you see the laptop, you don't see what the tractor is doing. There is no outside film of it; isn't that right?

A. That's right. It's a single camera event.

Q. How do we know during what sequence that laptop is in operation?

A. Well, besides me telling you under oath and what you see on the video, I think that's what we have.

Q. Well, are you saying that as you are driving this vehicle that you are looking at the laptop, and you can tell us what was being shown at that laptop during the whole sequence while you are driving?

A. No. I never looked at the laptop while I was driving. I was looking ahead and driving. Where I'm talking about looking at the laptop is on the video.

Q. Okay. But just looking at the laptop on the video, do you know what the tractor was doing at that particular time, in which way, were you on the gravel, were you on the pavement? Where were you?

A. I can tell in general where we are from what the sound of the vehicle is doing and the shaking of the camera, but, you know, I didn't have a two- or three-camera setup with timelines so you can coordinate those. I just have a single camera there."

The above deposition testimony is annexed as part of Exhibit R.

Defendants' experts attempt to testify what is happening on the video by the sounds they claim to hear will be equally confusing and misleading to a jury.

Koepke testifies on Page 346, Line 2:

"Q. What do you hear that you say is the engine brake going on?

A. You can hear the sound of it.

Q. You hear a popping noise?

A. No.

Q. There is no popping noise?

9

A. I'm very surprised at – I know it said it in the Jacobs publication, but it doesn't sound like a popping noise to me."

And on page 347, Line 9:

"Q. You never heard the modulator valves being pulsed?

A. No, I couldn't hear them in the truck. I could hear them in the lab, but I could not hear them over the sound of the engine and the Jake Brake.

Q. And you don't hear them on the video?

A. No."

Above deposition testimony is annexed as part of Exhibit R.

*Daubert/Kumho* limiting criteria includes the extent to which the technique relies upon the subjective interpretation of the expert.

Are we now going to submit to lay jurors their subject interpretation of what they hear?

Even relevant evidence is excluded if its probative value is "substantially outweighed" by its likelihood to confuse the issue or mislead the jury. Fed. R. Evid. 403.

The unacceptability of Howerton's simulations using PC Crash and EDSMAC have been detailed in the Memorandum in support of the Cross-Motion.

Defendants' opposition that these programs are "not unreliable" (Page 10, Defendants' Memorandum) is unsupported with any evidence to the contrary.

By what standard can the PC Crash simulation by which Howerton admits he can inadvertently or intentionally bias the results meet the *Daubert/Kumho* criteria for reliability?

Isn't the PC Crash simulation just *ipse dixit* cloaked in the guise of technology?

Furthermore, the EDSMAC simulation, according to defendants' opposition, cannot depict an articulated vehicle and so Howerton adds weight to the rear wheels of an unarticulated vehicle, but never offers any explanation how this added weight takes the place of a 48 foot long trailer and the vehicle dynamics it creates.

Howerton has failed to show "a substantial similarity in circumstances" between his reconstruction/simulation and the original accident. (*Fusco v. Gen. Motors Corp.*, 11 F.3rd 259, 264 (1st Cir. 1993).

## CONCLUSION

Freightliner set up and conducted tests, demonstrations, and simulations to support a pre-determined conclusion, rather than conduct scientific tests to help our jury understand the true facts of this tragic accident.

Plaintiffs respectfully asks the Court to exercise its gatekeeping role to preclude the testimony of Howerton, Koepke and Barnes.

Respectfully submitted,

Plaintiffs: Alice G. Svege, Administratix of
The Estate of Thor Svege, Sr. and Alice G.
Svege, as Guardian of the Estate of Minor
Children, Thor Svege, Jr. and Briana Svege

By:

_____
LEO GILBERG, ESQ.
305 Broadway
New York, New York 10007
212-822-1440
Federal Bar No. CT22824

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing Reply Memorandum with Exhibits was sent on this date by FED EX for May 26, 2004 delivery to:

Paul E. Williams, Esq.
Day, Berry & Howard LLP
City Place I
Hartford, CT 06095

_____
LEO GILBERG