UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALICE SVEGE,

    Plaintiff,

v.     No. 3:01cv1771(MRK)

MERCEDES-BENZ
CREDIT CORP., et al.,

    Defendants.

## MEMORANDUM OF DECISION

Presently pending before the Court is the motion of defendant Mercedes-Benz Credit Corporation ("MBCC") for summary judgment [doc. # 90] on the three remaining causes of action directed against it, counts two, four, and six of plaintiff's Amended Complaint [doc. #35], all of which assert claims under the Connecticut Product Liability Act, Conn. Gen. Stat. §§ 52-572m *et seq.* ("CPLA").[1]

The issue on the present motion is whether MBCC is a "product seller" within the contemplation of Conn. Gen. Stat. § 52-572m(a) with respect to its ownership and leasing of a 1998 Freightliner Model No. FLD132064T (the "Truck"), one of the vehicles involved in the motor vehicle accident giving rise to the present case. MBCC argues that it did not manufacture the Truck, and had no role in the vehicle's assembly, design, or distribution, and that its financing activities surrounding the sale and leasing of the Truck and thousands of other Freightliner trucks are not sufficient to render it a "product seller" under the CPLA. *See* Mercedes-Benz Credit

---

[1] By ruling dated January 31, 2002 [doc. # 48], Judge Janet Bond Arterton granted MBCC's motion to dismiss the first, third, and fifth counts of plaintiff's Amended Complaint.

Corp.'s Memorandum in Support of Motion for Summary Judgment [doc. #91], at 3-4 ("Mem. in Supp. of Mot. for Summ. J."). The Court disagrees. Because the Court concludes that MBCC is a "product seller" for purposes of the CPLA, the Court DENIES MBCC's motion for summary judgment.

### I.

The following facts are derived from the parties' submissions, including the Deposition of Robert Hartshorn [doc. #93], Ex. 3, and transactional documents attached as exhibits to the parties' pleadings. All ambiguities are set forth in the light most favorable to the non-moving party, the plaintiff. *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 2004 WL 1472678, at *2 (2nd Cir. July 1, 2004). Accordingly, there are no genuine issues of material fact regarding the issues relevant to the pending motion.

MBCC is incorporated under the laws of Delaware, has its principal place of business in Lisle, Illinois, and is in the business of financing commercial vehicle purchases. On September 1, 1997, MBCC and Kentucky Freightliner Trucks, Inc. ("Kentucky Freightliner") entered into an "Equipment Purchase and Lease Assignment Agreement for Freightliner Dealers" [doc. #91], Ex. A ("Assignment Agreement"), which govern MBCC's and Kentucky Freightliner's respective roles in the January 1998 sale and leasing of the Truck. The Assignment Agreement was similar or identical to agreements MBCC had in place nationwide with all 300 dealers of trucks made by Freightliner Corporation, Inc. ("Freightliner") during the time period from September 1997 to January 1998.

Of relevance to the Court's "product seller" analysis below are the following provisions

of the Assignment Agreement:

> KENTUCKY FREIGHTLINER TRUCKS, INC. (hereinafter called "Dealer") desires to sell to Mercedes Benz Credit Corporation (hereinafter called "MBCC"), on the terms set forth below, certain equipment, including but not limited to new . . . trucks, truck-tractors . . . covered by closed or open-end lease agreements acceptable to MBCC.
>
> Dealer and MBCC agree as follows:
>
> 1. Unless MBCC consents otherwise, the paper offered to MBCC shall consist of leases . . .
>
> . . .
>
> 4. Dealer warrants that: . . . (h) Dealer will ensure that a title reflecting MBCC as owner of the equipment (and additionally as lienholder, if requested by MBCC) will be filed or recorded so as to be effective against all persons, and will file any financing statement with respect to any Lease as may be requested by MBCC.
> . . . Dealer shall have performed all proper pre-delivery servicing on all new equipment covered by a Lease in the manner prescribed by the manufacturer thereof and shall deliver new and used equipment to the lessee thereof only after proper execution of all documents applicable to the Lease. Dealer agrees no equipment will be placed in service by the lessee until such equipment has been sold and the applicable Lease assigned to MBCC.

Assignment Agreement at 1.

On January 8, 1998, Freightliner transferred the Truck to Kentucky Freightliner with an invoice listing its dealer as the buyer and MBCC as the entity responsible for the wholesale purchase price. *See* Invoice [doc. #93], Ex. 6. This method of bringing trucks to the showroom was a standard procedure under which MBCC financed (by loans to dealers paid directly to Freightliner) approximately 40% of all wholesale inventory purchases of Freightliner trucks by Freightliner dealers during the years 1998, 1999, and 2000. Deposition of Robert Hartshorn[2]

---

[2] Mr. Hartshorn, MBCC's designated witness, has been district finance manager for Daimler Chrysler Services Commercial Vehicles, Mercedes-Benz Credit Corporation, since

[doc. # 93], Ex. 3, at 58-59 ("Hartshorn Depo."). In each year, the 40% figure approximated roughly 80,000 wholesale truck purchases. *Id.* at 60.

Between the transfer of the Truck on January 8, 1998 and January 13 of the same year, Hensley Industries, Inc. ("Hensley") took steps towards becoming the lessee of the Truck.[3] On January 13, 1998, MBCC sent Kentucky Freightliner a "Lease Financing Commitment" [doc. #91], Ex. B ("Commitment") for the Truck, setting forth MBCC's commitment to provide lease financing for Hensley and listing multiple conditions for the lease financing. The Commitment stated that the financing was provided pursuant to a "Published Freightliner Success Program" ("Success Program").[4] The Success Program and other programs like it were designed solely by MBCC specifically for financing Freightliner trucks, were marketed in published finance manuals to dealers, and included a joint advertising component pursuant to which Freightliner would offer a product and MBCC a rate reduction and the combined package would be marketed

---

January 1999. Hartshorn Depo. at 6-7, 10. According to Mr. Hartshorn, in January 2002, the truck finance division of MBCC was transferred to Daimler Chrysler Commercial Vehicles. *Id.* at 10.

[3] Mr. Hartshorn testified in his deposition that the Truck appeared from relevant documents to have been a "stock truck," one ordered for Kentucky Freightliner which Hensley decided to purchase after it arrived on the dealer's showroom floor. Hartshorn Depo. at 46.

[4] The "Freightliner Success" Promotion [doc. #93], Ex. 7, self-described as a "Marketing Notice," states:

> Mercedes-Benz Credit Corporation-Freightliner Financial Services Division and Freightliner Corporation along with a number of its vendors have joined forces to introduce special finance and lease incentives to support the introduction of the "Freightliner Success" sales promotion.
>
> The "Freightliner Success" sales promotion offers lower finance and lease rates on qualified vehicles in addition to other sales incentives outlined in Freightliner's correspondence to all Century Class dealers dated 07.31.97.

4

to end user lessees through print media. One such advertisement in the record displays both Freightliner's and MBCC's logos and pictures of Freightliner trucks. *See* "SelecTrucks of Florida" Ad [doc. #93], Ex. 8. The advertisement also highlights the "Power to Succeed Program," listing incentives such as "retail financing through MBCC," "new set of batteries," "free brake relining kit coupons," and "new tires all the way around," etc. The familiar Mercedes-Benz logo is located at the lower corners of the ad, along with "Mercedes-Benz Credit Corporation." *Id.*

On January 15, 1998, Hensley and Kentucky Freightliner signed a Kentucky Freightliner document titled "Retail Order for a Motor Vehicle." *See* doc. #91, Ex. E. Handwritten above the upper border of the document is the heading "Bill of Sale." Although the document lists MBCC as the purchaser and lessor of the Truck and Hensley as lessee, Hensley signed as purchaser. *Id.*

On January 16, 1998, Kentucky Freightliner and Hensley entered into an open-end lease agreement [doc. #93], Ex. 1-A (the "Lease Agreement"), the subject of which was the Truck. Of the roughly 80,000 Freightliner trucks for which MBCC provided wholesale financing in 1998, MBCC subsequently provided retail financing for 6,604 pursuant to agreements identical or substantially similar to the Lease Agreement. Hartshorn Depo at 60, 62. In addition, as a general matter during this time period, there was tension in the relationship between Freightliner and MBCC. Freightliner was looking for additional finance sources to help it sell vehicles, since financing was an important to dealers' abilities to make sales. Hartshorn Depo. at 37. Freightliner urged MBCC to increase the number of vehicles for which it would provide retail financing, but MBCC declined to finance as many vehicles as Freightliner requested. *Id.*

Critical to the Court's analysis of MBCC's status as a "product seller" for purposes of the

CPLA are the following Lease Agreement provisions:

. . .

2. TERM. This Lease shall commence on the delivery date stated on the applicable Schedule and shall continue until all rental payments as hereinafter described, and all of Lessee's other obligations hereunder, have been satisfied in full by Lessee.

. . .

9. ASSIGNMENT. All right, title and interest in and to this Lease, as well as to the Equipment, may be assigned at any time by Lessor without Lessee's consent. . . . It is expressly understood that any reference in this Lease to "Lessor" shall be construed to mean Lessor or Lessor's assignee.

. . .

10. OWNERSHIP/TITLE. Ownership of and title to all Equipment shall be and remain in Lessor, notwithstanding possession and use thereof by Lessee.

. . .

15. PURCHASE OPTION. It is understood and agreed that Lessee has no option to purchase the Equipment at any time; however, Lessee may have the opportunity to purchase the Equipment upon the expiration of the Lease for an amount equal to the Residual Value set forth in the Schedule(s).

. . .

16. END OF LEASE TERMINATION LIABILITY. Upon the expiration of this Lease, Lessee shall, at Lessee's expense assemble and return the Equipment unencumbered at Lessor's place of business, or at such other place as Lessor specifies, in the same condition, appearance and functional order as received, reasonable and ordinary wear and tear excepted.

Upon the return of the Equipment as herein provided, Lessor will sell the Equipment at a public or private sale with or without notice to Lessee. If the amount received from the sale . . . exceeds Residual Value of the Equipment as set forth in the Schedule(s), the amount of such surplus shall be paid to Lessee. If the amount received from the sale . . . is less than the Residual Value of the Equipment . . . , Lessee shall be liable . . . for, and shall pay upon demand, the amount of such deficiency to Lessor. Lessee acknowledges that the potential benefit or liability contemplated by this Section 16 is not intended to create any equity interest in the Equipment for Lessee, but rather are designed as incentives for Lessee to properly maintain the Equipment as required by this Lease.

. . .

> BY SIGNING BELOW, LESSEE ACKNOWLEDGES THAT LESSOR'S SIGNATURE ON THIS LEASE WILL HAVE THE EFFECT OF ASSIGNING ALL RIGHT, TITLE AND INTEREST OF LESSOR TO AND IN THIS LEASE AND THE EQUIPMENT TO MERCEDES-BENZ CREDIT CORPORATION, AND THAT LESSEE ACCEPTS THE TERMS AND CONDITIONS OF THIS LEASE.
>
> . . .
>
> [Title and Signature Lines for Lessee]
>
> BY SIGNING BELOW, LESSOR ACCEPTS THE TERMS AND CONDITIONS OF THIS LEASE AND ASSIGNS ALL RIGHT, TITLE AND INTEREST TO AND IN THIS LEASE AND THE EQUIPMENT TO MERCEDES-BENZ CREDIT CORPORATION PURSUANT TO THE TERMS OF THE EQUIPMENT PURCHASE AND LEASE ASSIGNMENT AGREEMENT BY AND BETWEEN LESSOR AND MERCEDES-BENZ CORPORATION.
>
> [Title and Signature Lines for Lessor]

Lease Agreement at 1-4.

Attached to the Lease Agreement is Lease Schedule A [doc. #93], Ex. A, which identified the Truck as the subject "Equipment" and provided that the Truck was available for use and placed in service by Hensley on the delivery date, which was specified as January 16, 1998. In addition, in upper case letters just above the signature lines for Hensley and Kentucky Freightliner, Schedule A reiterated:

> LESSOR AND LESSEE HEREBY ACKNOWLEDGE THAT LESSOR'S SIGNATURE ON THIS LEASE SCHEDULE SHALL CONSTITUTE AN ASSIGNMENT OF ALL LESSOR'S RIGHT, TITLE, AND INTEREST IN AND TO THIS SCHEDULE AND THE EQUIPMENT LEASED HEREUNDER TO MERCEDES-BENZ CREDIT CORPORATION PURSUANT TO THE TERMS OF THE EQUIPMENT PURCHASE AND LEASE ASSIGNMENT AGREEMENT BY AND BETWEEN LESSOR AND MERCEDES-BENZ CREDIT CORPORATION.

*See id.*

An invoice dated January 21, 1998 [doc. #91], Ex. B, reveals that MBCC paid Kentucky

Freightliner for the Truck in a bifurcated manner standard for its financing transactions with dealers. The first step entailed wiring to Kentucky Freightliner the excess of the retail cost over the wholesale cost plus a dealer fee but minus Hensley's down payment. The second step was essentially a cancellation of the debt owed by Freightliner Kentucky to MBCC for MBCC's financing of the wholesale purchase of the truck. This latter step is memorialized on the books of MBCC by moving the wholesale purchase price from an asset in its inventory financing to a receivable due from Hensley. Hartshorn Depo. at 48-51.

Ultimately, the Truck was operated by Scottie Wightman in the course of his employment with Hensley when it was involved in the motor vehicle accident giving rise to the present case.

## II.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). The "District Court must resolve any factual issues of controversy in favor of the non-moving party," *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990), mindful that its ultimate concern is to ascertain "whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

Conn. Gen. Stat. § 52-572n(a)[5] provides, "[a] product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers . . ." In turn, Conn. Gen. Stat. § 52-572m(a) provides,

> "Product seller" means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller" also includes lessors, or bailors of products who are engaged in the business of leasing or bailment of products.

"Whether [a] defendant is a 'product seller' is a question of law for the court to decide." *Stanko v. Bader*, No. CV030193669, 2003 WL 22413476, at *2 (Conn. Super. Ct. Oct. 7, 2003) (citing *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 72 (1990)).

The Connecticut Supreme Court has rarely discussed the contours and considerations applicable to the analysis of determining whether an entity fits within the statutory definition of "product seller."[6] MBCC cited only four cases in its brief on the interpretation of the term

---

[5] Although both Svege and MBCC refer to Pennsylvania law in footnotes to their briefs, neither contests the applicability of Connecticut law to the pending motion. Accordingly, the Court will analyze whether MBCC is a "product seller" under Connecticut law.

[6] The CPLA is based on the Draft Uniform Product Liability Law ("Draft Act"), 44 Fed. Reg. 2296-3019 (1979), not the Model Uniform Product Liability Act ("Model Act"), 44 Fed. Reg. 62,714-50 (1979). *See Elliot v. Sears, Roebuck & Co.*, 229 Conn. 500, 711-12 (1994); *see also Vitanza v. Upjohn Co.*, 257 Conn. 365, 386-88 (2001), *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 230-31 (1997). Thus, it is "not mere coincidence[]" that "[t]he definition of "product seller" provided by § 52-572m(a) is identical to the definition provided by § 102(1) of the [Draft Act] . . . ," *Truglio v. Hayes Constr. Co.*, 66 Conn. App. 681, 685 (2001), and, where the Connecticut Legislature saw fit to adopt the Draft Act verbatim or nearly so, the Connecticut Supreme Court has directed judicial interpretation to take guidance from the commentary to it. *See Vitanza*, 257 Conn. at 387; *see also Potter*, 241 Conn. at 230-31; *Elliot*, 241 Conn. at 714; *Truglio*, 66 Conn. App. at 685. In the present case, the commentary to § 102(1) of the Draft Act does not provide substantive guidance on whether MBCC's financing and other activities related to the purchase and lease of the Truck are sufficient to bring MBCC within the scope of the definition of "product seller." *See* 44 Fed. Reg. 3003.

"product seller," two of which are from the Connecticut Superior Court, one from the District of Connecticut, and one from the Connecticut Appellate Court. Mem. in Supp. of Mot. for Summ. J. at 4. The Appellate Court decision, *Desnoyers v. Wells*, 4 Conn. App. 666 (Conn. App. Ct. 1985) has little if any applicability to this case[7] and the trial court decisions are discussed below. Svege's opposition correspondingly provided no additional case law interpreting the CPLA's "product seller." *See* Mem. in Opp'n to Mot. for Summ. J. [doc. #93].

In *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 71-73 (1990), the Connecticut Supreme Court held, as a matter of law, that General Motors Corporation ("GM") in the role of a trademark licensor was not a "product seller" within the meaning of Conn. Gen. Stat. § 52-572m(a).[8] Under the facts of *Burkert*, GM's "role as a trademark licensor was unusually

---

[7] MBCC's cites *Desnoyers* as an instance in which a court "recognized that summary judgment is appropriate when the documents submitted establish that the defendant did not design, manufacture or distribute the product in question." Mem. in Supp. of Mot. for Summ. J. at 4. However, the court in *Desnoyers* did not purport to construe "product seller," and it was uncontradicted that the defendant did not manufacture, purchase, import, distribute, or sell the chain saw which allegedly injured the plaintiff "since the defendant did not come into existence until the following year." *Desnoyers*, 4 Conn. App. at 668. Furthermore, the court observed that the plaintiff failed to file an affidavit in opposition to defendant's motion for summary judgment stating that "he could not for some reason present facts essential to justify his opposition which would authorize the court to deny the summary judgment motion or to grant a continuance to allow an opportunity to gather additional facts." *Id.* at 668. Therefore, neither the facts nor the legal issues addressed in *Desnoyers* are applicable to the present case.

[8] The trial court had submitted the question of whether GM was a "product seller" to the jury, and, on appeal, Burkert argued that such submission was error. The Connecticut Supreme Court agreed that the facts presented at trial demonstrated as a matter of law that GM was not a "product seller," *id.* at 72, and thus that ultimate resolution of whether an entity is a "product seller" within the meaning of Conn. Gen. Stat. § 52-572m(a) was a question of law for the court (which correspondingly may properly be answered at the summary judgment stage), *see, e.g., Wallace v. Gerard Med., Inc.*, No. CV000274660S, 2003 WL 1995910, at *2 (Conn. Super. Ct. April 7, 2003) ("Whether the defendant is a product seller is a question of law for the court to decide"). Nevertheless, *Burkert* leaves room for the submission of fact questions to the jury where the answers are predicates for making the legal determination of "product seller" status.

10

limited," *id.* at 68, and comprised permitting third parties to use GM's trademark to sell automatic transmission fluid after the lubricant had passed roughly 20 separate performance tests at one of two GM approved laboratories. *See id.* However: 1) GM exercised no control over the actual transmission fluid formulations; 2) the physical and chemical properties of tested fluids varied; 3) no one at GM was aware of the secret formulations of the tested fluids; 4) GM received no royalties or other financial benefits from the licensing program; 5) GM had established the program not as a marketing scheme to generate income or to promote visibility in the marketplace but to ensure an adequate supply of quality lubricant to meet its needs; 6) GM provided little supervision on the production and distribution of lubricant after it had passed performance tests and been licensed; 7) GM provided no educational literature or seminars to licensees on production and quality control matters; 8) GM did not test fluid samples after they were on the market to ensure that they continued to pass GM's performance specifications; and 9) GM did not warn purchasers of potential problems with the product. *See id.* at 68-69. On these facts, the Connecticut Supreme Court concluded that because GM had done "no more than allow others to use its Dexron(R) II trademark in the production, marketing and distribution of transmission fluid," *id.* at 72, and "absent any further involvement in the stream of commerce," *id.*, GM was "[p]lainly . . . not the manufacturer, wholesaler, distributor, retailer, lessor or bailor of the defective transmission fluid, and not otherwise 'engaged in the business of selling' the product." *Id.*

---

For example, a jury might be called upon to resolve a factual dispute regarding the extent of a defendant's participation in moving a product through the stream of commerce, an inquiry that is critical to resolution of an entity's status as a product seller. In this case, however, the Court concludes that there are no genuine issues of material fact that require submission to the jury.

11

In rejecting the argument that "GM was so involved in the stream of commerce that it should be held liable as an 'apparent manufacturer' under theories of negligence and strict tort liability," *id.* at 73, 77-82, the Supreme Court in *Burkert* further explained the notion of "further involvement in the stream of commerce," suggesting several factors as indicative of significant involvement in bringing a product to market, including taking title to a product in the process of distribution, deriving substantial economic benefit from pre-distribution agreements, and engaging in an active advertising campaign to promote sales of the product. *See id.*

*Burkert* teaches that whether an entity is sufficiently involved in the stream of commerce of a product to be a "product seller" under the CPLA requires a fact intensive, case-by-case assessment. While *Burkert* dealt specifically with a trademark licensor, there is nothing in the language of the Supreme Court's opinion or its logic that would justify confining the court's approach to trademark licensors alone. Accordingly, the Court concludes that the fact-specific approach delineated by the Connecticut Supreme Court in *Burkert* governs MBCC's motion in this case. Utilizing the *Burkert* approach, the Court further concludes that, based upon the undisputed transactional and documentary evidence in the record, and without the necessity of further fact finding by a jury, *see supra* note 7, MBCC is a "product seller" within the meaning of Conn. Gen. Stat. § 52-572m(a) as a result of MBCC's significant participation and involvement in the stream of commerce that brought the Truck and thousands like it on an annual basis into the hands of end users.

The Assignment Agreement with Kentucky Freightliner was similar or identical to the agreements MBCC had in place across the United States with every dealer who sold trucks made by Freightliner Corporation. Under it, a dealer was obligated to ensure MBCC was both title

12

owner and lessor of a truck before the lessee was permitted to use the truck. The Lease Agreement executed in connection with the sale and leasing of the Truck on its face fulfilled this mandate: lessor Kentucky Freightliner simultaneous with the inking of its signature transferred all right, title, and interest to MBCC in accord with the Assignment Agreement. The equivalent to the Lease Agreement was executed by dealers and lessees 6,604 times in 1998 alone, and all 6,604 of the subject trucks were part of the larger 80,000 Freightliner trucks for which MBCC provided wholesale financing to Freightliner dealers.

The Lease Financing Commitment reveals that the Truck was purchased pursuant to the Success Program, a standard form of marketing device developed by *MBCC* and jointly deployed with Freightliner to induce prospective buyers to purchase Freightliner trucks through various means, including the use of print media featuring Freightliner's and MBCC's respective logos and enticing offers. *See* Lease Financing Commitment [doc. #91], Ex. B. In addition, MBCC's financing of 40% of Freightliner dealers' inventory and a substantial percentage of retail sales, its contractual right under the Assignment Agreement to force a dealer to perform proper pre-delivery servicing, Freightliner's desire that MBCC provide more financing during the relevant time period, and MBCC's significant role in marketing Freightliner trucks demonstrate enough market participation by MBCC for the Court to conclude that MBCC was, at a minimum, in a position equivalent to a "distributor or retailer who is engaged in the business of selling such products" or to "lessors or bailors of products who are engaged in the business of leasing or bailment of products," within the meaning of Conn. Gen. Stat. § 52-72m(a). In addition, the Lease Agreement evinces MBCC's intent to retake the Truck at the end of the lease term and sell it for at least 25% of its projected residual value with the lessee having no rights to purchase the

13

Truck. Lease Agreement [doc. #93], Ex. A, ¶¶ 15, 16.

In summary, MBCC's critical role in developing a program to finance inventory to dealer showrooms, to promote dealer sales of Freightliner trucks to end users through programs like the Success Program, to finance trucks at retail for buyers, as well as its taking title owner and lessor status of all trucks for which it provides retail financing before the lessee is permitted to use the truck, taken collectively lead the Court to conclude that MBCC's role in putting Freightliner trucks into the stream of commerce is sufficiently developed and pervasive to justify concluding MBCC is a "product seller" for purposes of the CPLA.

MBCC disputes this outcome, citing the Court to three decisions interpreting Connecticut law in a manner MBCC claims entitles it to summary judgment: *Am. Honda Fin. Corp. v. Dore*, No. CV9870159312, 1998 WL 568717, at *3 (Conn. Super. Aug. 24, 1998), *Mundaca Inv. Corp. v. Daddona*, No. CV950144551S, 1996 WL 24574, at *4-5 (Conn. Super. Jan. 4, 1996), and *Marron v. H.O. Penn Mach. Co.*, 518 F. Supp. 1069, 1072-73 (D. Conn. 1981). Mem. in Supp. of Mot. for. Summ. J. at 4. The Court does not take issue with the holdings of any of these decisions. However, none of those decisions convinces the Court that its conclusion on the particular facts of this case is wrong.

For example, *Marron*, the cornerstone decision that both *Mundaca* and *Dore* cite as authoritative, primarily held that a lessee of a forklift could not escape its contractual obligation to indemnify the owner/lessor for the tortious use of the forklift merely because the owner/lessor had given a security interest in the forklift and assigned the rentals due under the lease to the party that had loaned the funds the owner/lessor used to purchase the forklift. *See Marron*, 518 F. Supp. at 1072-73. The district court's holding was rooted in the fact that "[n]either the lease

14

itself nor title to the leased forklift truck was assigned to [the secured party]." *See id.* at 1073. The court thus correspondingly concluded that Conn. Gen. Stat. § 42a-9-317, which provides that "[t]he *mere existence* of a security interest . . . does not impose contract or tort liability upon the secured party for the debtor's acts or omissions," controlled and therefore the secured party could not be held liable for any tortious conduct of the lessor and correspondingly that the lessor's contractual right of indemnity did not become that of the secured party.[9] *Id.* (emphasis added). In contrast to the facts in the present case, the court in *Marron* explicitly noted that the secured party was assigned neither the lease nor the title to the forklift.

As to *Mundaca*, the Court notes as an initial matter that it is very difficult to piece together the exact facts leading to the decision's conclusions. In light of the procedural posture of the opinion, a ruling on a motion to strike, the ambiguity appears to have resulted from difficulty in construing the pleadings. *See e.g., Mundaca*, 1996 WL 24574 at *5 ("Apparently, at the time of . . ."). Notwithstanding the lack of clarity, however, the Superior Court rejected counterclaims for negligence and breach of contract against Mundaca as purchaser and assignee of the note and mortgage on the property which suffered water damage from a roof fire. The court declined to hold Mundaca liable for several reasons, the upshot of which was that Mundaca was not "even minimally involved in the circumstances" giving rise to the events that caused the water damage, and that Mundaca was not liable "*merely* by virtue of having purchased the note

---

[9] MBCC cites Conn. Gen. Stat. § 42a-9-317 in its reply brief for the proposition that MBCC's inventory financing of Freightliner trucks for dealers cannot make MBCC liable as a "product seller" under the CPLA. Assuming *arguendo* this proposition is correct, it would not change the Court's analysis. MBCC's inventory financing cannot be viewed in isolation but must rather under *Burkert* must be seen as a part of the overall facts and circumstances evincing MBCC's significant role in putting Freightliner trucks into the stream of commerce.

and mortgage" and "taking assignment of such documents." *See id.* at *4-5 (emphasis added).

Finally, although *Dore* has a surface similarity to the present case, the similarity evaporates upon scrutiny. In *Dore*, Higgins Motors, Inc. ("Higgins") entered into a lease agreement with Dore for a 1993 Acura Legend, and then assigned the lease to American Honda, which also held a security interest in the leased vehicle (perhaps indicating that it had financed the vehicle for Higgins' inventory). *See Dore*, 1998 WL 568717 at *1. Counterclaiming against American Honda's suit for a deficiency judgment after foreclosure sale, Dore asserted a product liability claim under the CPLA based on alleged injuries his wife sustained in connection with the alleged malfunctioning of the Acura's supplemental restraint system. *See id.* The Superior Court granted American Honda's motion for summary judgment on Dore's counterclaim on the ground that American Honda was not a "product seller" as defined in Conn. Gen. Stat. § 52-572m(a). However, the decision was predicated on Dore's failure to dispute that conclusion and on the court's rejection of Dore's more expansive categorical argument that "American Honda may be liable under the Product Liability Act because it was assigned the lease from a product seller." *Id.* At *3. As the court held, "'Under Connecticut law, an assignment relationship does not *automatically* impute the liability in negligence of the assignor to the assignee.'" *Id.* at *3 (quoting *Mundaca*, 1996 WL 24574, at *4) (emphasis added).

The Court fully agrees with *Dore* and recognizes – indeed emphasizes – that under Connecticut law an assignment relationship does not *automatically* render an assignee a "product seller." Therefore, nothing in this decision should be construed as a general holding making all lease assignees or all entities providing vehicle financing automatically liable as product sellers

16

under the CPLA.[10] Instead, the Court's holding in this case is a narrow and very fact-specific one. The present case, in contrast to *Mundaca* and *Dore*, does not involve a mere assignment of a note or lease or the mere provision of vehicle financing. Instead, the undisputed facts show MBCC's critical involvement and extensive engagement in the stream of commerce that brought Freightliner trucks in general, and the Truck in particular, to the consuming public. Using, as this Court must, the approach to the CPLA endorsed by the Connecticut Supreme Court in *Burkert*, the Court concludes that those particular facts are sufficient to qualify MBCC as a "product seller" within the meaning of Conn. Gen. Stat. § 52-72m(a).

### IV. Conclusion

For the reasons set forth above, defendant MBCC's Motion for Summary Judgment [doc. #90] is DENIED.

---

[10] MBCC has not here argued and the Court therefore does not address whether MBCC should prevail on the theory that the Connecticut Supreme Court would adopt the position of those legal authorities that have rejected strict products liability for entities performing the role of "finance lessor." *See* Wash. Rev. Code § 7.72.010(1)(d) (". . . The term "product seller" does not include: A finance lessor . . . , one who acts in a financial capacity who is not a manufacturer, wholesaler, distributor, or retailer, and who leases a product without having a reasonable opportunity to inspect and discover defects in the product, under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor . . . "); *Nath v. Nat'l Equip. Leasing Corp.*, 497 Pa. 126 (1981) (an oft-quoted decision of the Pennsylvania Supreme Court in which the policy arguments for and against exempting "finance lessors" from the chain of strict products liability are explored by both majority and dissent); *see also Wright v. Newman*, 735 F.2d 1073, 1075, 1077-78 (8th Cir. 1984); *ABCO Metals Corp. v. Equico Lessors, Inc.*, 721 F.2d 583, 584 (7th Cir. 1983). The Washington statute cited above, Wash. Rev. Code § 7.72.010(1)(d), is identical to a portion of the definition of "product seller" found in the Model Act, 44 Fed. Reg. 62,717, but not in the earlier Draft Act on which the CPLA is modeled. *Compare* Conn. Gen. Stat. §§ 52-572m(a) *with* § 102(1) of the Draft Uniform Product Liability Law (draft act), 44 Fed. Reg. 2996, 2997-98 (1979); *see supra* note 6. The Court, therefore, has no occasion in this case to consider the Model Act or its definition of "product seller."

IT IS SO ORDERED

_____
Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: July 22, 2004.