UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALICE G. SVEGE, ADMINISTRATRIX, ET AL. | : | CIVIL NO. 3:01 CV 01771 (MRK) |
| Plaintiffs, | : | |
| -vs- | : | |
| MERCEDES-BENZ CREDIT CORPORATION, ET AL. | : | September 1, 2004 |
| Defendants. | : | |

**PLAINTIFFS' RULE 59 MOTION FOR
A NEW TRIAL UPON THE GROUNDS
THAT THE JURY'S FINDINGS WERE
AGAINST THE WEIGHT OF EVIDENCE**

Pursuant to Rule 59, F.R.C.P., plaintiffs' move to set aside the jury verdict as against the weight of evidence and for a new trial.

A less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law. Katara v. D.E. James Commodities, Inc., 835 F.2nd 966, 970 (2nd Cir. 1987).

"The District Court's grant of a new trial motion is usually warranted only if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Sorlucco v. New York City Police Department, 971 F.2nd 864, 875 (2nd Cir. 1992) quoting Smith v. Lightening Bolt Productions, Inc., 861 F.2nd 363, 370 (2nd Cir. 1988).

Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence to support the jury's verdict. Song v. Ives Laboratories, Inc., 957 F.2nd 1041, 1047 (2nd Cir. 1992).

In evaluating a motion for a new trial, the court "is free to weight the evidence...and need not view it in the light most favorable to the verdict winner." Bovevina v. Saydjari, 574 F.2nd 676, 684 (2nd Cir. 1978).

A copy of the verdict form and the findings of the jury is annexed as Exhibit A.

I. **REVIEW OF THE RECORD FOR SUBSTANTIAL EVIDENCE TO SUPPORT THE VERDICT WILL SHOW THAT IT WAS GREATLY OUTWEIGHED ON THE SCALES BY THE PLAINTIFFS' EVIDENCE.**

Stated simply, it was defendants' contention at trial that the only cause for the loss of control of the tractor-trailer was the negligence of the driver, Scottie Wightman, and he was solely responsible for the accident.

After plaintiffs rested their *prima facie* case, the defendants' case consisted of calling three (3) expert witnesses.

The first, William A. Howerton, testified as an accident reconstructionist.

Mr. Howerton never testified on direct and conceded on cross-examination that he did not know and had no opinion as to what caused the loss of control of the subject tractor-trailer.

His simulations based upon his PC Crash and EDSMAC analysis and reconstruction of the accident assumed a start value of sixty (60) miles per hour for the tractor-trailer before loss of control, but Mr. Howerton never contended that speed was a factor in the loss of control.

On the contrary, Mr. Howerton's testimony and opinion was that the engine brake could not cause loss of control under the conditions that existed in the tractor or on the roadway based upon his calculations in evidence that the torque at the rear axles of the tractor would not be sufficient to break traction which was necessary to cause loss of traction and loss of control.

The above opinion is negated by the jury when it found that plaintiffs proved by a preponderance of the evidence that defendants in this case were negligent in failing to adequately

warn and instruct that the use of the engine brake on a wet and slippery road could lead to loss of control.

The second expert witness for defendants was defendant Freightliner's electrical engineer, Donald Barnes.

At no time during his testimony did Mr. Barnes offer an opinion as to the cause of the loss of control of the tractor-trailer, and more specifically, never offered any testimony or opinion that the speed of the tractor-trailer had anything to do with the accident.

What Mr. Barnes did testify to was his opinion that the ABS computer had an independent capacity, not dependent on the driver's application of the service brake, to send a data link message turning off the engine brake whenever its monitoring of the wheel sensors of the rear axles of the tractor revealed wheel slip or deceleration sufficient to meet the algorithm parameters for impending wheel lockup. Therefore, Mr. Barnes opined the engine brake could not cause loss of vehicle control on a wet and slippery road surface, and the warning contained in the Freightliner Driver's Manual that he engine brake could cause such a loss of vehicle control was "redundant".

Mr. Barnes admitted that he had searched the Freightliner test department records and elsewhere but had not found nor does he know of any written documentation that exists that supports his testimony about this independent capacity of the ABS computer to disengage the engine brake.

He testified that he did bench tests that show this capacity, but has no written reports.

As well, Barnes testified that Bruce Koepke's demonstrations with a tractor bobtail in a railroad yard on railroad tracks and gravel on dry Summer days supports what he says, but admits that there are no written reports of these demonstrations which were not peer-reviewed and were

not instrumented to verify what was taking place as is the procedure of the Freightliner testing department.

Mr. Barnes' opinion of the independent capacity to disengage the engagement brake was negated by the jury when it found that plaintiffs proved by a preponderance of the evidence that defendants in this case were negligent in failing to adequately warn and instruct that the use of the engine brake on a wet and slippery road could lead to loss of control.

The third and final defendants' expert witness was Bruce Koepke, a defendant Freightliner employee since 1977 and who is a licensed professional engineer.

Mr. Koepke admitted to presently spending 70% of his time with litigation in defense of claims brought against Freightliner, and having participated in approximately 200 cases involving claims and litigation against Freightliner.

Although Mr. Koepke has had a CDL for 25 years, his driving experience was approximately 10,000 miles.

Mr. Koepke, like his co-employee Donald Barnes, opined that the engine brake could not cause loss of control of the tractor-trailer because its ABS computer had the independent capacity, without the need of a service brake application by the driver, to disengage the engine brake whenever the wheel sensors in the rear axles of the tractor indicated that impending lockup would take place.

Like Barnes, Mr. Koepke testified that he had searched and found no written documentation that he knew of that this independent capacity existed.

Mr. Koepke testified to and showed the jury a video of his demonstration in August of 2003 when he drove a tractor bobtail in a railroad yard across gravel on a dry and sunny day.

occurred.

However, Mr. Koepke admitted on cross-examination that his calculations did not factor in the curve, lateral acceleration, or the speed of the tractor-trailer.

Mr. Koepke, like the other two defendants' experts, never considered speed of the tractor-trailer as a cause of the loss of control

## II. THE JURY'S FINDINGS, OTHER THAN THOSE THAT FOUND THE DEFENDANTS NEGLIGENT FOR FAILURE TO WARN AND TO TEST, WERE AGAINST THE WEIGHT OF EVIDENCE.

This case is premised on plaintiffs' claim that use of the engine brake on the subject tractor on a curve of a wet and slippery Pennsylvania Turnpike road was the primary cause of the tractor-trailer driven by Scottie Wightman losing control and crossing over the concrete median barrier into the opposite lanes of traffic, striking the Svege SUV, killing Thor Svege, Sr., and seriously injuring his two children, Thor Svege, Jr. and Brianna Svege.

The jury found, by answer to Interrogatories, that the defendants were negligent in failing to adequately warn and instruct that the use of the engine brake on a wet and slippery roadway could lead to loss of control, and in not having tested the engine brakes despite having used engine brakes since 1976.

Despite a contrary view taken by defendants' experts at trial who labeled defendant, Freightliner's admission "redundant", there was little doubt or issue at trial that Freightliner admitted that it knew that use of an engine brake on a wet and slippery roadway can cause loss of vehicle control, and defendant Freightliner had inserted that warning in its approximately 260 page Driver's Manual.

In evidence at this trial is an SAE report of driver-controlled vehicle tests titled "Directional Control of Retarder-Equipped Heavy Trucks Operating on Slippery Surfaces" conducted by R.W. Radlinski on behalf of and funded by the Vehicle Research and Test Center, National Highway Traffic Safety Administration. (Exhibit 28).

6

The tests were, in many respects, similar to the accident sequence in this case and concluded that a tractor-trailer entering a curve on a wet and slippery roadway will jackknife when the retarder is turned on at 2 seconds after the beginning of the turning maneuver. The driver would only have 0.5 seconds to react before the jackknife approaches an uncontrollable level of articulation.

Since perception and reaction time is accepted as 1.5 seconds, an engine brake induced tractor jackknife is tantamount to irreversible loss of control.

Along with the Driver's Manual, Freightliner included the Jacobs Vehicle Systems Professional Drivers Techniques Manual which stated that driving on wet and slippery roads is unpredictable, but advising that drivers experienced on dry roads could drive on wet and slippery roads, but that if a "fishtail" or loss of traction occurred, to turn off the engine brake switch.

The driver of the tractor-trailer testified that it was his intention and practice not to use the engine brake in wet weather, but he had no independent recollection of whether the engine brake switches were on or off, at the time he took his foot off the throttle after going into a curve on a wet highway, then hearing a "popping" sound (characteristic noise of engine brake) before going into a tractor jackknife and losing directional control of his vehicle.

An inspection of the tractor after the accident found the engine brake switches in the "ON" position, although one was broken. (Photograph, Exhibit 11).

What the defendants failed to communicate and warn, and, in fact, have concealed, is the full seriousness of the problem. Namely, that an engine-brake-induced jackknife can come about so suddenly, that with the typical driver reaction time, drivers like the driver of this tractor, with 16 years experience, cannot recognize the critical condition they are in before the jackknife is at the point of no return and loss of control is irreversible.

7

Defendants Freightliner and Detroit Diesel are SAE members and as manufacturers or sellers are held to be experts. As an expert, the manufacturer or seller is required to keep abreast of scientific and technological knowledge and discoveries, and is conclusively presumed to know all available scientific and technological information. Foreseeability of injury should be considered in light of defendant's status as a expert in it field. Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1089 (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974); Dartez v. Fibreboard Corp., 765 F.2d 456, 461 (5th Cir. 1985); Wright v. Carter Products, 244, F.2d 53, 59 (2d Cir. 1957); Prosser & Keeton, Law of Torts, §96 at 689 (5th ed. 1984).

It is plaintiffs' position that defendant product sellers could reasonably foresee that operator's of their tractors, like Scottie Wightman, could lose control of a tractor-trailer if the engine brake was enabled when the vehicle went into a curve on a wet and slippery roadway.

Foreseeability on a negligence theory is crucial, but inapplicable in establishing causation in a failure to warn case under the CPLA. Sharp v. Wyatt, *supra.*

The jury has also heard deposition testimony of Scottie Wightman that he never looked to see if the engine brake switch was "ON" at any time during the course of driving eastbound that day on the Pennsylvania Turnpike. He testifies on Page 154, Line 4:

> "Q. Did you actually look at the speedometer at any time prior to the accident near the time of the accident to determine what your speed actually was?
>
> A. Yes.
>
> Q. And how long in advance of the accident had that happened?
>
> A. Seconds.
>
> Q. What was the reason that you were looking at your speedometer at that point in time?
>
> A. It's common practice to do what they call a sweeping motion, where you look in the left mirror, you look at the road, down

8

>       at your instrumentation, back to the road, right mirror, back to the road, back to instrumentation.
>
> Q.    And the sweeping sequence that you described would begin on the right side of the vehicle?
>
> A.    The left.
>
> Q.    I'm sorry. The left, the driver's side, correct?
>
> A.    Correct.
>
> Q.    And you'd begin by looking at your mirrors?
>
> A.    Correct.
>
> Q.    And then sweep the horizon for your roadway and your instruments?
>
> A.    You would look into the left mirror, directly at the road in front of you, a quick glance at instrumentation, back to the road, to the right mirror, back to the road, and back to the instrumentation.
>
> Q.    Okay. When you refer to instrumentation, would that include the electronic switch for the engine brake that is –
>
> A.    In some instances, yes.
>
> Q.    Was that part of your routine to check that as part of your instrumentation as you commonly did your sweeps?
>
> A.    In this particular incident, no.
>
> Q.    How about during the course of driving eastbound on the Pennsylvania turnpike that day prior to the accident?
>
> A.    No, I never looked to see if it was on."

The jury also heard evidence from Mr. Wightman that if the engine brake was on at the time of the accident, there was no way he would think to turn it off. Page 59, Line 3.

> "Q.   I'm speaking about – we're talking about at the time of the accident. When you say you don't know whether it was on or wasn't on, wouldn't the first thing you would do before you started steering be to turn off the engine brake?
>
> A.    If it was off, there would be no need to reach and turn if off.

9

> Q. But if it was on, would that be the first thing you would do?
>
> A. In reaction time, no.
>
> Q. So the first thing you would do would be to steer the vehicle in the way you said you did?
>
> A. You are correct.
>
> Q. And the second thing would be to apply the hand brake –
>
> A. Yes.
>
> Q. -- to the trailer. And the third thing would be to drop gears?
>
> A. Yes.
>
> Q. And when would you turn off the engine brake?
>
> A. If the engine brake would have been on at that particular time, thee is no way that you would think to reach and turn it off."

Plaintiffs contend that defendants did not give an adequate warning since it did not disclose the catastrophic consequences of irreversible loss of control caused by jackknifing, which once initiated, occurs at a rate too rapid for drivers to control.

Furthermore, there was no warning present when and where needed, namely, on the dashboard.

Plaintiffs have offered, and there is in evidence, Exhibit 33, an alternate design for their warning claim both an Engine Brake Active Light as well as a Service Brake Control of Engine Brakes, both designed and made available to Freightliner by Detroit Diesel, and already wired into the subject tractor, but never made operational by Freightliner.

The Service Brake Control of Engine Brakes would allow the dash-mounted engine brake switch to be set to the ON position but not engage the engine brakes until the service brake is pressed.

Plaintiffs' expert John C. Glennon, Jr. has testified to his opinion that the Service Brake Control of the Engine Brakes would have prevented this accident because placing the operator's foot on the service brake to enable the engine brake in wet and slippery weather would permit the driver to timely access the ABS system and stabilize the wheel speeds on all the wheels of the tractor-trailer combination, if a sudden tractor jackknife is initiated.

Defendants did not controvert this opinion at trial.

Plaintiffs' alternate design would be limited to inclement weather by a transfer switch (Exhibit 39) which would then also permit the engine brake to be enabled by release of the throttle in good weather in the usual manner.

The Engine Brake Active Light on the dashboard of the tractor would go on and remain on whenever the engine brake is active.

Samuel J. Sero, P.E., plaintiffs' electrical and electronics expert testified as to the feasibility of these Detroit Diesel options, how to use transfer switches to retain the advantage of engine brake use in good weather and how to limit its disadvantages of causing loss of control in bad weather conditions. Mr. Sero was not cross-examined on the use of transfer switches or its feasibility, and it is a non-issue.

Mr. Sero testified that making the Service Brake Control operational with transfer switches was cost-effective amounting from $5.00 to $7.00.

He also testified to the cost-effectiveness of the Active Engine Brake Light as the cost of basically drilling a hole in the dashboard and purchasing some wiring.

Also introduced as evidence in this trial is expert opinion in the form of a chart taken from "*What Is a Warning and When Will It Work?* from <u>Proceedings of the Human Factors Society</u>, Page 427. (Exhibit 607).

Plaintiffs' expert John C. Glennon, Jr. has testified to his opinion that the Service Brake Control of the Engine Brakes would have prevented this accident because placing the operator's foot on the service brake to enable the engine brake in wet and slippery weather would permit the driver to timely access the ABS system and stabilize the wheel speeds on all the wheels of the tractor-trailer combination, if a sudden tractor jackknife is initiated.

Defendants did not controvert this opinion at trial.

Plaintiffs' alternate design would be limited to inclement weather by a transfer switch (Exhibit 39) which would then also permit the engine brake to be enabled by release of the throttle in good weather in the usual manner.

The Engine Brake Active Light on the dashboard of the tractor would go on and remain on whenever the engine brake is active.

Samuel J. Sero, P.E., plaintiffs' electrical and electronics expert testified as to the feasibility of these Detroit Diesel options, how to use transfer switches to retain the advantage of engine brake use in good weather and how to limit its disadvantages of causing loss of control in bad weather conditions. Mr. Sero was not cross-examined on the use of transfer switches or its feasibility, and it is a non-issue.

Mr. Sero testified that making the Service Brake Control operational with transfer switches was cost-effective amounting from $5.00 to $7.00.

He also testified to the cost-effectiveness of the Active Engine Brake Light as the cost of basically drilling a hole in the dashboard and purchasing some wiring.

Also introduced as evidence in this trial is expert opinion in the form of a chart taken from "*What Is a Warning and When Will It Work?* from Proceedings of the Human Factors Society, Page 427. (Exhibit 607).

The chart establishes and supports plaintiffs' premise that there was no warning present when and where needed, namely, on the dashboard.

Critical issue of defectiveness under failure to warn provision of CPLA depends not on whether product itself is defective, but, rather, on whether warnings are necessary, and, if so, whether they are adequate. Sharp v. Wyatt, 31 Conn. App. 824, 627A.2nd 1347 (1993).

Further, under the evidence and proof submitted at trial, most of which was not controverted, for the jury to find that this tractor-trailer, being operated on an interstate highway when it uses an engine brake in wet weather on a slippery pavement, conditions admittedly known to cause loss of vehicle control, is not unreasonably dangerous, and to find further that a tractor-trailer, where there is evidence of credible testing by the National Highway Safety Administration that when the engine brake is enabled on a curve on wet and slippery pavement, loss of traction, once initiated, leads to irreversible loss of control, the tractor, is not unreasonably dangerous, is against the weight of the credible evidence.

### III. THE SVEGE AND DENSBERGER CASES ARE SIMILAR AND JURY'S RESPONSE OF NO PROXIMATE CAUSE IS AGAINST THE WEIGHT OF EVIDENCE.

The Svege case is strikingly similar to Densberger v. United Technologies, Corp., 125 F.Supp. 2nd J85 (D. Conn. 2000) where a jury verdict that defendant had negligently failed to warn that an ESS Kit installed on a helicopter could cause the helicopter to become uncontrollable was affirmed by the Second Circuit, 297 F.3rd 65.

The helicopter did become uncontrollable in flight and crashed leading to death and personal injury to its occupants.

Just like in the Svege case, no human factors expert testified in Densberger, *supra* that had an adequate warning been given the pilot would have heeded the warning and the pilot's

behavior would have changed so that no harm would come to the helicopter's occupants. Nor was there such testimony from any other source.

The defendants in Svege like those in Densberger maintain that the plaintiff failed to present any evidence that defendants' failure to have an adequate warning was causally related to the harm that came to plaintiffs.

Whether or not there had been a warning, defendants say Scottie Wightman might well have operated the tractor-trailer as he did.

Defendants' contention rests on a false premise.

When a defendants' negligent act is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that very casual tendency is evidence enough to establish a case of cause-in-fact.

The kind of negligence that the jury attributed to the defendant tends to cause exactly the kind of injury that the plaintiffs suffered.

That is what the Svege jury must have found when it decided that the defendants' failure to warn constituted negligence.

The defendants never offered any evidence whatsoever at trial to rebut the strong inference that the defendants' negligence was in fact a but-for-cause of the plaintiffs' death and injuries. Zuchowicz v. United States, 140 F.3rd 381 (2nd Cir. 1998).

That is what the jury found in Densberger, *supra.*

In the Svege case, the jury's response that the defendant was negligent in allowing a condition to exist where use of the engine brake on a wet and slippery roadway could lead to loss of vehicle control without an adequate warning and finding that defendants' negligence was not a proximate cause of plaintiffs' injuries and death was against the credible weight of the evidence.

13

At no time during the trial did defendants rebut or come forward with evidence that its negligence was not such a but-for-cause.

"Pursuant to failure to warn provision of product liability statute, cause in fact exists if issuance of adequate warnings would have prevented injury or death at issue." C.G.S.A. §52-572q(c) quoting Sharp v. Wyatt, *supra*.

Relying on negligence principles, the jury could reasonably arrive at only one conclusion with respect to proximate cause – that is that defendants' negligence was a proximate cause of the loss of control and the harm to plaintiffs.

The test for finding proximate cause is whether the harm which occurred was of the same general nature that defendant negligently failed to warn of.

Like in Densberger, *supra*, because Wightman was not aware that loss of vehicle control meant irreversible loss of control, proximate cause did not rest on what Wightman would have done if he knew, and finding of no proximate cause is against the weight of the credible evidence.

### IV. STANDARDS FOR DETERMINING WHETHER A DEFENDANT MAY BE NEGLIGENT IN FAILING TO WARN IS NOT LIMITED TO CPLA.

Circuit Judge Guido Calebrisi, writing for the Court in Densberger, *supra*, wrote as follows:

"Significantly the CPLA discusses the duty to warn in terms of product defect, that is, in terms of strict liability and liability for violation of implied warranties. *See* §52-572q(a) ("A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that *the product was defective* in that adequate warnings or instructions were not provided." (emphasis added)). The statute may therefore perhaps be read to establish standards for determining whether a product is *defective* due to a defendant's failure

14

to warn; it does not, however, establish any standards for determining when and whether a defendant may be *negligent* in failing to warn. For these standards, we must look to the common law. "[A]lthough the [CPLA] addresses some substantive aspects of a product seller's duty to warn, it does not address all of the applicable elements necessary for recovery under that theory. Those elements must be derived from Connecticut common law." *LaMontagne I*, 834 F. Supp. at 588."

V. **THERE WAS INSUFFICIENT EVIDENCE FOR THE JURY TO HAVE FOUND THAT THE DRIVER'S NEGLIGENCE WAS THE SOLE PROXIMATE CAUSE OF THE ACCIDENT OR A SUPERSEDING CAUSE OF THE ACCIDENT.**

The defendants' only claim of the driver's negligence was the speed at which the tractor-trailer was being driven.

Other than defendants' claim itself that the driver of the tractor-trailer, Scottie Wightman, was driving too fast for the prevailing conditions, there is no data to support such a conclusion.

As already set forth herein, defendants' experts never testified to an opinion that the speed of the tractor was causally related to the loss of control.

The deposition testimony read to the jury of Trooper Long, who was dispatched to the scene to investigate the accident on September 16, 1999, was that he arrived at the scene at 12:15 p.m. – more than one and one-half (1½) hours after the accident, at which time the driver of the tractor-trailer had been removed to the hospital, and Trooper Long did not interview the driver until September 28, 1999 at the hospital.

Nor was there any physical evidence at the scene available to Trooper Long to verify or estimate the speed of the tractor-trailer <u>before</u> loss of control.

Trooper Long's deposition testimony, which was the same as Wightman's deposition testimony, was that Wightman was travelling at 57-58 miles per hour as he went into the curve and took his foot off the throttle.

Mr. Wightman did not testify that speed had anything to do with his loss of control, but that when he took his foot off the throttle, he heard a popping noise, the rear axles began to slide to the left, he recognized that he was in a tractor jackknife, it came about suddenly, and he lost directional control of the vehicle.

This testimony was consistent with what he told Trooper Long at the hospital.

Trooper Long's diagram, not to scale, and his Total Station computer generated maps were consistent with showing a jackknife condition of the tractor trailer into the concrete barrier to the right of the eastbound travel lanes.

The only eyewitness was a Mr. Fiscus who, according to the police report, was travelling in the westbound lanes at 65 miles per hour and when passing saw the tractor in the eastbound lane coming off the berm with the trailer still on the berm. Mr. Fiscus said the tractor-trailer appeared to be going too fast. He gave no speed estimation.

This observation would have been made _after_ the loss of control, while Fiscus was travelling at 65 miles per hour in the opposite direction in what he described as very heavy rain.

With only the above to go on, Trooper Long concluded in his police report that Wightman was going too fast for the heavy rain conditions and lost control.

He later changed the conclusion, after completing his Investigative Report, and limited his conclusion to that Wightman was going too fast for the heavy rain conditions, leaving out loss of control.

There was no other data upon which to base any conclusion as to the speed of the tractor being a proximate cause of the accident or even a concurrent cause of the accident.